UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EMILY McINTYRE, and <br> CHRISTOPHER McINTYRE, as co-administrators <br> of the ESTATE OF JOHN L. McINTYRE <br>           Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br> H. PAUL RICO, <br> JOHN M. MORRIS, <br> JOHN J. CONNOLLY, <br> RODERICK KENNEDY, <br> ROBERT FITZPATRICK, <br> JAMES RING, <br> JAMES GREENLEAF, <br> JAMES AHEARN, <br> KEVIN J. WEEKS, <br> JAMES J. BULGER, <br> STEPHEN J. FLEMMI, and <br> JOHN DOES, Number 1-50, <br>           Defendants. | CIVIL ACTION NO. 01-10408-RCL |

MEMORANDUM AND
ORDER ON UNITED STATES' MOTION TO DISMISS

LINDSAY, District Judge.

### I. Introduction

This is a suit filed by the Estate (the "Estate") of John L. McIntyre ("John McIntyre" or "McIntyre"), of which McIntyre's mother, Emily McIntyre, and his brother, Christopher McIntyre, are co-administrators (the "plaintiffs"). The defendants are the United States of America ("United States"); several individuals, who at the times relevant to the complaint were

1



agents of the Federal Bureau of Investigation ("FBI"); and three alleged members of the Winter Hill Gang, an alleged criminal organization. The plaintiffs' claims relate to the 1984 homicide of John McIntyre. The complaint asserts fourteen counts (numbered from one to thirteen, with two counts numbered "ten"), of which seven are asserted against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. The common theme of all of the counts against the United States is that acts or omissions of the United States and its agents proximately caused the homicide of John McIntyre and the kidnapping and torture of him that preceded his death. The United States has moved to dismiss all counts against it under Fed. R. Civ. P. 12(b)(1).

## II. Background

According to the complaint, John McIntyre was the engineer on a ship called the Valhalla that had been used to attempt to deliver weapons from Massachusetts to the Irish Republican Army ("IRA") in Ireland. Compl. ¶ 245. In mid-October 1984, McIntyre revealed this information to Richard Bergeron ("Bergeron") of the Quincy Massachusetts Police Department and began to cooperate with the police. *Id.* McIntyre told Bergeron that Joseph Murray ("Murray"), the owner of the Valhalla, was connected to James J. Bulger ("Bulger"), an alleged leader of the Winter Hill Gang, and that Bulger, through his alleged criminal associates Kevin Weeks ("Weeks") and Patrick Nee ("Nee"), was involved in the Valhalla arms shipment. *Id.* ¶ 246. Bergeron arranged for agents from the United States Customs Service and the FBI to participate in the questioning of McIntyre. *Id.* ¶ 249. The complaint alleges that in October or November 1984, Bulger and his associates became aware that McIntyre was cooperating with the authorities and informing them about illegal activities carried out by Bulger and his associates. *Id.* ¶ 255. As a result, Bulger and another alleged criminal associate, Stephen Flemmi

("Flemmi"), Weeks and others kidnapped, tortured, and murdered McIntyre on or about November 30, 1984. *Id.* ¶ 256. At the time of McIntyre's murder, Bulger and Flemmi were both confidential informants for the FBI; the defendant John J. Connolly, then an FBI special agent, was their "handler." *Id.* ¶83. The complaint alleges that Connolly and other FBI agents and the FBI itself were at best negligent in failing to control Bulger and Flemmi and in failing to protect John McIntyre, *id.* ¶ 378, and at worse deflected and squelched prosecutions and criminal investigations of Bulger and Flemmi and provided information to them about confidential informants like John McIntyre, *id.* ¶ 372.

The complaint, and materials submitted by the parties in their briefing on this motion[1], include the following facts that are relevant to the questions raised by the present motion. First, the government has provided the court with a copy of the book *Valhalla's Wake: The IRA, MI6, and the Assassination of a Young American* (1989) ("*Valhalla's Wake*"), written by John Loftus ("Loftus"), then the attorney for the McIntyre family (including the plaintiffs), and Emily McIntyre. The book includes the following statements and assertions, among many others.

Before John McIntyre's disappearance, "[c]ustoms needed John [McIntyre] to take the stand against Joe Murray,[2] [Philip] Brady [of the United States Customs Service] explained. If John agreed, Brady promised that he would be admitted into the Witness Protection Program and

---

[1] On a motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), the court is permitted to look beyond the pleadings without converting the motion to one for summary judgment. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002).

[2] Murray is described in the book as an underworld associate of the "Mafia" whose territory ranged from Winter Hill, in the Boston suburb of Revere, north to the industrial city of Lynn and the bedroom communities of the North Shore. *Id.* at 2-3. Murray is also described as a man who "worked for the mob, but [who] was an Irishman just the same and a willing soldier in the provisional wing of the IRA." *Id.* at 4.

3

put forever beyond the reach of the Mob's retribution." *Id.* at 172. Later, "John couldn't believe that he was being double-crossed by grunts from Brady's office. It was obvious that customs [sic], in its typically graceless fashion, was now trying to blackmail him. If he didn't cooperate in its investigation of Joe Murray, customs [sic] would expose him as an informer to his buddies in the IRA and the Mob." *Id.* at 175.

Days after McIntyre's disappearance, his girlfriend "discovered [McInytre's] pickup in the parking lot of Murray's home-heating oil business in Charlestown. [She] knew of John's growing dread of retribution by Murray. She began to fear that Joe had kidnapped John and killed him." *Id.* at 184-85. "A few days later, the McIntyres were presented with another piece of chilling news. John's blue pickup, the same one Robbi [McIntyre's girlfriend] had spotted at Murray's, was found parked under the Neponset Bridge in Quincy." *Id.* at 187. "When [McIntyre's father] opened [an envelope the tow-truck operator had found on the pickup's dashboard], his ailing heart skipped a beat. Inside was John's VA check. If John hadn't cashed this check, thought McIntyre, he must be in real trouble. For the first time, he had some hard evidence to justify his brooding fears for his son's life." *Id.*

Some time later, Loftus reportedly had the following conversation with Assistant United States Attorney Gary Crossen ("AUSA Crossen"):

> "Was John really killed because he was a government source?" asked Loftus.
> "Yeah," replied Crossen. "We offered him the Witness Protection Program because we were concerned for his safety, but he refused. Now everyone I've talked to is pretty certain that he's dead."

*Id.* at 210.

In the end, the book proposes, supposedly based upon information from a "source" within British intelligence, *id.* at 194-96, and "an IRA courier," *id.* at 213-15, that McIntyre was killed

4

by British agents "to provide cover for their IRA mole and to confuse IRA efforts to find and punish the real double agent in their midst," *id.* at 196.

According to *Valhalla's Wake*, in July 1985, Loftus wrote a letter (the "1985 Loftus letter") to then Attorney General Edwin Meese, in which Loftus referred to John McIntyre as "the deceased," and stated that "[i]t is murder, not merely negligent homicide, when the government knowingly exposes an informant." *Id.* at 210-11. In this letter, Loftus threatened to file a civil action against the United States for John McIntyre's wrongful death. *Id.* at 211. Next, in 1986, Loftus sent a letter (the "1986 Loftus letter") to the Department of Justice, Customs Service, Drug Enforcement Administration ("DEA"), the United States Attorney for the District of Massachusetts, and the Secretary of State, on behalf of the plaintiffs in this case and another member of the McIntyre family, claiming damages under the FTCA for the wrongful death of John McIntyre and demanding, under the Freedom of Information Act, "copies of each file, document or dossier in which John L. McIntyre is named as a subject or cross-reference." United States' Reply Brief, Ex. B (Letter from Loftus and authorizations from the McIntyres for Loftus to act as their attorney "concerning the wrongful death of John L. McIntyre").[3]

---

[3] The United States provided a copy of the 1986 Loftus letter as an attachment to its reply brief. In their surreply brief, the plaintiffs pejoratively described the letter as one "purportedly transmitted by an attorney representing the McIntyre family" and emphasized that "the government does not contend that this correspondence amounts to presentation of an administrative claim." Plaintiffs' Surreply Brief at 9. But, at oral argument, the plaintiffs argued briefly that the 1986 Loftus letter could be a valid administrative claim, that the government had failed to send a denial letter, and that therefore the six-month time limit to file suit after an agency's denial of a claim, 28 U.S.C. § 2675(b), had never begun running. *See Pascale v. United States*, 998 F.2d 186, 192-93 (3d Cir. 1993) ("As long as a claimant files an administrative claim within two years of its accrual and the agency does not send notice of final denial, the claimant may wait indefinitely before filing suit."). Given that the plaintiffs did not submit the 1986 Loftus letter to the court; fully accepted with approval, in their surreply, the contention of the United States that the letter was not a valid claim letter; and filed a new administrative claim in May 2000, I conclude that the plaintiffs cannot now argue that their suit is based upon the 1986 Loftus letter.
5

Also in 1986, Emily McIntyre requested that the Veterans' Administration place a headstone marker for John McIntyre at the Massachusetts National Cemetery. United States' Combined Motion and Brief For Leave To File a Supplement to its Reply to Plaintiffs' Opposition to the United States' Motion To Dismiss (hereinafter "United States' Supplement to Reply"), Ex. 2 (Declaration of Kurt Rotar); *see also Valhalla's Wake* at 211. In 1991-92, Emily McIntyre applied to the Veterans' Administration for death benefits from John McIntyre's policy. United States' Supplement to Reply, Ex. 1.

In the years after McIntyre's disappearance, Boston-area newspapers published many articles that suggested both the general theory that McIntyre was killed because he was believed to be an informant and the more specific theory that the plaintiffs now present in their complaint. Emily McIntyre is either quoted or mentioned in several of these articles. I highlight below the contents of those articles that appear most pertinent to this motion.

A December 24, 1992 *Boston Globe* article, which quoted Emily McIntyre, reported that AUSA Crossen found "suggestions that British agents killed McIntyre ... unfounded and implausible" and quoted him as saying that "[p]eople disappear in cases in which Joe Murray was involved." United States' Motion To Dismiss, Ex. 3 (Kevin Cullen, *Valhalla Case Now a Little Murkier*, Boston Globe, Dec. 24, 1992, at 15, *available at* 1992 WL 4207096). The same article described Murray and Nee, "an Irish-born career criminal who was the last person seen with McIntyre," as "members of an organized crime group allegedly headed by James J. (Whitey) Bulger." *Id.*

On January 29, 1995, the *Boston Globe* published an extended "Special Report" about McIntyre and the *Valhalla* gunrunning plot. United States' Motion To Dismiss, Ex. 4 (Kevin

6

Cullen, *IRA Man Tells a Tale of Betrayal*, Boston Globe, Jan. 29, 1995, at 1, *available at* 1995 WL 5919073). This article, which quoted Emily McIntyre extensively, stated that "Murray and Nee were part of a criminal organization allegedly headed by James J. (Whitey) Bulger, who was charged with racketeering this month and is now a fugitive." *Id.* Bulger reportedly "was involved in helping to finance [the *Valhalla* arms shipment], or at least sanctioned the involvement of his underlings." *Id.* Furthermore, according to the article, "[f]ederal agents say the last person they saw with McIntyre was Nee." *Id.* The article also quoted Sean O'Callaghan, an IRA agent turned informer, as saying that he did not believe that British intelligence killed John McIntyre. *Id.* Nevertheless, according to the article, "Emily McIntyre continues to subscribe to the conspiracy theory that her son was murdered by British spies." *Id.* While Jerry Padalino, a United States Customs Agent, said that they had "no proof that [McIntyre] [wa]s dead," the article stated that "[n]either does Emily McIntyre, although every fiber of her being believes he is." *Id.*

A December 11, 1996 *Boston Globe* article, which also quoted Emily McIntyre, stated that "McIntyre, whose body has not been recovered, is believed to have been killed by underworld figures who organized the 1984 IRA gunrunning mission aboard a Gloucester fishing trawler, the Valhalla." United States' Motion To Dismiss, Ex. 5 (Kevin Cullen, *Former IRA Double Agent Freed From Life Sentence*, Boston Globe, Dec. 11, 1996, at B1, *available at* 1996 WL 6889381). The article also reported that "[c]onversations recorded in a Quincy condominium by US Drug Enforcement Administration agents suggested the plot was run by the criminal organization of James J. (Whitey) Bulger...." *Id.*

A June 14, 1997 *Boston Globe* article stated: "Although McIntyre's body was never found, and no one has been charged with his murder, there was a consensus in law enforcement

7

that Pat Nee, a member of Bulger's gang, had brought McIntyre to Bulger and Bulger's associate, Stephen "The Rifleman" Flemmi, who later killed him in East Boston." United States' Motion To Dismiss, Ex. 6 (Kevin Cullen, *Bulger Hurt IRA Effort, Sources Say "Whitey" Allegedly Sank Gunrunning Bid*, Boston Globe, June 14, 1997, at A1, *available at* 1997 WL 6257528).

At about the same time, the FBI publicly acknowledged, and the *Boston Globe* reported, that Bulger and Flemmi had worked as FBI informants for decades, and Flemmi alleged in an affidavit that the FBI had assured him and Bulger that they would not be prosecuted for any crimes that they committed, short of murder. United States' Motion To Dismiss, Ex. 8 (Patricia Nealon, *Flemmi Says He, Bulger Got FBI's OK on Crimes*, Boston Globe, June 26, 1997, at A1, *available at* 1997 WL 6259022).

An April 16, 1998 *Boston Herald* article reported that Emily McIntyre attended hearings before United States District Court Judge Mark L. Wolf in the federal racketeering case against Bulger, Flemmi, Francis P. Salemme, and two others (the "*Salemme* hearings"). United States' Motion To Dismiss, Ex. 7 (Ralph Ranalli, *Fed Agent: FBI Got Too Close to Mob*, Boston Herald, Apr. 16, 1998, at 5, *available at* 1998 WL 7342855). *See also United States v. Salemme*, 91 F. Supp. 2d 141 (D. Mass. 1999), *rev'd in part, United States v. Flemmi*, 225 F. 3d 78 (1st Cir. 2000). The article described the hearings as "exploring the FBI's controversial, decades-long informant relationships with Bulger and Flemmi" and reported the testimony of former DEA official, Robert Stutman, that he suspected that the FBI had interfered with the DEA's investigation of Bulger and Flemmi. *Id.* The article concluded: "After watching Flemmi, her son's alleged killer, for less than an hour, McIntyre's mother left the courtroom in tears." *Id.* Following the hearing on the present motion, Emily McIntyre filed an affidavit in which she

acknowledged having "briefly attended one court hearing involving Stephen Flemmi" and finding that she "had to leave the courtroom." Affidavit of Emily McIntyre ¶5.

A May 21, 1998 *Boston Globe* article reported that "last summer, after the FBI admitted that Bulger had been an informant for years, sources said authorities now believe that Bulger ... and Flemmi tortured ... John McIntyre, who was suspected of cooperating with authorities." United States' Motion To Dismiss, Ex. 9 (Patricia Nealon, *DEA Unable to Link Bulger to IRA Guns*, Boston Globe, May 21, 1998, at B2, *available at* 1998 WL 9134795).[4]

The plaintiffs argue that these articles do not suggest that the McIntyres had actual knowledge of facts critical to their claim in this case, namely that the United States failed adequately to supervise Connolly who leaked to Bulger and Flemmi that McIntyre was cooperating with law enforcement officials. The United States, on the other hand, argues that the articles, together with the 1985 Loftus letter, indicate that the McIntyres had reason to suspect foul play on the part of the government at least fourteen years before the present claim was filed. The United States cites *Cutting v. United States*, 204 F. Supp. 2d 216, 224-25 (D. Mass. 2002),

---

[4] The United States did not produce, but I have found, another *Boston Herald* article pertinent to the present motion. *See* Jack Sullivan, *Quincy Man Says Mobster Threatened Him*, Boston Herald, Jan. 29, 2000, at 7, *available at* 2000 WL 4315544. The article, which reported an interview with Emily and Christopher McIntyre, includes the following statements:
> In an interview at their attorney's office yesterday, Chris McIntyre, 40, and his mother, Emily McIntyre, said they suspected Bulger's hand in the disappearance of John McIntyre in 1984 but said nothing out of fear.
> "Whitey Bulger had an unbelievable amount of power," said Chris McIntyre. "People were afraid of him. I was afraid of him."

*Id.*

Christopher McIntyre, in an affidavit submitted in connection with my inquiry concerning this article, said that his and his family's opinion that John McIntyre was murdered was only "an intuitive family feeling that remained dominant until 1999." I find tantalizing the suggestion that the "intuitive family feeling" prevailed only until 1999. The affidavit does not say what happened in 1999 - - whether, for example, the feeling dissipated or ripened into something more substantial. In any event, Christopher McIntyre does not deny the quote attributed to him in the article.

9

in which Judge Ponsor observed that, "the discovery rule puts a burden on plaintiffs once they have some reason to suspect foul play; accrual may occur long before there is firm confirmation of the defendant's culpability."

The plaintiffs contend, however, that for at least fifteen years, the United States concealed its involvement in John McIntyre's death. Specifically, the complaint alleges that "[a]fter McIntyre's disappearance agents of the FBI contacted the McIntyre family only to suggest that [John McIntyre] was a fugitive from justice and would be prosecuted when caught." Compl. ¶ 299. The plaintiffs contend that, as part of the concealment, the United States sought and obtained a federal indictment against McIntyre in April 1986. Plaintiff's Memorandum, Ex. B. The indictment was not dismissed until March 20, 2000. *Id.*, Ex. G (Dismissal of Indictment and Arrest Warrants).

There are other circumstances that support the plaintiffs' claim of concealment. The January 29, 1995 *Boston Globe* article cited above stated that "[o]fficially, US Customs officials still consider John McIntyre a fugitive." United States' Motion To Dismiss, Ex. 4. Furthermore, in 1997, an investigation by the FBI's Office of Professional Responsibility found "no evidence of continuing criminal conduct within the statute of limitations" by Connolly or his supervisor at the FBI, John Morris, in their relationships with Bulger and Flemmi. Plaintiff's Memorandum, Ex. F (Ralph Ranalli, *Former FBI Agents Cleared in Mob Case*, Boston Herald, Dec. 5, 1997, at 6). Finally, Judge Wolf himself indicated that the FBI did not cooperate fully in the investigation of McIntyre's death. The judge stated that "important FBI documents concerning John McIntyre were ... improperly withheld by agents of the Boston FBI until it was too late to question relevant witnesses concerning them." *United States v. Flemmi*, No. 94-10287-MLW, at 13-14 (D. Mass. Aug. 30, 2001); *see also Salemme*, 91 F. Supp. 2d at 154 n.3.

The complaint alleges that the FBI's role in John McIntyre's death was "disclosed for the first time" in Judge Wolf's findings of fact in *Salemme*. Compl. ¶ 5. Four months later, "the bones of John L. McIntyre were uncovered in a shallow make-shift grave in Dorchester, Massachusetts." *Id.*

The plaintiffs raise several claims against the United States relating to the FBI's handling of Bulger and Flemmi: its knowledge of their crimes, its failure to investigate McIntyre's disappearance, and its failure to warn or protect McIntyre. The complaint also suggests, as noted earlier, that FBI agents may have provided information to Bulger and Flemmi concerning John McIntyre's cooperation with law enforcement officials. The United States has moved to dismiss all counts against it, pursuant to Fed. R. Civ. P. 12(b)(1). Specifically, the United States argues that the plaintiff's allegations are insufficient to confer subject matter jurisdiction on the court because the plaintiff failed to file a timely administrative claim as required by the FTCA. *See* 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...."). The United States argues that the plaintiffs' claim accrued more than two years before the Estate presented a written notice of its claim on May 25, 2000.

### III. Analysis

In addressing the present motion, I treat as true all well-pleaded facts and all reasonable inferences therefrom. *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2002). As noted earlier, because the motion raises jurisdictional questions, I may also look beyond the complaint to affidavits or other sources of uncontested facts. *Id.; see also* note 1, *supra*.

While the general rule is that a FTCA claim accrues at the time of injury, the First Circuit applies a "discovery rule" to such claims when "[t]he factual basis for a cause of action [is]

11

'inherently unknowable' at the time of injury." *Gonzalez*, 284 F.3d at 288-89 (quoting *Attallah v. United States*, 955 F.2d 776, 780 (1st Cir. 1992)).[5] The factual basis for a cause of action is "inherently unknowable" when "it is incapable of detection through the exercise of reasonable diligence." *Id.* Thus, according to the First Circuit, under the discovery rule, "a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." *Id.* at 288.

In the seminal case *United States v. Kubrick*, 444 U.S. 111 (1979), the Supreme Court described, as the "factual predicate" for a claim, awareness of the plaintiff's "injury and its probable cause," *id.* at 118. Elsewhere in the *Kubrick* opinion, the Court referred to "the critical facts that he has been hurt and who hurt him." *Id.* at 122. Similarly, the First Circuit has defined the "factual basis" of a claim as "the injury and its probable cause." *Gonzalez*, 284 F.3d at 289. However, "[t]he plaintiff need not know either the full extent of the injury ... or that it was negligently inflicted." *Id.* (citations omitted).

Several aspects of this case are unusual and render difficult the application of the discovery rule to it. First, John McIntyre's body was not found until more than fifteen years after his disappearance. Thus, this case is unlike the typical wrongful death case, in which "the

---

[5] Two recent decisions of the Supreme Court, *Rotella v. Wood*, 528 U.S. 549 (2000), and *TRW, Inc. v. Andrews*, 534 U.S. 19 (2001), have cast some doubt upon the continuing validity of judicially-implied discovery rules outside of the medical malpractice and latent disease contexts. However, given that neither case involved the FTCA and that the First Circuit has, subsequent to these cases, in *Gonzalez*, continued to express the discovery rule in broad terms, not limited to these contexts (although *Gonzalez* itself was a medical malpractice case), I conclude that it is appropriate to apply the discovery rule in this case. 284 F.3d at 284; *see also Cutting*, 204 F. Supp. 2d at 224. ("[T]his court will not assume that the application of the discovery rule in the wrongful death context is unwarranted, simply because no Supreme Court or First Circuit case contains an explicit holding to that effect.")

12

community disturbing event of death is likely to prompt immediate focus by third parties upon the cause thereof." *Cadieux v. International Tel. & Tel. Co.*, 593 F.2d 142 (1st Cir. 1979). Second, although there is evidence tending to support the plaintiffs' claim of long-term government concealment of facts relevant to the plaintiffs' claims, there is also evidence that the McIntyres did not believe the government's denials of its involvement in John McIntyre's disappearance. *Cf. Kronisch v. United States*, 150 F.3d 112, 123 n.6 (2d Cir. 1998) ("The original concealment ... did not continue to toll the statute of limitations once [the plaintiff] became aware of the basic facts of his claim...."). Third, unlike the typical discovery rule plaintiff, who professes to have no suspicion of either the injury or of the government-related cause, Emily McIntyre had developed, eleven years before filing this suit, a book-length account of John McIntyre's death.[6] To complicate matters further, this theory, while identical, in its broadest outline, to the basis for the current suit, differs from it in many details.

This unique combination of circumstances presents a situation for which previously-decided discovery rule cases provide very little guidance. For example, cases that refer to "the injury and its probable cause" do not indicate the level of specificity at which the "probable cause" should be identified. The reason for this omission is obvious—a plaintiff in most instances sues under the same theory of government liability that he first forms. A plaintiff may not be sure whether the government is responsible for his injury, *see, e.g., Gonzalez*, 284 F.3d at 290-91 (holding that the plaintiff's claim was time-barred even though the plaintiff was unaware at the time of injury that the allegedly negligent members of the relevant hospital staff were federal government employees), but in no case that has been brought to the court's attention has a

---

[6] The dust jacket to *Valhalla's Wake* indicates that the book is based on discoveries the authors made "as they turned the old-boy spy network upside down."

plaintiff formed the belief that one agency of the government has caused the injury in one way, only to revise the theory later to accuse another agency of the government of causing the injury in a similar manner.

All of that said, however, I conclude that a cogent argument can be made that the plaintiffs' claims against the United States accrued by at least 1989, when Emily McIntyre publicly claimed in *Valhalla's Wake* to have formed a firm belief, based on specific facts, that John McIntyre was murdered because the United States negligently revealed his status as an informant. By that time, her research and investigation had persuaded her sufficiently to justify a book setting forth two propositions critical to the accrual of the present claims (and, in fact, made in the present claims): John McIntyre was murdered and an agency of the government bore some responsibility for his murder. Indeed, one can argue that the plaintiffs' claims accrued not later than April 16, 1986, when Loftus, acting as attorney for the present plaintiffs and another member of the McIntyre family, made a demand on the various federal agencies for damages in connection with John McIntyre's death and for the agencies' files on John McIntyre.[7]

In the end, I need not rest my decision that the plaintiffs' claims are time-barred on the state of Emily McIntyre's knowledge in the 1980's. The record submitted by the parties in connection with the present motion makes clear that the McIntyres were aware, or in the exercise of reasonable diligence should have been aware, of ample facts for a claim, under the plaintiffs' present theory, to have accrued by April, 1998, at the latest. The administrative claim, however, was not filed until May 25, 2000.

---

[7] The United States makes the not implausible argument that the plaintiffs' claims accrued by at least the time of the 1985 Loftus letter referred to in *Valhalla's Wake*. That letter, however, is not before me, except by reference to it in the book.

First, the McIntyres clearly believed John McIntyre to be dead. Emily and Christopher McIntyre signed statements authorizing Loftus to pursue a "wrongful death" suit in 1986. Emily McIntyre requested a headstone marker for John McIntyre in 1986 and death benefits in 1991. And, of course in 1989, she had co-authored *Valhalla's Wake*, which described an elaborate theory of John McIntyre's murder.

The McIntyres also had access to sufficient facts to form the theory that Bulger, Flemmi, and their associates were responsible for John McIntyre's death, and that the FBI was at least negligent in their handling of Bulger and Flemmi. The following information, described in more detail above, appeared in newspaper reports, many of which quoted Emily McIntyre.

- In 1992: AUSA Crossen's suggestion that Murray may have been involved in McIntyre's death; that McIntyre was last seen with Nee; that Murray and Nee were members of Bulger's organization.

- In 1995: that McIntyre was last seen with Nee; that Murray and Nee were members of Bulger's organization; that Bulger helped finance the Valhalla plot.

- In 1996: that McIntyre was "believed to have been killed by underworld figures;" that the Valhalla plot was run by Bulger's organization.

- In 1997: that "there was a consensus in law enforcement that Pat Nee, a member of Bulger's gang, had brought McIntyre to Bulger and Bulger's associate, ... Flemmi, who later killed him;" that the FBI acknowledged that Bulger and Flemmi were long-time informants.

The existence of media reports that provide the basic elements of a claim does not always cause a claim to accrue. *See Donahue v. Federal Bureau of Investigation*, 204 F. Supp. 2d 169,

177-78 (D. Mass. 2002); *Heinrich v. Sweet*, 44 F. Supp. 2d 408, 417-18 (D. Mass. 1999). However, such reports fail to do so only when the plaintiff has not even a "hunch or suspicion of government wrongdoing." *Heinrich*, 44 F. Supp. 2d at 418 (citing *Kronisch*, 150 F.3d at 122). Here, not only did the McIntyres suspect government involvement in John McIntyre's death, but Emily McIntyre was interviewed for, and quoted in, many of the relevant articles.

Furthermore, the record shows that Emily McIntyre attended at least one day of the *Salemme* hearings before Judge Wolf in which the relationship between FBI agents, on the one hand, and Bulger and Flemmi, on the other, was laid bare and widely reported in the local press. Of especial importance in this regard is the April 16, 1998 article in the *Boston Herald*.[8] This article not only reports that Emily McIntyre attended a session of the *Salemme* hearings, but reports also testimony by a former official of the DEA that he suspected that the FBI had compromised criminal investigations of Bulger and Flemmi - - precisely one of the allegations made in this case.

Thus this case is different from *Donahue*, in which the uncontradicted statements of the plaintiffs were that they had no suspicion that the revelation of the identity of a government informant had led to their deceased's murder. The Donahues claimed that, far from attending the *Salemme* hearings, they were unaware even of newspaper articles that described the content of the hearings. *Donahue*, 204 F. Supp. 2d at 177-78. Here the plaintiffs do not deny that they were aware of the press reports linking the FBI to wrongdoing that assisted the criminal activities of Bulger and Flemmi.

---

[8] It is an irony of this case that this article was published twelve years to the day from the sending of the 1986 Loftus letter.

16

I therefore conclude that any cause of action of the plaintiffs against the United States, of the nature set forth in the complaint in this case, accrued more than two years before May 25, 2000, the date on which the administrative claim was filed, and that the plaintiffs' claims against the United States under the FTCA are time-barred.

The motion to dismiss of the United States is GRANTED.

SO ORDERED.

DATED: 3/31/05

_____
United States District Judge