UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EMILY McINTYRE and CHRISTOPHER McINTYRE as co-administrators of the Estate of John L. McIntyre, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 01-CV-10408-RCL |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, et al., | ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM AND ORDER ON MOTIONS OF DEFENDANTS AHEARN,
CONNOLLY, FITZPATRICK, GREENLEAF, KENNEDY, MORRIS, AND RING FOR
JUDGMENT ON THE PLEADINGS BASED ON QUALIFIED IMMUNITY

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.   The Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      B.   The Use of Informants by the FBI as Alleged in the Complaint . . . . . . . . . . . . 8
      C.   The Development of Bulger and Flemmi as Informants as Alleged in the Complaint 9
      D.   Allegations that the Agents Shielded Bulger and Flemmi from Investigation and
           Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      E.   The Murder of McIntyre in 1984 as Alleged in the Complaint . . . . . . . . . . . . . 12

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      A.   Standard for Consideration of the Motions   . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      B.   Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      C.   Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      D.   Substantive Due Process Rights of McIntyre  . . . . . . . . . . . . . . . . . . . . . . . . . 22
           1.   Conspiracy Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           2.   The Substantive Due Process Claim Against Connolly . . . . . . . . . . . . . . 26
                a.   General Principles of Substantive Due Process . . . . . . . . . . . . . . 26
                b.   Conscience-Shocking Conduct: The Touchstone of Arbitrary
                     Executive Conduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                c.   Violation of a Fundamental Right  . . . . . . . . . . . . . . . . . . . . . . . 30
                     i.    Murder of McIntyre as Private Violence . . . . . . . . . . . . . 31
                           (a)   Governmental Restraint of Victim  . . . . . . . . . . 32
                           (b)   State-Created Danger . . . . . . . . . . . . . . . . . . . . . 37
                     ii.   Murder of McIntyre as Government Action  . . . . . . . . . 41
                           (a)   Attributing Conduct of the Informants to the
                                 Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
                           (b)   Governmental Participation in Private Conduct
                                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
           3.   Violation by Connolly of the Clearly Established Substantive Due Process
                Rights of McIntyre  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
           4.   Violation by Other Agents of the Clearly Established Substantive Due
                Process Rights of McIntyre . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      E.   Access to the Courts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

LINDSAY, District Judge.

## I.    INTRODUCTION

This is an action brought by Emily and Christopher McIntyre (the "plaintiffs"), as

co-administrators of the Estate of John L. McIntyre (the "Estate"), against James Ahearn, John J.

Connolly, Jr., Robert Fitzpatrick, James Greenleaf, Roderick Kennedy, John M. Morris, and

James A. Ring (collectively, the "agents," all of whom were agents of the Federal Bureau of

Investigation ("FBI") at various times relevant to the complaint); the United States of America;

and Kevin Weeks, James J. Bulger, and Stephen J. Flemmi, purported members of the Winter Hill

Gang, an alleged criminal organization operating in the Greater Boston area.  The complaint

alleges that in 1984, McIntyre was murdered by Weeks, Bulger, Flemmi, or other members of the

Winter Hill Gang.  The complaint further alleges that the agents are liable for the murder of

McIntyre because the agents chose to protect Bulger and Flemmi - - allegedly "top echelon"

informants of the FBI - - from prosecution, so that the agents could boost their own careers by

using the information Bulger and Flemmi provided to them to investigate, arrest, and prosecute

members of La Cosa Nostra ("LCN," commonly known as the "Mafia"), a criminal organization

that was a rival to the Winter Hill Gang.  As part of his alleged efforts to shield Bulger and

Flemmi from prosecution, Connolly, with the knowledge, assistance, or acquiescence of the other

agents (except Ahearn), allegedly informed Bulger and/or Flemmi that McIntyre was providing

the United States Drug Enforcement Administration (the "DEA") with information that

incriminated Bulger and Flemmi in criminal activity within DEA's area of concern.  According to

the plaintiffs, the agents made, caused, or permitted this disclosure, knowing, or with deliberate

indifference to the possibility, that Bulger and Flemmi would in turn murder McIntyre or cause

him to be murdered.  The plaintiffs also allege that all of the agents subsequently violated the constitutional rights of the Estate by engaging in "cover ups" of the murder of McIntyre and of numerous other criminal activities of Bulger and Flemmi.  The agents allegedly engaged in this misconduct to preserve the status of Bulger and Flemmi as top echelon informants and to conceal the FBI's corrupt relationship with them.

The complaint is in thirteen counts.[1]  In counts IX through XII, the plaintiffs assert claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) against various combinations of the agents for the deprivation of rights guaranteed by First, Fourth and Fifth amendments to the Constitution of the United States.  The breakdown of these claims is as follows:

Count IX:    This count alleges a violation of the Fourth Amendment right of McIntyre to be free from unreasonable seizure by the government.  The claim is asserted against all of the agents except Ahearn.

Count X:    This count alleges a violation of the Fifth Amendment substantive due process right of McIntyre not to be deprived of his life or liberty by the government.  The claim is asserted against all of the agents except Ahearn.

Count XA:    This count alleges a violation of the Fourth and Fifth Amendment rights of McIntyre described in counts IX and X.  The claim is asserted against Greenleaf and Ring under a theory of supervisory liability.

Count XI:    This count alleges a conspiracy in violation of the Fourth and Fifth Amendment rights of McIntyre described in counts IX and X.  The claim is asserted against all the agents.

Count XII:    This count alleges a conspiracy to violate the First and Fifth Amendment right of the Estate to access to the courts.  The claim is asserted against all the agents.

---

[1]Two of these counts are labeled "count X"; I will refer to the second of the two as "count XA."  Because count XIII is a request for attorneys' fees, I consider it to be a prayer for relief rather than the assertion of a cause of action.

4

Before the court are the motions of all of the agents for judgment on the pleadings as to the *Bivens* claims, based on the defense of qualified immunity.  On April 23, 2003, I ordered the agents moving for dismissal on the ground of qualified immunity to file a joint memorandum in support of their several motions to the extent that it was practicable to do so.  *McIntyre v. United States*, Civ. No. 01-10408 (D. Mass. Apr. 23, 2003) (docket entry 280).  An individual memorandum was to be filed only if the motion of an individual agent "raise[d] issues, with respect to qualified immunity, that are unique in his circumstances."  *Id.*  Pursuant to this order, Ahearn, Fitzpatrick, Greenleaf, Kennedy, and Ring, together with four other agent defendants in related cases,[2] submitted their Consolidated Memorandum of Law in Support of the Individual Defendants' Motions to Dismiss or for Judgment on the Pleadings on the Basis of Qualified Immunity ("Def.s' Cons. Mem.," docket entry 308).  Morris filed a motion to join the motions of the other defendants to dismiss on grounds of qualified immunity.[3]  Similarly, Connolly filed a motion for judgment on the pleadings based on qualified immunity.[4]  The plaintiffs in this case joined with plaintiffs in related cases in filing the Plaintiffs' Consolidated Brief in Opposition to

_____

[2]Richard F. Bates, Dennis F. Creedon, Thomas J. Daly, and Lawrence Sarhatt.

[3]In March 2004, by docket orders in this case, I granted Morris's motion to join the motion of the individual defendants, but did not issue an order with regard to whether he was entitled to qualified immunity.

[4]In his motion for judgment on the pleadings, based on qualified immunity, Connolly also moved for judgment on the ground that the plaintiffs' claims are time-barred.  On March 24, 2004, I denied the motions of Ahearn, Fitzpatrick, Greenleaf, Kennedy, and Morris for judgment on the pleadings based on the statute of limitations (docket entry 334).  I did not dispose of Connolly's motion in that order, because he had moved for judgment on the pleadings based on more than one ground.  Nonetheless, my ruling set forth in the March 24, 2004 order, that the *Bivens* claims in this action survive a statute of limitations defense, on a motion under Rule 12(c), applies to Connolly's motion as well.  Thus, to the extent Connolly moves for judgment on the pleadings, on the ground that the plaintiffs' claims are time-barred, his motion is DENIED.

Defendants' Motion to Dismiss or for Judgment on the Pleadings on the Basis of Qualified

Immunity ("Pl.s' Cons. Br. Opp.," docket entry 321 in *McIntyre*).  The individual defendants filed

a consolidated reply (docket entry 324).

## II.   FACTS

For the purpose of the present motions, I must treat all well-pleaded facts, and all

reasonable inferences therefrom, as true.  *Martin v. Applied Cellular Tech., Inc.*, 284 F.3d 1, 6

(1st Cir. 2002); *United States v. United State Currency, $81,000.00*, 189 F.3d 28, 33 (1st Cir.

1999); *see also Collier v. City of Chicopee*, 158 F.3d 601, 602 (1st Cir. 1998) (motions for

judgment on the pleadings under Fed. R. Civ. P. 12(c) warrant the same treatment as motions to

dismiss under Fed. R. Civ. P. 12(b)(6)).

### A.      The Agents

A brief identification of each agent, based on the complaint, is helpful in understanding the

factual allegations.

*Agents assigned to the Organized Crime Squad of the FBI Boston Office.*  Connolly was

a special agent in the Organized Crime Squad (the "OCS") of the FBI field office in Boston (the

"FBI Boston Office") from approximately February 1973 until his retirement from the FBI in

1990.  During this time, he was the "handler" of Bulger and Flemmi.  *Morris* was assigned to the

FBI Boston Office roughly from March 1972 until November 1991.  Between December 1977

and January 1983, Morris was the chief of the OCS and was Connolly's direct supervisor.  After

Morris left the OCS, he continued to have contact with Connolly, Bulger, and Flemmi.  *Ring* was

the chief of the OCS from approximately January 1983 until 1990 and was Connolly's direct

supervisor when McIntyre was murdered.

*The "special agents in charge" of the FBI Boston Office*.  Greenleaf was the special

agent in charge (the "SAC") of the FBI Boston Office from approximately November 1982 until

December 1986 and was the SAC at the time of the murder of McIntyre.  *Fitzpatrick* was an

"assistant special agent in charge"("ASAC") of the FBI Boston Office assigned to the McIntyre

matter at the time Bulger and Flemmi murdered McIntyre.[5]  *Ahearn* assumed the position of  SAC

of the FBI Boston Office upon Greenleaf's departure and continued in that position for the

remainder of the time period relevant to the complaint.

---

[5]The plaintiffs identify Fitzpatrick simply as a "special agent" rather than as a special agent in the supervisory role of an ASAC.  In his answer, however, Fitzpatrick admits by implication that he was an ASAC in the FBI Boston Office, and that he had some supervisory responsibility over the McIntyre matter at the time of McIntyre's murder.  *See* Fitz. Answer ¶ 257(c) ("Fitzpatrick says that after McIntyre's disappearance the entire matter was taken away from him by Greenleaf *and assigned to a different ASAC*." (emphasis added));  Fitzpatrick's admission is consistent with the findings in *United States v. Salemme*, 91 F. Supp. 2d 141, 225 (D. Mass. 1999) (Wolf, J.) (identifying Fitzpatrick as the FBI Boston Office ASAC in 1984 "with responsibility for relations with the DEA"), *rev'd in part on other grounds by United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000), *cert. denied,* 531 U.S. 1170 (2001).  It is appropriate for me to consider the information from *Salemme* in ruling on these motions for judgment on the pleadings.  *See, e.g.*, *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) ("Ordinarily ... any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden [in connection with deciding a motion under Rule 12(b)(6)], unless the proceeding is properly converted into one for summary judgment under Rule 56.  However, courts have made narrow exceptions for documents the authenticity of which are [sic] not disputed by the parties; for official public records; for documents central to [the] plaintiffs' claim; or for documents sufficiently referred to in the complaint." (citation omitted)); *Edwards v. John Hancock Mut. Life Ins. Co.*, 973 F.2d 1027, 1030 n.1 (1st Cir. 1992) (recognizing that certain items in the record and in the public record may be considered in a Rule 12(b)(6) motion without converting it to a motion for summary judgment) (citation omitted); *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996) ("[M]atters of public record, including court records in related or underlying cases which have a direct relation to the matters at issue, may be looked to when ruling on a 12(b)(6) motion to dismiss."), *rev'd on other grounds sub. nom. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

*Kennedy*.  Kennedy was a special agent in the FBI Boston Office when McIntyre was murdered in 1984.  He was the "operational liaison with other agencies concerning narcotics matters."  Compl. ¶ 251.

## B.   The Use of Informants by the FBI as Alleged in the Complaint

In the mid-1960's the FBI, including the FBI Boston Office, began to investigate LCN.  In the Greater Boston area, LCN was in direct competition with the Winter Hill Gang - - a more local, clandestine criminal organization.  As the FBI investigated LCN, the development of "top echelon" criminal informants became a high priority for the agency.  Top echelon informants were individuals who "could provide a continuous flow of quality criminal intelligence information regarding the leaders of organized crime."  *Id.* ¶ 39.  Information provided to the FBI by its informants permitted the FBI to prosecute and convict members of LCN.  Thus, an FBI agent's success in developing informants - - particularly top echelon informants - - could significantly advance the agent's career.

Although often ignored in the FBI Boston Office, guidelines in the FBI Manual of Instructions (the "Guidelines") prescribed limitations on the use of informants.  The Guidelines required that

> special care be taken not only to minimize ... use [of informants] but also to ensure that individual rights are not infringed and that the government itself does not become a violator of the law.  Informants as such are not employees of the FBI, but the special relationship of an informant to the FBI imposes a special responsibility upon the FBI when the informant engages in activity where he has received, or reasonably thinks he has received encouragement or direction for that activity from the FBI.

*Id.* ¶ 110.  Similarly, the Guidelines advised agents that "[t]he FBI may not use informants ... for acts ... which the FBI could not authorize for its undercover agents."  *Id.* ¶ 111 (alterations in

8

original).  Further, the Guidelines mandated that '[u]nder no circumstances shall the FBI take any action to conceal a crime by one of its informants."  *Id.* ¶112.  "[I]f the FBI learned that one of its informants had violated the law in furtherance of his assistance to the FBI," the FBI was required to report the crime to law enforcement or prosecutive authorities, or to the United States Department of Justice.  *Id.* ¶¶113; 114.  The Guidelines contained the same mandate where the FBI had "knowledge that one of its informants had committed a serious crime unconnected with his FBI assignments."  *Id.* ¶115 (internal quotation marks omitted).  The Guidelines also dictated that agents seek pre-authorization to permit an informant to commit a crime in order to obtain information for the FBI.  Finally, the Guidelines required agents to "avoid any disclosure to anyone which might permit identification of a criminal informant or even cast suspicion on a criminal informant."  *Id.*  ¶ 109.

**C.** **The Development of Bulger and Flemmi as Informants as Alleged in the Complaint**

Flemmi was first developed as a top echelon informant in 1967 by H. Paul Rico, then a special agent in the FBI Boston Office.  At the time, Rico knew Flemmi was "a suspect of [sic] possibly being involved in gangland slayings."  *Id.* ¶ 47.  "Rico promised Flemmi protection from the FBI if Flemmi would become an FBI informant."  *Id.* ¶ 43.  Rico proved true to that promise.  For example, in 1969, he warned Flemmi to leave Boston because Flemmi would soon be indicted; in 1974, Rico successfully arranged to have a murder charge against Flemmi dropped upon Flemmi's return to Boston.

The same year that Flemmi returned to Boston, Connolly transferred from an FBI field office in New York to the FBI Boston Office.  As a special agent in the OCS, Connolly sought to cultivate Bulger as an informant.  Despite the fact that Bulger was known to be violent, Connolly

extended the same promise of protection to Bulger that Rico had given Flemmi.  In 1975,

Connolly succeeded in having Bulger designated as a "top echelon" informant.  Shortly thereafter,

Flemmi, who was working with Bulger, but was no longer an official FBI informant, also began

providing information to Connolly.  Flemmi was eventually re-registered as an FBI informant in

1980.  Connolly continued to act as the "handler" of Bulger and Flemmi until he retired from the

FBI in 1990, even though, at times, he led FBI headquarters in Washington, D.C. to believe that

he was no longer using them as informants.

**D.    Allegations that the Agents Shielded Bulger and Flemmi from Investigation and
       Prosecution**

All of the agents "knew that despite their cooperation with the FBI, Bulger and Flemmi

were still engaged in serious criminal wrongdoing."  *Id.* ¶ 84.  The agents went to great lengths to

protect Bulger and Flemmi from investigation and prosecution by state law enforcement agencies,

other federal agencies, and even other offices and divisions of the FBI.  The agents had several

incentives to ensure that the criminal activities of Bulger and Flemmi were not exposed.  The

information that Bulger and Flemmi provided to Connolly and Morris enabled them and the other

agents to investigate and prosecute key members of LCN, resulting in prestige not only for

Connolly and Morris, but for those above them in the chain of command.  Further, as Connolly

and Morris became more entrenched in their relationship with Bulger and Flemmi, Connolly and

Morris treated Bulger and Flemmi more as friends than as criminals, accepting from Bulger and

Flemmi gifts, including wine and money.  If Bulger and Flemmi were prosecuted, their corrupt

relationship with Connolly and Morris would have been disclosed.  Moreover, with each improper

deflection of an investigation of Bulger and Flemmi, it became more important for Connolly, Morris, and the other agents to prevent the previous "cover ups" from being discovered.

One of the ways in which Connolly and Morris helped Bulger and Flemmi to avoid investigation and prosecution was by alerting them that criminal associates of the two Winter Hill gangsters were cooperating or might cooperate with law enforcement agencies in providing information about the gangsters' criminal activities. Such disclosures prompted Bulger and Flemmi to murder persons who had been identified by Connolly and/or Morris as actual or possible informants. After each murder, the agents failed to perform a thorough investigation of the crime and prevented other law enforcement agencies from discovering the circumstances of the victim's death.

In 1976, for example, Bulger and Flemmi learned from Connolly that Richard Castucci was providing the FBI with specific information regarding the whereabouts of two fugitive members of the Winter Hill Gang. As a result of Connolly's disclosure, Bulger and Flemmi murdered Castucci on or about December 29, 1976. In 1981, Bulger and Flemmi learned from Connolly that Oklahoma businessman Roger Wheeler, an official of World Jai Alai ("WJA"), suspected that John Callahan, the president of WJA, was skimming money from WJA for the Winter Hill Gang. On May 27, 1981, Bulger, Flemmi and others caused Wheeler to be shot and killed in Tulsa, Oklahoma. In January 1982, Brian Halloran, a member of the Winter Hill Gang, began to cooperate with the FBI Boston Office and implicated Bulger, Flemmi, and Callahan in the Wheeler murder. Morris learned of Halloran's cooperation and passed on the information to Connolly. Connolly in turn disclosed Halloran's cooperation to Bulger and Flemmi, and, on May 11, 1982, Bulger and others gunned down Halloran outside a café in South Boston. Later that

year, Connolly alerted Bulger and Flemmi that law enforcement agencies were seeking to question

Callahan about the Wheeler and Halloran murders; as a result, Bulger and Flemmi caused

Callahan to be murdered on or about August 1, 1982.

**E.     The Murder of McIntyre in 1984 as Alleged in the Complaint**

In mid-October 1984, John McIntyre, the engineer on a ship called the Valhalla, began to

cooperate with the local police in the investigation of criminal activities in which Bulger was

involved.  He revealed that Bulger participated in an attempt to use the Valhalla to smuggle

weapons from Massachusetts to the Irish Republican Army ("IRA") in Ireland.  The local police

arranged for agents from the United States Customs Service and the FBI, including defendant

Kennedy, to participate in the questioning of McIntyre.  During the interview with Kennedy,

McIntyre repeated his allegations about Bulger's involvement in the arms shipments.  At the time

of this interview, Kennedy was aware of at least some of the ongoing criminal activities of Bulger

and Flemmi.  Kennedy reported the information he received from McIntyre to Greenleaf;

Connolly was present when these FBI agents discussed McIntyre's cooperation with law

enforcement agencies.  In October or November 1984, Bulger and his associates learned from

Connolly that McIntyre was informing authorities about illegal activities carried out by Bulger and

his associates.[6]  As a result of this disclosure, Bulger, Flemmi[7] and Weeks kidnapped, tortured, and murdered McIntyre on or about November 30, 1984.

After the disappearance of McIntyre, the FBI Boston Office told his family that he was a fugitive and failed to undertake any effort to investigate McIntyre's disappearance.  Moreover, in the years following the murder of McIntyre, all of the agents continued to protect Bulger and Flemmi from investigation and prosecution with respect to any of their criminal activities.  *See generally id.* ¶¶ 298-365, 472, 473.

## F.    The Alleged Liability of the Agents

In addition to the allegations set out above, the plaintiffs allege that the conduct of all the agents, except Ahearn, resulted in the death of McIntyre because the agents

> continued to utilize Bulger and Flemmi as top echelon informants; failed to control the criminal activities of Bulger and Flemmi; failed to enforce the [Guidelines] governing high echelon informants, including Bulger and Flemmi; ... failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position; failed to warn and protect McIntyre after he agreed to cooperate with federal law enforcement agencies; and failed to warn and protect McIntyre after it became known to the Bulger Group that McIntyre was cooperating with law enforcement officials concerning the illegal activities of the Bulger Group.

*Id.* ¶ 421, 427.

---

[6]The plaintiffs allege that "associates of the Bulger Group learned that John McIntrye was cooperating with law enforcement officials," Compl. ¶ 255, instead of explicitly alleging that Connolly disclosed McIntyre's informant status to Bulger and Flemmi.  All the same, from Connolly's knowledge of McIntyre's cooperation, *id.* ¶ 254, and general allegations that Connolly disclosed the identity of informants to Bulger and Flemmi, *e.g.*, *id.* ¶¶ 88, 103, one may reasonably infer that Connolly revealed McIntyre's informant status to Bulger and Flemmi.

[7]At the time of the murder of McIntyre, Morris had not been Connolly's direct supervisor for over a year.  Nonetheless, Morris was still mired in his corrupt relationship with Connolly, Bulger, and Flemmi.

The plaintiffs further assert that Ring and Greenleaf are liable for the murder of McIntyre because they failed to supervise Connolly in his role as the "handler" of Bulger and Flemmi. Likewise, the plaintiffs claim that Ring and Greenleaf allegedly failed to supervise Kennedy in his duty to warn and protect McIntyre.

### III.    DISCUSSION

**A.    Standard for Consideration of the Motions**

As explained above, when ruling on motions brought under Fed. R. Civ. P. 12(c), I must accept as true the factual allegations of the complaint and draw all reasonable inferences therefrom in favor of the plaintiff; I may not grant the motion unless "it appears beyond a doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *United States Currency, $81,000.00*, 189 F.3d at 33.

**B.    Qualified Immunity**

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Indeed, qualified immunity is meant to protect government officials not just from ultimate liability, but from the burdens of litigation itself. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Whether a government actor enjoys the protection of qualified immunity in a given case is an issue that should be decided, as a matter of law, at the earliest possible stage of a case. *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987).  Nonetheless, "pre-trial resolution [of the question of qualified immunity] sometimes will be impossible because of a dispute as to material facts.  In such a case, the factual issues must be

decided by the trier of fact ...." *Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir. 2002) (citation

omitted).[8]

    In determining whether qualified immunity applies in a specific case, a court must "first

determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all,

and if so, proceed[] to determine whether that right was clearly established at the time of the

alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526

U.S. 286, 290 (1999)); *see also Soto v. Flores*, 103 F.3d 1056, 1064 (1st Cir. 1997). "[T]he

inquiry whether the right at issue was clearly established properly focuses 'not upon the right at its

most general or abstract level, but at the level of its application to the specific conduct being

challenged.'" *Singer v. Maine*, 49 F.3d 837, 845 (1st Cir. 1995) (quoting *Wiley v. Doory*, 14

F.3d 993, 995 (4th Cir. 1994)). Where a plaintiff seeks to hold a defendant liable by virtue of the

defendant's supervisory authority over a subordinate, who violated a constitutional right of the

plaintiff, "the 'clearly established' prong of the qualified immunity inquiry is satisfied when (1) the

subordinate's actions violated a clearly established constitutional right, and (2) it was clearly

---

    [8]*See also Johnson v. Jones*, 515 U.S. 304, 316 (1995) ("Many constitutional tort cases ...
involve factual controversies about, for example, intent - - controversies that, before trial, may
seem nebulous."); *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 93 (1st Cir. 2004) (summary
judgment based on qualified immunity inappropriate where parties disputed government actor's
purpose in terminating plaintiff's employment, and termination, if retaliatory, deprived the plaintiff
of her rights under the First Amendment); *Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir. 1991)
(summary judgment based on qualified immunity inappropriate where plaintiffs alleged that
reasonable law enforcement officer would have known warrant was not lawfully procured and
parties disputed law enforcement officer's knowledge); *Polk v. District of Columbia*, 121 F.
Supp. 2d 56, 65 (D.D.C. 2000) ("Where ... the applicability of qualified immunity turns on the
facts known by public officials at the time of the challenged conduct and there is a genuine issue
with respect to the existence of such facts or the defendants' knowledge thereof, the issue of
qualified immunity is subject to determination by the factfinder at trial." (internal quotation marks
omitted)).

established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998); *see also Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002) (agreeing with the two-prong test in *Camilo-Robles* and characterizing the second prong as requiring the plaintiff to show that the "supervisory liability doctrine under which the [plaintiff] wishes to hold [the supervisor] liable" was clearly established). Finally, if a defendant has violated a clearly established right, a court must then consider "whether a reasonable official, similarly situated would understand that the challenged conduct violated a constitutional norm." *Rivera-Jiménez*, 362 F.3d at 93.

## C.    Fourth Amendment

The plaintiffs allege that the murder of McIntyre deprived McIntyre of his right under the Fourth Amendment to be free from unreasonable governmental seizure and his Fifth Amendment right to substantive due process. The plaintiffs, however, cannot maintain claims for the violation of both of these rights, because "where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).[9] It is therefore important that I consider the Fourth Amendment claims as a threshold matter.

---

[9]The distinction between claims under the Fourth and Fifth amendments is more than a matter of mere words. As discussed further in Part III.D.2, *infra*, in order to state a claim for a violation of substantive due process rights, the executive conduct in question must "shock the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). In contrast, conduct subject to Fourth Amendment scrutiny is unconstitutional merely if it is "unreasonable." *Anderson*, 483 U.S. at 640-41.

The agents argue that the murder of McIntyre was not a Fourth Amendment seizure because a seizure requires "governmental termination of freedom of movement *through means intentionally applied*," *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989), and the plaintiffs have failed "to assert that the individual defendants intended to bring about a particular result [*i.e.*, death] with regard to a particular decedent," Def.s' Cons. Mem. at 26.  The agents also maintain that a seizure only occurs when there is "*direct* police action *intended* to cause a particular result," and that, in this case, the claimed seizures were not "effectuated by Government personnel such as the individual defendants."  *Id.* at 25, 26.  In contrast, the plaintiffs argue that the murder of McIntyre was "intended and [was] for the purpose of furthering [a] criminal enterprise" comprising Connolly, Morris, and others, and that Bulger and Flemmi were acting as "representative[s] of the government" when they murdered McIntyre.  Pl.s' Cons. Br. Opp. at 19, 20.

Neither the argument of the agents nor that of the plaintiffs completely resolves the question of whether the plaintiffs have alleged a seizure within the meaning of the Fourth Amendment.  While I cannot glean from the agents' memorandum how they would define "direct police action,"[10] it is "well established that unlawful acts performed by informants at the instance of Government officials may, for Fourth Amendment purposes, be treated as acts of the

---

[10]The defendants cite *Brower*, 489 U.S. 593 at 596-97, in support of their assertion that a seizure requires "direct police action," Def.s' Cons. Mem. at 25, and the plaintiffs have attributed the quotation "direct police action" to *Brower* as well as to the defendants' memorandum, Pl.s' Cons. Br. Opp. at 19.  *Brower*, however, does not contain the phrase "direct police action" and the level of police participation in the conduct complained of was not at issue in that case.

Government itself." *United States v. Bennett*, 729 F.2d 923, 925 (2d Cir. 1984).[11]  Here, the

plaintiffs have adequately pleaded government action by alleging that the agents acted in concert

with Bulger and Flemmi and/or improperly supervised other FBI employees who did.  Moreover,

the plaintiffs have explicitly or implicitly alleged that the agents either intended the death of

McIntyre and/or improperly supervised other defendants who so intended, thus satisfying the state

of mind requirement for a Fourth Amendment seizure.

Despite the problems with the agents' position and a superficial appearance of soundness

in the plaintiffs' position, the plaintiffs' argument nevertheless fails to carry the day for them.

Apparently the plaintiffs interpret *Brower* as holding that a Fourth Amendment seizure occurs

*whenever* "there is a governmental termination of freedom of movement *through means*

*intentionally applied*."  489 U.S. at 597; *Brower* does not, however, stand for that proposition.

In *Brower*, the issue facing the Court was whether a Fourth Amendment seizure occurred when a

---

[11]For additional authority on the application of the Fourth Amendment to the conduct of
private parties, *see Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989)
(Fourth Amendment does not apply to private action unless the private party "acted as an
instrument or agent of the Government"); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)
(Fourth Amendment inapplicable where private party is "not acting as an agent of the Government
or with the participation or knowledge of any governmental official." (quoting *Walter v. United
States*, 447 U.S. 649 (1980) (Blackmun, J., dissenting))); *Coolidge v. New Hampshire*, 403 U.S.
443, 487 (1971) (where a private party acts as an "instrument or agent" of the state in effecting a
search or seizure, Fourth Amendment interests are implicated); *United States v. Pervaz*, 118 F.3d
1, 6 (1st Cir. 1997) (no single test determines whether action by a private party may be imputed
to the government for purposes of the Fourth Amendment; relevant factors may include the "the
government's role in instigating or participating" in the conduct, "its intent and the degree of
control it exercises over ... the private party, and the extent to which the private party aims
primarily to help the government or to serve its own interests"); *United States v. Mendez-de
Jesus*, 85 F.3d 1, 2-3 (1st Cir. 1996) (where two private citizens brought the defendant to a police
station, and there was "no suggestion that the government initiated or participated in the citizen
action," the Fourth Amendment did not apply and the actions of the citizens did not constitute a
seizure under the Fourth Amendment).

suspect, leading police in a high-speed pursuit, was killed by crashing into a police roadblock, when he could have voluntarily stopped earlier.  The Court explained that, where a suspect being pursued by police unexpectedly loses control of his car and crashes, no seizure occurs because the mechanism that terminated the suspect's freedom of movement (his unexpected loss of control of the car) was not same mechanism the officers employed in an effort to seize the suspect (show of authority through flashing lights and siren).  The Court held, however, that in the case before it, a seizure had occurred because, by setting up a roadblock, the defendants intended to terminate the suspect's freedom of movement in the very manner that it happened:

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but *only* when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Id.* at 596-97 (second emphasis added).

Contrary to the implication the plaintiffs find in the foregoing language, the passage indicates that "governmental termination of freedom of movement through means intentionally applied" is merely one *element* of a Fourth Amendment seizure - - not the entire *definition* of such a seizure.  While *all* seizures are governmental terminations of freedom of movement through means intentionally applied, the reverse is not true: not all governmental terminations of freedom of movement through means intentionally applied are seizures.  "[G]overnmental conduct which is not actuated by an investigative or administrative purpose will not be considered a 'search' or 'seizure' for purposes of the Fourth Amendment."  *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 317 (D. Mass. 1999) (quoting *United States v. Attson*, 900 F.2d 1427, 1430 (9th

Cir. 1990) (dismissing claim that federal defendants "seized" patients by conducting unproven and dangerous medical experiments without their knowledge; complaint stated claim, however, for violation of the patients' substantive due process rights)).  The *Brower* decision was necessarily limited, by the factual circumstances of the case, to a discussion of the means by which the government effected the seizure.  Because the relevance of the Fourth Amendment to a police pursuit of a fleeing suspect is patent, the *Brower* court did not need to consider whether the officer's conduct in question was actuated by an administrative or investigative purpose.

In other cases, however, the distinction between police conduct actuated by an administrative or investigative purpose and police conduct actuated by some other purpose must be made.  The Second Circuit's analysis in *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998), is helpful on this point.[12]  In *Hemphill*, the court held that the alleged conduct of police officers in assisting a private citizen to shoot the plaintiff in the course of the officers' arrest of the plaintiff

---

[12]*See also United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (explaining, in case where jury found state judge criminally liable for violating the substantive due process rights of an employee and a job applicant by sexually assaulting them, that *Graham* "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments."); *Poe*, 282 F.3d at 137 (holding that the Due Process Clause, instead of the Fourth Amendment, was "proper source" of constitutional right violated when male police officer secretly videotaped plaintiff as she was changing clothes in order to appear in a police training video; the objectionable conduct "occurred outside of a criminal investigation or other form of governmental investigation or activity."); *Rogers v. City of Little Rock*, 152 F.3d 790 (8th Cir. 1998) (holding that plaintiff's claim that police officer stopped her for traffic violation, followed her home, entered her residence and raped her was properly analyzed as substantive due process violation); *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that plaintiff's claim that uniformed officer raped plaintiff after he insisted on giving the allegedly intoxicated plaintiff a ride home was substantive due process claim; "[b]ecause the harm inflicted did not occur in the course of an attempted arrest or apprehension of one suspected of criminal conduct, the claim was not one of a Fourth Amendment violation but of the violation of the substantive due process right"); *cf. Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001) ("Claims of excessive force by a police officer arising outside the context of a seizure, and thus outside the Fourth Amendment, are analyzed under substantive due process principles.").

was not a seizure within the meaning of the Fourth Amendment, but that the conduct did deprive the plaintiff of his substantive due process rights.  According to the plaintiff in that case, when the defendant officers arrived at the scene of an armed robbery, they found that the victim, a store owner and retired police officer, had been shot in the leg by the plaintiff.  The officers asked the store owner if he wanted to go directly to the hospital, and he replied that he wanted to accompany the officers in their pursuit of the plaintiff - - who had fled in a jeep - - because the store owner wanted to "get them."  *Id.* at 414.  The officers permitted the store owner to ride in their patrol car and at some point gave him one of their guns.  The officers learned that the jeep had stopped at a parking lot and proceeded to that site where, during the plaintiff's standoff with the police, the store owner and an on-duty police officer shot the plaintiff.

The plaintiff, acting *pro se*, brought a claim under § 1983 against the officers, claiming the defendants had used "excessive force" and "unlawful action" to deprive him of life and liberty.  *Id.* at 414.  Without addressing the plaintiff's allegations about the role the officers allegedly played in "aiding and abetting" the private citizen's shooting of the plaintiff, the district court granted the defendants' motions for summary judgment, holding that the force used by the police officer who shot the plaintiff was reasonable for purposes of the Fourth Amendment.

On appeal, the officers argued that their conduct with respect to the private citizen "must be analyzed exclusively under the requirements of the Fourth Amendment" because it "occurred in the context of [the plaintiff's] arrest."  *Id.* at 418.  The Second Circuit disagreed, and, in reversing the decision of the trial court, explained that

> while some of the facts that comprise [the plaintiff]'s allegations with respect to
> the Officers' aiding and abetting [the private citizen] occurred in the "context" of
> his arrest in a physical sense, the Officers' alleged actions with respect to [the

private citizen] form a different kind of claim from excessive force in effecting an arrest.  *Graham's* holding that excessive force claims in the context of an arrest are to be analyzed under the Fourth Amendment's objective standards does not extend to this unusual situation in which the police officers allegedly engaged in a deprivation of rights coincident with, but distinct from, their arrest of the suspect.

*Id.* at 418-419.

When compared to the more subtle circumstances in *Hemphill,* where the substantive due process violation was "coincident" to, yet distinctive from, the police's arrest of the victim, the inapplicability of the Fourth Amendment to the allegations of the present plaintiffs is obvious. The plaintiffs have not alleged facts suggesting that the murder of McIntyre was "governmental conduct ... actuated by an investigative or administrative purpose."  Indeed, the plaintiffs have argued that the murders were "for the purpose of furthering the criminal enterprise" among Bulger, Flemmi, Connolly, Morris, and others.  Pl.s' Cons. Br. Opp. at 19.  Moreover, the FBI was not investigating McIntyre.  On the contrary, the plaintiffs allege that McIntyre was murdered to shut down or prevent investigations of criminal activity of Bulger and Flemmi.

Because the Fourth Amendment is not the source of a constitutional right the agents may have violated when they allegedly caused the murder of McIntyre, the plaintiffs have not stated a claim against the agents under that Amendment.  Thus, the motions of the agents for judgment on the pleadings on the Fourth Amendment claims (counts IX, XA, and XI, to the extent the latter two concern the Fourth Amendment), are GRANTED.

**D.      Substantive Due Process Rights of McIntyre**

The plaintiffs have alleged in counts X, XA, and XI of their complaint that the agents violated the substantive due process right of McIntyre to life and liberty by acts and omissions that led to his murder.  In their qualified immunity defense as to these claims, the agents argue

that (1) the murder of McIntyre was not "government action," and (2) McIntyre did not have clearly established substantive due process rights that would have required the agents to protect him from private violence.  For the reasons set forth below, I deny in part and grant in part the motions of the agents.

### 1.      Conspiracy Claims

Before embarking on an analysis of whether the conduct of the agents regarding the murder of McIntyre violated his substantive due process rights, I will apply two principles that will eliminate one of the conspiracy claims in this case.  In count XI the plaintiffs allege that Ahearn violated McIntyre's substantive due process rights by joining a conspiracy whose members had previously caused McIntyre's murder in furtherance of the conspiratorial object of protecting Bulger and Flemmi.  The complaint, however, does not contain any reference to conduct by Ahearn occurring prior to the death of McIntyre.  It is therefore a legal and factual impossibility that Ahearn violated the substantive due process rights of McIntyre, because those rights terminated at the time of McIntyre's death.  *See Judge v. Lowell*, 160 F.3d 67, 76 n.15 (1st Cir. 1998), *overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61 (1st Cir. 2004).  The claims against Ahearn cannot stand even if the murder of McIntyre and Ahearn's concealment of the circumstances of that murder were in furtherance of a single conspiratorial object.  *Id.*; *Estate of Halloran v. United States*, 268 F. Supp. 2d 91, 96 (D.

Mass. 2003).[13]  Thus, I grant defendant Ahearn's motion for judgment on the pleadings as to

count XI of the complaint.

There is a second reason that impels me to grant the motions of Morris, Connolly,

Kennedy, Fitzpatrick, Ring, and Greenleaf as to count XI of the McIntyre complaint.  The stated

object of the conspiracy described in count XI was to protect Bulger and Flemmi from

investigation and prosecution.  In a *Bivens* claim based on a theory of conspiratorial liability,

however, the plaintiffs must allege that the agents "act[ed] in concert" to (1) deprive the

decedents of their civil rights; or to (2) "commit a lawful act," "the principal element of which is

an agreement between the [agents] to inflict an [unconstitutional injury] upon the [decedents]."

*Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988) (internal quotation marks omitted).  In other

words, the plaintiffs must allege that the underlying purpose of the agents in conspiring was to

commit the constitutional violation.  In *Estate of Halloran*, for example, I held that a claim

virtually identical to count XI of the present complaint failed to state a claim for a *Bivens*

---

[13]  *See also Ford v. Moore*, 237 F.3d 156, 165 (2d Cir. 2001) (reversing the denial of an
officer's motion for summary judgment on the basis of qualified immunity where plaintiff had
alleged that the officer violated the decedent's rights by conspiring to cover up the fact that his
subordinates had shot and killed the decedent: "Even if there were a viable claim [against the
officer] for conduct after [the decedent's] death, the death would have extinguished claim of [the
decedent]."); *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980) (affirming
grant of FBI agents' motion to dismiss *Bivens* claim that the agents were part of a conspiracy to
kill the decedent where plaintiff alleged that agents joined conspiracy after decedent's death:
"[W]ith the death of [the decedent], the conspiracy to violate her rights terminated.  Thus, the
FBI defendants could not be held liable for the prior violations of [the decedent]'s constitutional
rights even if a *Bivens* claim encompasses a relation back theory of conspiracy."); *Guyton v.
Phillips*, 606 F.2d 248, 251 (9th Cir. 1979) (affirming dismissal of claim for the violation of the
decedent's civil rights against officials whose alleged misconduct consisted of covering up the
circumstances of the decedent's death; "[I]nasmuch as [the decedent]'s civil rights must
terminate with his death, so must any conspiracy to deprive him of those rights.").

conspiracy claim, because the plaintiff had not alleged that the object of the conspiracy was to deprive the decedent his constitutional rights. 268 F. Supp. 2d at 96. I pointed out that "the [plaintiff] is not able to show that the goal of protecting law enforcement informants is wrongful or unlawful," and I suggested that "law enforcement agents regularly form common plans to protect their sources as a matter of good investigative practice." *Id.* at 95.[14] Count XI suffers the same infirmity as the claim I dismissed in *Halloran*. Even if the agents foresaw or should have foreseen that the acts furthering their conspiratorial object would deprive McIntyre of his substantive due process rights, the claim cannot go forward because the plaintiffs have not alleged that the deprivation was the *object* or "principal element" of the agents' agreement. *Cf. Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 220 (D. Mass. 1995) (dismissing civil rights conspiracy claim brought under 42 U.S.C. § 1985(3) to deprive plaintiff of her right to interstate travel where complaint alleged a conspiracy to prevent plaintiff from meeting with out-of-state corporate officials to discuss plaintiff's allegations of employment discrimination; statute provided protection against conspiracies for the purpose of depriving persons of constitutional rights, whereas defendants' purpose was to prevent plaintiff from meeting with corporate officials regardless of their location; interference with plaintiff's interstate travel was "incidental"). Permitting a *Bivens* conspiracy claim to go forward where the constitutional deprivations were merely "foreseeable" contravenes the principle that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 848

---

[14]Indeed, the agents' alleged failure to form or execute a plan to protect McIntyre is the very conduct at the heart of the claim of the plaintiffs.

25

(1998).  Accordingly, the motions of all of the agents for judgment on the pleadings are hereby

GRANTED as to count XI of the complaint.[15]

## 2.        The Substantive Due Process Claim Against Connolly

Although, all of the agents allegedly protected Bulger and Flemmi from investigation and

prosecution, Connolly's alleged misconduct is at the heart of the plaintiff's allegations.  Connolly

was the agent whose alleged misconduct had the closest nexus to the murder of McIntyre:

Connolly allegedly revealed McIntyre's informant status to Bulger and Flemmi, knowing that the

disclosure would result in injury to McIntyre.  The alleged misconduct of the other agents

consists primarily of acts or failures to act in matters concerning Connolly's "handling" of Bulger

and Flemmi.  Thus, a necessary condition to the liability of these agents for a violation of the

clearly established substantive due process rights of McIntyre is that Connolly is liable for such a

violation.  If Connolly did not violate the clearly established substantive due process rights of

McIntyre, then any misconduct by the other agents with respect to the murder of McIntyre will

not rise to the level of a constitutional violation.  I therefore first examine whether the plaintiffs

have sufficiently alleged that Connolly violated the clearly established substantive due process

rights of McIntyre.

### a.        General Principles of Substantive Due Process

The Fifth Amendment of the Constitution of the United States mandates that "[n]o person

shall ... be deprived of life, liberty, or property without due process of law."  U.S. Const. amend.

---

[15]As demonstrated below in Part III.D.2.C(ii), *infra,* my holding regarding count XI does not preclude a substantive due process claim where a plaintiff has alleged facts supporting an inference that the agents agreed to violate McIntyre's substantive due process right, even if the plaintiff has not explicitly based the claim on a conspiracy theory.

V.  The "touchstone of due process is protection of the individual against arbitrary action of the

government."  *County of Sacramento*, 523 U.S. at 845 (quoting *Wolff v. McDonnell*, 418 U.S.

539, 558 (1974)).  The Fifth Amendment guarantees two types of due process - - procedural and

substantive.  *Collins v. City of Harker Heights,* 503 U.S. 115, 125 (1992).  Whereas procedural

due process "provide[s] a guarantee of fair procedure in connection with any deprivation of life,

liberty, or property" by the government, due process, in the substantive sense, "protects individual

liberty against 'certain government actions regardless of the fairness of the procedures used to

implement them.'"  *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).[16]  The

"individual libert[ies]" protected by the guarantee of substantive due process are "those

fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and

tradition,'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quoting *Collins*, 503 U.S.

at 125), and so "'implicit in the concept of ordered liberty' that 'neither liberty nor justice would

exist if they were sacrificed,'" *id.* at 721 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325

(1937)).

    b.    **Conscience-Shocking Conduct: The Touchstone of Arbitrary
         Executive Conduct**

    The guarantee of substantive due process "limits what the government may do in both its

legislative ... and its executive capacities," and the "criteria to identify what is fatally arbitrary

differ depending on whether it is legislation or a specific act of a governmental officer that is at

issue."  *Country of Sacramento*, 523 U.S. at 846.  Legislation infringing a litigant's fundamental

---

[16]Substantive due process analyses under the Fifth and Fourteenth amendments are
identical.  *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

rights is arbitrary in the constitutional sense unless the manner of "the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (quoting *Flores*, 507 U.S. at 302).

The touchstone of arbitrariness of executive conduct is of necessity different from that of legislation. Because "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *County of Sacramento*, 523 U.S. at 846 (quoting *Collins*, 503 U.S. at 129), "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as ... conscience shocking,'" *id.* at 847 (quoting *Collins*, 503 U.S. at 128). The conscience-shocking standard provides relief where government officials have "abus[ed] [their] power, or employ[ed] it as an instrument of oppression," *id.* at 846 (quoting *Collins*, 503 U.S. at 126)), while it "preserv[es] the constitutional proportions of constitutional claims," and prevents the demotion of the Constitution "to a font of tort law," *id.* at 848 n.8. Thus, "[o]utside of a few narrow categories, like the safeguarding of prisoners who have been wholly disabled from self-protection, this means conduct that is truly outrageous, uncivilized, and intolerable." *Hasenfus v. LaJeunesse,* 175 F.3d, 68, 72 (1st Cir. 1999) (citing *County of Sacramento*, 523 U.S. at 847). It is only where "the necessary condition of egregious behavior [is] satisfied" that there is "a possibility of recognizing a substantive due process right to be free of such executive action." *County of Sacramento,* 523 U.S. at 847 n.8.

Admittedly, the term "conscience-shocking" is far from self-defining. The Supreme Court has observed that "the measure of what is conscience shocking is no calibrated yard stick, [although] it does ... 'poin[t] the way.'" *County of Sacramento*, 523 U.S. at 847 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). There are, however, some clear markers

on the measuring stick: "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.[17]  Official acts falling somewhere between these two benchmarks "may be actionable" depending on the circumstances.  *Id.*

As alleged in the complaint the conduct of Connolly in relation to the murder of McIntyre is conscience-shocking because it was "conduct intended to injure [McIntyre] in some way unjustifiable by any government interest."  According to the plaintiffs' allegations and reasonable inferences from those allegations, Connolly purposefully revealed McIntyre's cooperation with the DEA to Bulger and Flemmi.  At the time of disclosure, Connolly knew that, under any circumstance, revealing the identity of a confidential informant could result in the informant's death.  He also fully appreciated that the danger was especially high in revealing to Bulger and Flemmi the identity of informants who provided information about them to law enforcement agencies.  Connolly knew that Bulger and Flemmi had committed murders, and that they had murdered other informants whose identities had been revealed to them.  Thus, the plaintiffs have alleged that the disclosure by Connolly of McIntyre's confidential informant status to Bulger and Flemmi was not only "conduct intended to injure" McIntyre, but also conduct intended to injure him *fatally*.  Moreover, the conduct was "unjustifiable by any government interest."  It is true that the government had a legitimate interest in investigating and prosecuting members of LCN for

---

[17]*See, e.g.*, *Hemphill,* 141 F.3d at 419; *Dwares v. City of New York*, 985 F.2d 94, 96 (2d Cir. 1993) (police officers' conduct in encouraging a group of skinheads physically to attack flag-burning demonstrators was conscience-shocking).

their criminal activities, and, in a most perverse sense, the death of McIntyre furthered that lawful

goal.  With good reason, however, neither Connolly nor any of the other agents has advanced a

Swiftian proposal[18] that the government's interest in prosecuting LCN warranted offering up

McIntyre as a sacrificial lamb.  Indeed, it is a fundamental tenet of the Constitution that the ends

of law enforcement do not justify all means used to fight crime.  *See, e.g.*, *Olmstead v. United*

*States*, 277 U.S. 438, 485 (1928) ("To declare that in the administration of the criminal law the

end justifies the means - - to declare that the government may commit crimes in order to secure

the conviction of a private criminal - - would bring terrible retribution.") (Brandeis, J.,

dissenting).[19]  Because the plaintiffs have alleged that the conduct of Connolly was "intended to

injure [McIntyre] in some way unjustifiable by any government interest," the plaintiffs have

unquestionably pleaded conscience-shocking conduct on the part of Connolly.

### c.      Violation of a Fundamental Right

I must next determine whether the plaintiffs have adequately alleged that the conscience-

shocking conduct of Connolly violated a fundamental right of McIntyre.  A key question in

determining whether Connolly violated the substantive due process rights of McIntyre is whether

the plaintiffs' allegations support the inference that the murder of McIntyre at the hands of

---

[18]In Jonathan Swift's 1729 satirical work *A Modest Proposal*: *For Preventing the Children of Poor People in Ireland from Being a Burden to Their Parents or Country, and for Making Them Beneficial to the Public*, the author proposes that the whole population of famine-stricken Ireland would benefit from eating the babies of Irish parents too poor to provide for them.

[19]*See also*, *e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935) (explaining that in prosecuting crime, while the government "may strike hard blows, [it] is not at liberty to strike foul ones"); *Olmstead*, 277 U.S. at 470 ("It is a less evil that some criminal should escape than that the government should play an ignoble role.") (Holmes, J., dissenting).

Bulger, Flemmi, or their associates, was sufficiently connected to the government to take the crimes out of the category of purely private violence. While "[t]he Due Process Clause is intended to prevent government officials 'from abusing [their] power or employing it as an instrument of oppression,'" *Cummings*, 271 F.3d at 346 (quoting *County of Sacramento*, 523 U.S. at 846 (alteration in original)), the "Clause is phrased in the negative. It says that a state shall not 'deprive' residents of life, liberty, or property, save with due process. It does not require the state to furnish residents with property they lack, or ensure that they do not suffer loss at private hands," *Archie v. City of Racine*, 847 F.2d 1211, 1220 (7th Cir. 1988).

As discussed below, there are, however, limited circumstances under which the government may have a duty to protect individuals from the wrongful acts of third parties. Here, Connolly and the other agents contend that the murder of McIntyre was an act of private violence, and that the narrow exceptions to the general rule that government agents do not have a duty under the Constitution to protect citizens from the acts of private violence do not apply. In contrast, the plaintiffs argue both that the murder of McIntyre implicates these exceptions and that, moreover, the murder was not purely private conduct, but government action. For the reasons explained below, I hold that the plaintiffs have adequately alleged that the murder of McIntyre was government action.

### i.     Murder of McIntyre as Private Violence

There are two exceptions to the general rule that the guarantee of substantive due process does not require the government to protect citizens from acts of private violence: (1) when the government has restrained a citizen's ability to care for himself, as in the case of incarcerated persons or persons in a foster care setting, *see DeShaney v. Winnebago County Dept. of Social*

*Servs.*, 489 U.S. 189, 198-200 (1989); and (2) when the government, through its affirmative acts, renders an individual more vulnerable to third-party violence, *see Soto*, 103 F.3d at 1064.  Not surprisingly, the parties on the present motions disagree sharply as to the scope of these duties and their applicability to the present case.

**(a)      Governmental Restraint of Victim**

In *DeShaney*, the Supreme Court observed that, absent any claim that the state created the danger, a citizen does not have a constitutional right to be free from the violent acts of third parties, unless the state has restrained the citizen's liberty.  In that case, state officials had taken temporary custody of a small child, Joshua, after receiving reports that his father had physically abused him.  After the father voluntarily committed to taking certain steps to improve the child's welfare, the officials returned Joshua to his father's custody.  Although the officials later became aware that the father was not adhering to the promises he made prior to Joshua's return, and that Joshua was showing signs of physical abuse, the state took no action until the father beat Joshua so severely that the child fell into a life-threatening coma and became profoundly retarded. Joshua and his mother brought a § 1983 action against the state Department of Social Services, certain of its employees, and the county, alleging that the defendants violated Joshua's substantive due process rights "by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *Id.* at 193.  The district court granted the defendants' motion for summary judgment, and the court of appeals affirmed.

Affirming the lower courts, the Supreme Court reiterated the principle that there is no general constitutional right to be free from private violence:

32

> [N]othing in the language of the Due Process Clause itself requires the State to
> protect the life, liberty, and property of its citizens against invasion by private
> actors.  The Clause is phrased as a limitation on the State's power to act, not as a
> guarantee of certain minimal levels of safety and security.  It forbids the State itself
> to deprive individuals of life, liberty, or property without "due process of law," but
> its language cannot fairly be extended to impose an affirmative obligation on the
> State to ensure that those interests do not come to harm through other means....
> Its purpose was to protect the people from the State, not to ensure that the State
> protected them from each other.

*Id.* at 195-196.  The plaintiffs nonetheless argued that "even if the Due Process Clause imposes no

affirmative obligation on the State to provide the general public with adequate protective services,

such a duty may arise out of certain 'special relationships' created or assumed by the State with

respect to particular individuals."  *Id.* at 197.  The plaintiffs maintained that "such 'special

relationship' existed [in that case] because the State knew that Joshua faced a special danger of

abuse at his father's hands, and specifically proclaimed, ... its intention to protect him against that

danger."  *Id.*  The plaintiffs conceded that the state did not play a part in creating the danger

Joshua faced.  *Id.*

The Court rejected the plaintiffs' "special relationship" argument.  *Id.* at 198.

Acknowledging that in some instances "the Constitution imposes upon the State affirmative duties

of care and protection with respect to particular individuals," *id.*, the Court held that such

circumstances were limited to where the state performed an "affirmative act of restraining the

individual's freedom to act on his own behalf - - through incarceration, institutionalization, or

other similar restraint of personal liberty," *id.* at 200.  In those situations, "it is the State's

affirmative act of restraining the individual's freedom to act on his own behalf ... which is the

'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act

to protect his liberty interests against harms inflicted by other means."  *Id.*; *see also Davis v.*

*Rennie*, 264 F.3d 86, 98 (1st Cir. 2001) ("Once the state restrains an individual's liberty,

rendering that individual unable to act for himself ... the state does acquire an affirmative duty to

protect." (quoting *Shaw v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir. 1990)) (alteration in

original)).  In other words, the underlying relationship giving rise to a concomitant constitutional

duty on the part of the government to protect an individual from private violence is one in which

the government has restrained someone against his/her will.  First Circuit cases decided after

*DeShaney* unequivocally demonstrate that this "governmental restraint of freedom" exception[20] to

the general rule that the Constitution does not protect against private violence is limited to

situations where government officials have forcibly restrained an individual in a physical rather

than in a figurative sense.  In *Souza v. Pina*, 53 F.3d 423 (1st Cir. 1995), for example, the First

Circuit rejected the argument of a § 1983 claimant that prosecutors had allegedly driven the

---

[20]I recognize that many federal courts refer to this exception as the "special relationship" exception, but the Supreme Court never has adopted the term in discussing whether an individual has a right to protection from third-party violence.  Instead, in *DeShaney*, the Court rejected the plaintiffs' argument that a supposed "special relationship" between the state and Joshua gave rise to a governmental duty to protect the child, and the Court used the term only in characterizing the plaintiff's argument and in referring in a parenthetical to a "special relationship" as possibly giving rise to a *common law* affirmative duty to act.  *Id.* at 202.

Thus, use of the phrase "special relationship" to refer to the government's constitutional duty to protect those whom it has physically restrained by incarceration, institutionalization, or similar methods is overly broad and possibly misleading.  The governmental restraints of freedom described in *DeShaney* might be characterized as a "special relationship," but, because a "special relationship" is also a basis for tort liability, the danger in transporting the term to the narrower field of constitutional liability is that plaintiffs may point to cases defining the government/plaintiff relationship as "special" under tort law, *see, e.g.*, *McIntyre v. United States*, 367 F.3d 38, 54 (1st Cir. 2004) (reversing my dismissal of *tort* claims against the United States on the basis of the statute of limitations, and acknowledging that the tort claims "arise[] out of a *special duty* that the government has to confidential informants who would be endangered if their informant status were revealed to others" (emphasis added)), to bolster arguments that the governmental restraint of freedom exception of *DeShaney* applies to their substantive due process claims.

plaintiff's decedent to commit suicide.  The court discerned no constitutional duty to protect the

decedent because the prosecutors had not restrained him within the meaning of *DeShaney*.  The

plaintiff had maintained that, in light of the fact that the prosecutors knew or should have known

that the decedent had posed a risk of suicide, their alleged misconduct limited the decedent's

freedom "as greatly as if he were locked in maximum security."  *Id.* at 426.  In reversing the

district court's denial of the prosecutors' motion to dismiss based on qualified immunity, the First

Circuit explained that "the Supreme Court has made clear that the state has a duty to protect only

when it affirmatively acts to restrain the 'individual's freedom to act on his own behalf - - through

incarceration, institutionalization, or other restraint of personal liberty.'" *Id.* (quoting *DeShaney*,

489 U.S. at 200).[21]  Similarly, in *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987

(1st Cir. 1992), the court affirmed the dismissal of § 1983 claim in a case where a *voluntarily*

*committed* mental health patient alleged he was injured when he jumped out of a van driven by

state employee.  At the time, the plaintiff was being transported from a state mental health

---

[21]*See also Hasenfus*, 175 F.3d at 71 (affirming dismissal of § 1983 claim in which parents alleged that the board of education, a gym teacher, and others had violated the substantive due process rights of their daughter who had attempted suicide at school; explaining that "[t]he main exceptions to [the general *DeShaney* rule] are incarcerated prisoners or involuntarily committed mental patients for whom a set of unique rules has developed" and that this custodial relationship did not exist between the daughter and school officials); *Frances-Colón v. Ramirez*, 107 F.3d 62, 63-64 (1st Cir. 1997) (affirming summary judgment in favor of government-employed doctors in § 1983 action by parents alleging that the doctors who delivered the parents' baby violated the baby's substantive due process rights by failing to perform a cesarean delivery; "A substantive due process interest in 'bodily integrity' ... cannot support a personal injury claim under section 1983 against the provider of a governmental service unless: (a) the government has taken the claimant into custody or otherwise coerced the claimant into a situation where he cannot attend to his own well-being ...; or (b) the government employee, in rare and exceptional case[s], affirmatively acts to increase the threat of harm to the claimant of affirmatively prevents the individual from receiving assistance.").

treatment center to a state-run group home.  The court reasoned that the *DeShaney* governmental restraint exception did not apply because the state had not committed the plaintiff involuntarily and therefore had not taken an "affirmative act" of restraining the plaintiff's liberty.  *Id.* at 991.

Despite this case law, the plaintiffs argue that, because McIntyre was a government informant, he was "owed a constitutionally protected duty of care arising out of a recognized 'special relationship.'"  Pl.s' Cons. Br. Opp. at 11.  The plaintiffs label the "'defendants' reliance on the proposition "that this only occurs 'through incarceration, institutionalization, or other similar restraint of personal liberty'''" as "misplaced and incomplete," *id.* (quoting Def.s' Cons. Mem. at 18), and maintain that "serving as a confidential informant for law enforcement significantly compromises one's ability to protect oneself, quite in the same fashion as if one were in a prison setting," *id.*

The plaintiffs' argument fails because, unlike an inmate or involuntarily institutionalized patient, the informant/government relationship is voluntary and does not involve physical restraint by government agents.  The plaintiffs have not suggested that the government physically forced McIntyre to become an informant.  To be sure, because McIntyre was suspected of criminal activity, his decision to cooperate might have been based on persuasive argument by the government that it was in his interest to assist the government's investigation and prosecution of the criminal activities of others.  It is also safe to say that confidential informants are generally more at risk than persons who are not informants.  But neither the government's leverage in recruiting criminal suspects to become informants nor the danger inherent in one's acceptance of that role amounts to "incarceration, institutionalization, or other similar restraint of personal liberty."  *DeShaney*, 489 U.S. at 200.  Whatever metaphorical shackles may be inherent in

becoming an informant, or to whatever degree being an informant "significantly compromises one's ability to protect oneself," is simply insufficient to cloth the informant with substantive due process rights to protection from the harm he might suffer as a consequence of being an informant.  Like the patient in *Monahan*, who voluntarily committed himself to a mental institution, McIntyre *chose* to be an informant.  His freedom to choose whether to cooperate with the government bears no resemblance to the situation of one who, by action of the government, is forced behind locked hospital or prison doors.[22]

**(b)      State-Created Danger**

Another exception to the general rule that there is not a constitutional right to be free from private violence is the so-called "state-created danger" theory.  In *DeShaney*, the Court implicitly acknowledged that, where the government's affirmative acts render a citizen more vulnerable to private violence, the citizen has a corresponding constitutional right to be protected from that violence:

> While the state may have been aware of the dangers Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them*.  That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, *it placed him in no worse position than that in which he would have been had it not acted at all*; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.  Under these circumstances, the State had no constitutional duty to protect Joshua.

---

[22]Further, the plaintiffs' characterization of the government's obligation to the informants as a "duty of care" betrays the argument that the agents' failure to protect McIntyre from private violence was a wrong of constitutional dimension.  The existence of a "duty of care" is an element of a negligence claim, *see Magarian v. Hawkins*, 321 F.3d 235, 238 (1st Cir. 2003), but "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *County of Sacramento*, 523 U.S. at 849.

489 U.S. at 201 (emphasis added).  Although this so-called state-created danger theory existed in

one form or another prior to *DeShaney*, *see, e.g.*, *Soto*, 103 F.3d at 1064-65 (providing an

overview of the development of the state-created danger theory of substantive due process

rights), many courts have read *DeShaney* as recognizing a constitutional requirement that the

government protect a citizen only when the government's affirmative acts place a person in a

"worse position than ... had it not acted at all."  *See, e.g.*, *Hasenfus*, 175 F.3d at 73 (citing

*DeShaney*, and explaining that "[w]here a state official acts so as to create or even markedly

increase a risk, due process constraints may exist, even if inaction alone would raise no

constitutional concern").[23]

     The agents argue that the plaintiffs cannot rely on the state-created danger theory because,

at the time of the agents' alleged misconduct, a substantive due process right based on this theory

was not "clearly established."  The threshold question for a court to consider in assessing the

qualified immunity defense in a given case, however, is whether "the facts alleged show the

[defendants'] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Thus, before considering the question of whether the right of a citizen to be protected from state-

created dangers was clearly established at the time of McIntyre's murder, I must first determine

whether the alleged conduct of Connolly violated that right as to McIntyre.  This is not a difficult

analysis: revealing to known murderers that one of their associates is an informant, cooperating

---

[23]*See also Martinez v. Colon*, 54 F.3d 980, 984-85 (1st Cir. 1995) (citing *Deshaney* and
noting that the plaintiff had not sought to avoid the general rule of *DeShaney* by alleging that "the
state made him more vulnerable to [the harassing officer]'s actions"); *Doe v. Town of Bourne*,
2004 WL 1212075, at *7 (D. Mass. May 28, 2004) (Woodlock, J.) (acknowledging viability of
theory); *Coyne v. United States*, 270 F. Supp. 2d 104, 120 (D. Mass. 2003) (same); *Willhauck v.
Mansfield*, 164 F. Supp. 2d 127, 134-135 (D. Mass. 2001) (same).

with the government, unquestionably endangers the safety of that informant.  Therefore when

plaintiffs allege that, in disclosing the informant status of McIntyre to Bulger and Flemmi,

Connolly acted affirmatively to put the life of McIntyre in jeopardy, they have sufficiently alleged

a violation by Connolly of McIntyre's substantive due process right to be protected from the

danger of the government's own creation.

But the plaintiffs argue in vain when they assert that the "state-created danger" theory, or

the "constitutional duty not to affirmatively abuse governmental power so as to create danger to

individuals and render them more vulnerable to harm," *Soto*, 103 F.3d at 1064, was clearly

established at the time Bulger and Flemmi are alleged to have murdered McIntyre.  *Soto v. Flores*

forecloses this argument.  In *Soto*, the plaintiff had reported her husband's emotional and physical

abuse of her to police officers.  At the time of the report, the plaintiff bore the visible marks of

recent physical abuse; she also expressed her fear that her husband would murder her if he learned

she had reported his abuse.  Despite the plaintiff's voiced concern, the police officers did not take

the husband into custody and in fact alerted the husband to the plaintiff's allegations.  After

learning of the report, the husband killed the couple's two children and then himself, leaving a

note indicating he had learned of the mother's domestic abuse report.  Advancing a state-created

danger theory of liability, the plaintiff claimed the officers had violated, among other things, her

substantive due process rights and those of her children.  The First Circuit held, however, that, "in

1991 'the contours of [a substantive due process right under state-created danger theory] were

[not] sufficiently plain that a reasonably prudent state actor would have realized not merely that

his conduct might be wrong, but that it violated a particular constitutional right.'"  *Id.* at 1065

(quoting *Martinez*, 54 F.3d at 988 (second alteration in original)).  Citing *White v. Rochford*, 592

F.2d 381, 383 (7th Cir. 1979), the First Circuit did acknowledge, however, that the "'state-created danger theory,' has been recognized by some federal courts as a viable mechanism for establishing a constitutional claim at least since 1979."  103 F.3d at 1064 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996)).  Nonetheless, the court concluded that the history of the theory was "an uneven one," and that the court could not "extract a clearly established right from a somewhat confusing body of caselaw through the use of hindsight."  *Id.* at 1065.

In light of the First Circuit's unambiguous holding in *Soto* that a substantive due process right under the state-created danger theory was not clearly established in 1991, the plaintiffs face a formidable obstacle.  The plaintiffs contend, however, that *Soto* is inapplicable to their case because *Soto* failed to "distinguish [between] materially distinct theories of state created danger," and because the harm to which the agents exposed McIntyre was a more likely and more dangerous harm than that implicated in the cases cited by the First Circuit in *Soto*.  Pl.s' Cons. Br. Opp. at 16  The plaintiffs also maintain that *Soto* is inapposite, because, in *Soto,* there was no evidence that the children (rather than the plaintiff) were at risk of being killed by the husband.  Contrasting their case with *Soto*, the plaintiffs point out that McIntyre was both the anticipated and actual victim of the danger created by the agents.  Pl.s' Cons. Br. Opp. at 15-16.

While there may be factual distinctions between *Soto* and the present case, these differences are immaterial insofar as the plaintiffs rely on a state-created danger theory for their contention that the agents violated a clearly established right.  The decision in *Soto* was not premised on the degree of harm the victims faced or the fact that the father had only threatened to kill the plaintiff, rather than the couple's children.  Such factors might be material to an inquiry

into whether a right under the state-created theory was violated, but not whether the right existed in the first place.

Finally, the plaintiffs seek to avoid the result required by *Soto* by arguing that, even if the First Circuit had not recognized the state-created danger theory at the time of the murder of McIntyre, "a factual question still exists whether the defendants ... had special knowledge through FBI legal training, regarding the *emerging* 'state created danger' theory prior to [the alleged misconduct by the defendants]."  Pl.s' Cons. Br. Opp. at 3 (emphasis added).  The mere statement of this proposition undermines the viability of the argument that the theory of liability based on state-created danger was clearly established at the time McIntyre's murder.  If the state-created danger is only "emerging," perforce it is not clearly established.  Furthermore the question of whether a constitutional right is "clearly established" is a legal question, not a fact question. *Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.'").

### ii.        Murder of McIntyre as Government Action

The question of whether the agents violated the substantive due process rights of McIntyre need not be cast only in terms of the possible obligation of the agents to protect McIntyre from *private violence*, however.  Not all action by non-governmental employees is private action.  Here, the plaintiffs have alleged that Connolly gave Bulger and Flemmi information, opportunity, encouragement, and protection to murder McIntyre.  It is also reasonable to infer from such allegations that the murder of McIntyre was the intended result of Connolly's disclosure.  Under the circumstances as alleged, I hold that the involvement of

41

Connolly in the murder of McIntyre transformed what ordinarily would have been a crime committed by private individuals into government action.

### (a)   Attributing Conduct of the Informants to the Government

As a prelude to the discussion of whether the murder of McIntyre is to be considered government action, it is worth noting that the federal courts have long held that the government may not categorically absolve itself of responsibility for the actions of its informants simply by disclaiming any formal agency relationship with them.  Almost half a century ago, in *Sherman v. United States*, 356 U.S. 369 (1958), the Supreme Court held that an unpaid informant was acting as an agent of the government when he persuaded a criminal defendant to procure narcotics. Because the informant had repeatedly attempted to have the defendant obtain drugs, including by appealing to the defendant's sympathy and by inducing the defendant to return to his narcotics habit, the Court held that the defendant was not criminally liable because the government, through the informant, had entrapped the defendant.  In so ruling, the Court explicitly stated that the informant had acted as an agent of the government, even if the government, by turning a blind eye to the informant's tactics, was not aware of all of the informant's activities:

> [The] Government cannot disown [the informant] and insist it is not responsible for his actions.  Although he was not being paid, [the informant] was an active government informer who had but recently been the instigatory [sic] of at least two other prosecutions.... In his testimony the federal agent in charge of the case admitted that he never bothered to question [the informant] about the way he had made contact with [defendant].  The Government cannot make such use of an informer and then claim disassociation through ignorance.

*Id.* at 373-75.  Similarly, in *Hoffa v. United States*, 385 U.S. 293 (1966), the Court warned that although the use of secret informants to investigate criminal suspects is not *per se*

42

unconstitutional, an informant is not "to the slightest degree more free from all relevant

constitutional restrictions than is any other government agent." *Id.* at 311.[24]  Lower courts have

likewise held that an informant's misconduct in investigating a criminal suspect may constitute

"outrageous conduct," violative of the suspect's due process rights, requiring that an indictment

against the suspect/defendant be dismissed.[25]

---

[24]*See also United States v. Groll*, 992 F.2d 755, 759 n.3 (7th Cir. 1993) ("A confidential
informant is an agent of the government for entrapment purposes."); *United States v. Campbell*,
874 F.2d 838, 843-45 (1st Cir. 1989) (holding that a jury was adequately charged on the
entrapment defense when the district court's instruction permitted a finding that the informant's
conduct could be imputed to the government); *United States v. Bueno*, 447 F.2d 903, 905 (5th
Cir. 1971) (reversing defendant's conviction on the basis of entrapment: "There is no evidence
from which to infer that the [government official] knew of this activity of the Informer, who was
employed only on a temporary basis.  However, we believe that the facts must be viewed in their
entirety for the purpose of considering their effect on this prosecution.  Both the [government
official] and the Informer must be treated as acting in concert, each with full knowledge of the
actions of the other.").

[25]*See, e.g., United States v. Bogart*, 783 F.2d 1428, 1432-34 (9th Cir. 1986) (holding that
criminal defendant had made a sufficient showing of government "outrageous conduct" to require
the district court to make finding of facts on whether prosecution would violate the defendant's
due process rights), *vacated in part as to other defendant in United States v. Wingender,* 790
F.2d 802 (9th Cir. 1986); *United States v. Sabri*, 973 F. Supp. 134, 139 (W.D.N.Y. 1996)
(granting motion to dismiss indictment where government had used defendant's attorney in
informant-like role to investigate defendant's possible criminal activity; as government agent,
attorney's conduct was attributable to the government); *United States v. Gardner*, 658 F. Supp.
1573, 1574, (W.D. Pa. 1987) (dismissing indictment because government informant's
"outrageous conduct" in manipulating criminal defendant into acquiring cocaine for the informant
violated defendant's due process rights and barred the government from seeking a conviction;
citing *Sherman* in finding that the informant was an agent of the government, and citing *United
States v. Twigg,* 588 F.2d 373 (3d Cir. 1978), finding that "the government initiated and was
actively involved in the criminal enterprise itself"); *United States v. Batres-Santolino*, 521 F.
Supp. 744, 751 n.4 (N.D. Ca. 1981) (dismissing indictment based on government informant's
outrageous conduct; noting that government "wisely" did not argue that informant's conduct
could not be attributed to government);  *cf. United States v. Merlino*, 2000 WL 294880, at *2 (D.
Mass. Mar. 10, 2000) (recognizing that government's outrageous conduct in using informant to
investigate criminal activity can violate a defendants due process rights and bar the government
from seeking a conviction) (Stearns, J.); *United States v. Ayyub*, 998 F. Supp. 81, 83-84 (D.
Mass. 1998) (same).

**(b)      Governmental Participation in Private Conduct**

With that backdrop, I turn to the question of when the conduct of a private citizen - - who

may or may not be and informant - - is "government action" for purposes of holding government

officials and the private citizen himself liable for the deprivation of constitutional rights.  The

notion that the action of a private party can be government action for purposes of determining

whether a constitutional violation has occurred was widely discussed in cases arising from the

Civil Rights Movement of the 1960's and 1970's.  In those cases, claimants alleged that the

government's imprimatur on the discriminatory acts of private citizens violated their rights under

the Equal Protection Clause of the Fourteenth Amendment.  U.S. Const. amend. XIV.[26]  In

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), one of the first of these cases, the

Court held that the plaintiff had sufficiently alleged that a municipal agency and a privately-owned

restaurant located on property owned and managed by the agency violated the equal protection

rights of a black restaurant customer who was refused service at the restaurant on the basis of his

race.  Explaining that "the concept of state responsibility [is] interpreted as necessarily following

upon 'state participation through any arrangement, management, funds or property,'" *id.* at 721

(quoting *Cooper v. Aaron*, 358 U.S. 1, 4 (1958)), the Court held that, because of the state's

failure to prohibit its lessee from discriminating against patrons on the basis of race, the state had

violated the equal protection rights of the customer who was refused service:

> By its inaction, ... the State [ ] has not only made itself a party to the refusal of
> service, but has elected to place its power, property and prestige behind the

---

[26]"The standards used for determining the existence of federal government action under
the Fifth Amendment are identical to those used for finding state action under the Fourteenth
Amendment."  *Gerena v. Puerto Rico Legal Servs., Inc.*, 697 F.2d 447, 449 (1st Cir. 1983).

> admitted discrimination.  The State has so far insinuated itself into a position of
> interdependence with [the private business] that it must be recognized as a joint
> participant in the challenged activity, which, on that account, cannot be considered
> to have been so "purely private" as to fall without the scope of the Fourteenth
> Amendment.

365 U.S. at 725.[27]  The Court warned, however, that "to fashion and apply a precise formula for

recognition of state responsibility under the Equal Protection Clause is an impossible task....  Only

by sifting facts and weighing circumstances can the nonobvious involvement of the State in

private conduct be attributed its true significance."  *Id.* at 722 (internal quotation marks

omitted).[28]

---

[27]The obvious corollary to the *Burton* rule is that private actors may also be held liable for
constitutional deprivations when the government is sufficiently involved in the conduct in
question.  Courts considering whether a government actor violated the Constitution through
conduct partly attributable to a private party have relied on cases addressing this corollary, and
vice versa, and I follow the same path in this memorandum and order.  *E.g., compare Blum v.
Yaretsky*, 457 U.S. 991 (1982) (explaining that the state can be held liable for constitutional
wrongs resulting from a private decision) *with Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S.
374, 378 (1995) (citing *Blum* in analyzing whether Amtrak violated artist's rights under the First
Amendment by rejecting the artist's lease of billboard space); *compare Adickes v. S.H. Kress &
Co.*, 398 U.S. 144 (1970) (holding that private party could be held liable for an alleged violation
of constitutional rights based on the private entity's alleged conspiracy with local police) *with
Fries v. Barnes*, 618 F.2d 988, 990 (2d Cir. 1980) (citing *Adickes* in holding that the plaintiff had
adequately alleged a § 1983 claim against police officers and private physicians for violating his
rights under the Fourth Amendment by claiming that the officers and the physicians conspired to
gather evidence from the plaintiff's person and effects while he was unconscious and undergoing
treatment for a gunshot wound); *see also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939
(1982) (citing *Burton* as providing a basis for analyzing whether private entity may be liable for
constitutional violations); *McQueen v. Druker*, 438 F.2d 781, 784 (1st Cir. 1971) (citing *Burton*
as providing a basis for analyzing whether private entity could be liable for constitutional
violations).

[28]*See also id.* at 725 ("Because readily applicable formulae may not be fashioned, the
conclusions drawn from the facts and circumstances of this record are by no means declared as
universal truths on the basis of which every state leasing agreement is to be tested.").

Subsequent Supreme Court decisions reiterated the two principles of *Burton*: that private
action that has a sufficient nexus to state authority can be "state action" for purposes of holding

Courts have addressed several kinds of government involvement in private conduct in determining whether that private conduct may be treated as government action in the context of a claimed constitutional violation. Because the calculus involves "sifting facts and weighing circumstances," the descriptions and tests for liability of government actors for constitutional violations, based on government involvement in private conduct, have multiplied[29] since *Burton* was issued. There is no rubric that is the single expression of the circumstances in which

---

the public and private parties liable for violating equal protection and other constitutional rights, and that there is no universal test for determining whether that nexus exists. In *Reitman v. Mulkey*, 387 U.S. 369 (1967), the Court upheld a ruling by the highest court of California that a state law allowing persons to decline to sell real estate interests to whomever they chose violated the Equal Protection Clause because the law "invalidly involved the State in racial discriminations in the housing market." *Id.* at 375. The Court reiterated both the "necessity for a court to assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations," *id.* at 380, and, citing *Burton*, that "formulating an infallible test" for making such a determination was an "impossible task," *id.* at 378; *see also, e.g.*, *Evans v. Newton*, 382 U.S. 296, 299 (1966) (concluding that "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action" and acknowledging that "[w]hat is 'private' action and what is 'state' action is not always easy to determine").

[29]*Burton* used the expressions "joint participant" and "position of interdependence" to describe the requisite level of government involvement. In *Reitman*, the Court employed the term "significantly involved," 387 U.S. at 380, but later characterized *Reitman* as being "based on a theory that ... the State was *abetting* a refusal to rent apartments on racial grounds," *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) (emphasis added). The *Evans* court spoke of private conduct "entwined with governmental policies." 382 U.S. at 299. In *Blum*, the Court stated that the government could be responsible for a private decision "only when it has exercised coercive power or had provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." 457 U.S. at 1004; *see also Edmondson Oil Co.*, 457 U.S. at 939, (pointing out that the Court has articulated the "public function," "state compulsion," "nexus," and "joint action" tests for determining whether private conduct was under "color of law" and observing that the tests might be "different in operation or simply different ways of characterizing the necessarily fact-bound inquiry").

46

government action will be found in the conduct of private actors.[30]  Still, the cases have a

common theme: when a government actor participates in the conduct of private actors that would

violate the constitution if the conduct were solely that of the government actor, the conduct is

government action for purposes of analyzing whether a constitutional violation has occurred.  I

need only discuss a sampling of cases that may be fairly analogized to the cases presently before

me to make the point.

In the well-known case, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), the Court held

that a store employee's act of refusing service to the plaintiff, allegedly because the plaintiff was a

white woman in the company of black persons, might have been under "color of law" if the

employer had conspired or "somehow reached an understanding" with local police to refuse the

plaintiff service on that ground: "The involvement of a state official in such a conspiracy plainly

provides the state action essential to show a direct violation of [the plaintiff]'s Fourteenth

Amendment equal protection rights, whether or not the actions of the police were officially

authorized, or lawful." *Id.* at 152.  While the trial court had held that the plaintiff had "failed to

allege any facts from which a conspiracy might be inferred," *id.* at 148, the Court held that the

undisputed facts did not foreclose the proposition that if a police officer were present at the store,

"it would be open to a jury ... to infer from the circumstances that the policeman and a Kress

employee had a 'meeting of the minds' and thus reached an understanding that petitioner should

be refused service," *id.* at 158.

---

[30]*Gerena,* 697 F.2d at 449 n.2 ("We note that the various formulae established in the many
Supreme Court opinions examining the existence of state action are not tests in the traditional
sense.  More precisely, they are different methods of analyzing and appraising the facts and
circumstances of a particular case.").

In *Fries v. Barnes*, 618 F.2d 988 (2d Cir. 1980), the Second Circuit used a similar mode of analysis to hold that a plaintiff, who alleged that police officers and private physicians had acted "in concert, cooperation and conspiracy with each other" to conduct a warrantless search and seizure, had stated a valid § 1983 claim against the officer and the physicians.  *Id.* at 990.  The district court had dismissed the plaintiff's claims *sua sponte* as frivolous, concluding that there was no indication that the physicians had acted under color of law when they turned over to authorities items the doctors obtained while treating the plaintiff for a gunshot wound.  Reversing the district court's order, the Second Circuit cited *Adickes* and explained that a "police officer or government agent may not escape responsibility by claiming that the violation of the plaintiff's rights was committed by the private person involved in such a collaborative undertaking."  *Id.* at 990.  Because the plaintiff had alleged that the police had "aided and abetted the other Defendants, and ... directed the concerted action that Plaintiff contends deprived him of his constitutional rights," the allegations met "the test laid down by *Adickes*, and are inconsistent with the district court's mistaken impression that there was no allegation of a conspiracy between the police and doctor."  *Id.* at 991 (alteration in original).

Over a decade after the *Fries* decision, the Second Circuit, in *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993) held that police officers who allegedly aided and abetted a private actor's assault on the plaintiff could be liable to the victim in a § 1983 claim.  The plaintiff alleged that, prior to a rally during which the assault occurred, the police officers told certain "skinheads" that unless the skinheads' conduct at the rally got completely out of control, the police would neither interfere with their assaults nor arrest the perpetrators.  During the rally, the skinheads attacked the plaintiff; police officers witnessed the ten-minute attack, but did not make an attempt

to intervene.  Citing *Fries* and *Adickes*, the Second Circuit vacated the district court's dismissal of the claim, explaining that "a state actor may be subject to liability for an action physically undertaken by private actors in violation of the plaintiff's liberty or property rights if the state actor directed or aided and abetted the violation."  *Id.* at 98.  Noting that, by alleging that the officers had agreed not to interfere with skinheads' conduct, the plaintiff had alleged that "the officers in effect aided and abetted" the assault."  The court concluded that "[s]uch a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause."  *Id.* at 99.[31]

The Second Circuit's analysis in *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998), discussed *supra*, is similar to that in *Dwares*.  Relying on allegations that the officers "conspired with another" by giving a gun to the store owner who then shot the plaintiff, the Second Circuit concluded that the plaintiff in *Hemphill* had sufficiently "ple[aded] a violation of his Fourteenth Amendment right not to be subjected to the excessive force of a third party who is aided and abetted by a state actor."  141 F.3d at 419.[32]  One of the factors the court pointed to in arriving at

---

[31]The court also found that the plaintiff had alleged a violation of his due process rights under a state-created danger theory.  *Id.* at 99.  Reasoning that "it requires no stretch to infer that [the officers'] prior assurances would have increased the likelihood that the 'skinheads' would assault the demonstrators," the court concluded that the complaint "asserted that the defendant officers indeed had made the demonstrators more vulnerable to assaults."  *Id.*  The court's analyses under the state-created danger and the "aiding and abetting" theories were nonetheless distinct.  *Id.* at 99; *see also Hemphill*, 141 F.3d at 419 ("We held in *Dwares*, that where the state actors actually contributed to the vulnerability of the plaintiff, *or* where the state actors aided and abetted a private party in the deprivation of a plaintiff's civil rights, a violation of the Due Process Clause does occur." (emphasis added)).

[32]In *Cummings*, the First Circuit cited *Hemphill* as an example of police misconduct of "constitutional dimension" that could give rise to a claim of violation of due process rights.  271 F.3d at 346.  The court characterized *Hemphill* as a case of "police officers aiding a third-party in shooting the plaintiff."  *Id.*

this conclusion was the fact that knowing that, the store owner wanted to "get" the plaintiff, the officers provided the store owner with a gun and allowed him to accompany the officers to the scene of the arrest.  *Id.*  Because a jury could infer from these circumstances that the officers "acted for the very purpose of causing [the plaintiff] harm," the factual dispute over the officers' intentions foreclosed summary judgment.  *Id.* at 420.

---

*See also Burton v. Stergue*, 1998 WL 893151 (D. Conn. Sept. 29, 1998).  In that case, the plaintiff brought a § 1983 claim against private citizens as well as state and local officials, alleging, *inter alia*, that the defendants conspired to and did violate her constitutional right to be free from bodily punishment and her right to attend a public meeting.  When the plaintiff (an attorney) attempted to attend a municipal conservation commission meeting on the property of a landowner against whom a client of the plaintiff had filed suit, the landowner physically assaulted the plaintiff.  The plaintiff claimed that some commission members prevented others from coming to the plaintiff's assistance and let the assault continue.  On a motion to dismiss, some of the defendants argued that the plaintiff's § 1983 claim was "fatally flawed" because it was "based upon an alleged assault by two private individuals without governmental involvement" and the government's failure to protect citizens from private violence did not violate the plaintiff's due process rights.  *Id.* at *5.  The court, however, agreed with the plaintiff that, as to the commissioner's act of restraining those attempting to assist the plaintiff, the plaintiff had alleged a conspiracy to violate her constitutional rights rather than a failure to protect her from private violence; preventing others from helping the plaintiff was an overt act in furtherance of that conspiracy.  The court concluded that the commissioner "'aided and abetted' action 'physically undertaken by private actors in violation of the plaintiff's [constitutional] rights.'"  *Id.* at *7 (quoting *Dwares*, 985 F.2d at 98 (alteration in original)); *cf. Ghandi v. Police Dept. of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984) (FBI agents who worked closely with informant not entitled to summary judgment on *Bivens* claim that FBI agents had instructed informant to violate plaintiffs' First Amendment rights; characterizing the FBI agents as the "supervisors" of the informant, the court explained that "[s]upervisory personnel are subject to liability where evidence establishes that they authorized [or] approved ... unconstitutional conduct of the offending officers" (quoting *Hays v. Jefferson County,* 668 F.2d 869, 874 (4th Cir. 1982))) (second and third alternations in original), *judgment for defendants after trial aff'd*, 823 F.2d 959 (6th Cir. 1987); *Blake v. Doyle*, 1999 WL 1044211 (N.D. Ill. Nov. 9, 1999) (where the plaintiff alleged "there were many other state and local employees aiding and abetting" burglary of plaintiff's residence by non-state actor, the plaintiff's allegations arguably satisfied the state action requirement of a § 1983 claim; the plaintiff's claim nonetheless failed because she had not alleged facts such as who the state and local employees were, for what agencies they worked, and the nature of the challenged conduct).

In the four cases discussed above, the courts used a variety of expressions to describe the relationship between the private and public actors in finding government action where a private party delivered the final blow.  The store clerk and the policeman in *Adickes* might have "reached an understanding" or had a "meeting of the minds" to refuse service to the plaintiff.  398 U.S. at 152, 158.  The jury could infer this "understanding" simply from the police officer's presence in the store.  *Id.* at 158.  In *Fries*, the plaintiff's claim of a conspiracy was supported by allegations that the police officers and the physicians were "involved" in a "collaborative undertaking" and that the officers "aided and abetted" the physicians and "directed" the objectionable conduct.  618 F.2d at 990.  In *Dwares*, the court characterized the police officers' promise that they would not arrest or even interfere with the skinheads as a "prearranged official sanction of privately inflicted injury."  985 F.2d at 99.  The officers "aided and abetted" the assault with their promise of inaction.  *Id.*  In *Hemphill*, a conspiracy for the "very purpose of causing" the harm inflicted on the plaintiff could be inferred from the allegations that the officers armed a vengeful citizen and delivered him to a volatile arrest situation.  141 F.3d at 420.  The officers' actions "aided and abetted" the assault.  *Id.* at 419.[33]  In each one of these cases, the government's participation in the conduct complained of was so far removed from the realm of "purely private" actions that it was deemed to have been government action.

The relationship between Connolly, on the one hand and, Bulger and Flemmi, on the other, with respect to the murder of McIntyre, may be characterized by any of the nomenclature

---

[33]*Cf. Kadar Corp. v. Milbury*, 549 F.2d 230, 233-34 (1st Cir. 1977) (reversing dismissal of claim under § 1983 or § 1985(3) that defendant conspired with municipal officials to adopt discriminatory rules and regulations that prevented the plaintiff from developing residential housing; claim of conspiracy survived dismissal at the pleading stage where plaintiff alleged that the defendant "aided and abetted" certain abuses).

used in *Adickes*, *Fries*, *Dwares*, and *Hemphill*.  As I have noted above, the allegations and the reasonable inferences from them are that Connolly not only knew the dire consequences of revealing to Bulger and Flemmi the identity of McIntyre as an informant, but intended that Bulger and Flemmi would kill McIntyre following the disclosure of his identity.  The plaintiffs allege that Connolly had an incentive to quiet McIntyre.  Because the hallmark of a successful FBI agent was handling a "top echelon" informant, it was necessary to protect Bulger and Flemmi from prosecution in order for Connolly to continue benefitting from the prestige of that relationship.  Moreover, Bulger and Flemmi were a repository of information not only about LCN, but also about the malefactions of the FBI generally, and of Connolly in particular.  Criminal prosecution of Bulger and Flemmi might expose the corrupt relationship Connolly maintained with Bulger and Flemmi.  Thus, Connolly, Bulger, and Flemmi might be said to have "reached an understanding;" that they had a "meeting of the minds;" that they engaged in a "collaborative undertaking;" or that they conspired to kill the McIntyre.  The disclosure by Connolly of the informant status of McIntyre may have been a "prearranged official sanction of privately inflicted injury."  It can also be said that, by disclosing McIntyre's identity as an informant and communicating in word or in deed that the FBI would deflect efforts by other law enforcement agencies to investigate and prosecute Bulger and Flemmi for murdering McIntyre, Connolly "aided and abetted" the homicide.  Regardless of the descriptor used, the plaintiffs have alleged that Connolly, in his role as a government official, participated in the murder of McIntyre, and the constitutionality of his conduct and that of all of the agents must be analyzed on the premise that the murder of McIntyre was government action.

3.      **Violation by Connolly of the Clearly Established Substantive Due Process Rights of McIntyre**

The Fifth Amendment explicitly states that the government may not deprive a citizen of life without due process of law.  Indeed, "[o]ne of the less controversial aspects of the due process clause is its implicit prohibition against a public officer's intentionally killing a person, or seriously impairing the person's health, without any justification."  *K.H. ex rel Murphy v. Morgan*, 914 F.2d 846, 848 (7th Cir. 1990); *see also Souza*, 53 F.3d at 426 ("There is a constitutional right not to be deprived of life without due process of law.  Thus, a state actor cannot murder a citizen.").[34]  The cases discussed in the preceding section of this memorandum and order establish that this right may be implicated even where the murder is physically carried out by a private actor.

The defense of qualified immunity applies unless the law is clearly established either by materially similar precedent or by general legal principles that apply with obvious clarity to the facts of the case.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Under the facts as alleged by the plaintiffs, it cannot be doubted that Connolly violated the substantive due process rights of McIntyre.  In fact, because Connolly allegedly participated in and/or aided and abetted the murder of McIntyre, the right in question might be characterized as the right not to be murdered by the government.  As so characterized, the right is clearly established by the words of the Fifth Amendment itself.  *See, e.g.*, *Heinrich*, 62 F. Supp. 2d at 319 (holding that the plaintiffs' decedents had a clearly established right in 1946 to be free from being injected with plutonium by the government without her consent "[e]ven absent the abundant case law that has developed on

---

[34]As I explained in Part III.D.2.b, *supra*, the government's interest in prosecuting the LCN did not justify taking the life of the decedents.

this point since the passage of the Bill of Rights").  But, even if the right is characterized as a right

not to be murdered by a private actor where a government actor aided, abetted, collaborated or

conspired with the private actor to accomplish the murder, the right was clearly established before

McIntyre was murdered.  The fact that there is no case proclaiming the existence of the right

under factual circumstances like those presented by the case before me does not preclude a

determination that the right was clearly established.  The Supreme Court has rejected the notion

that the determination of whether a constitutional right is clearly established requires that a court

find that the facts before it are fundamentally similar to a previous case declaring the right.  The

Court instead has explained that

> general statements of the law are not inherently incapable of giving fair and clear
> warning, and in other instances a general constitutional rule already identified in
> the decisional law may apply with obvious clarity to the specific conduct in
> question, even though the very action in question has not previously been held
> unlawful.

*Hope*, 536 U.S. at 741 (quoting *Lanier*, 520 U.S. at 270-71) (internal citation marks omitted).

Thus, "officials can still be on notice that their conduct violates established law even in novel

factual circumstances."  *Id.*  Indeed, "the easiest cases don't even arise."  *Lanier*, 520 U.S. at 271

(quoting *United States v. Lanier*, 73 F.3d 1380, 1410 (7th Cir. 1996) (Daughtrey, J., dissenting)).

For example, "[t]here has never been ... a section 1983 case accusing welfare officials of selling

foster children into slavery; it does not follow that if such a case arose, the officials would be

immune from damages [or criminal] liability."  *Id.* (quoting *Lanier*, 73 F.3d at 1410 (Daughtrey,

J., dissenting))[35]; *see also Anderson*, 483 U.S. at 640 (explaining that it is not required that the

---

[35]The quotations the Court cited from Judge Daughtrey's dissent in the Seventh Circuit's
*Lanier* opinion originated in *K.H. ex. rel. Murphy v. Morgan*, 914 F.2d 846, 850-52 (7th Cir.
1990), a case in which the Seventh Circuit, in affirming the district court's denial of motion to

"very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent").[36]

Cases in which "general statements of the law" gave "fair and clear ruling" applied "with obvious clarity" to the conduct in question include *Drummond v. City of Anaheim*, 343 F.3d

---

dismiss based on qualified immunity, held that a child's due process right "not to be placed with and shuffled among foster parents known to be incompetent and indeed dangerous" was clearly established. The court relied on a Supreme Court decision that the Constitution requires the state to take steps to prevent children in state institutions from deteriorating physically or psychologically, and on a circuit decision that a state cannot avoid certain responsibilities merely by delegating custodial responsibility to an irresponsible private person, in finding that the due process right of the child was "clearly established."

[36]*See also Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) ("[N]otwithstanding the absence of direct precedent, the law may be, as it was here, clearly established. Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1285-86 (9th Cir. 2001))); *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002) ("When 'the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.' To hold otherwise would allow an officer who understood the unlawfulness of his actions to escape liability simply because the instant case could be distinguished on some immaterial fact, or worse, because the illegality of the action was so clear that it had seldom been litigated." (quoting *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994)) (additional citation omitted)); *id.* at 554 ("The lack of more cases with similar facts is due to the clarity, rather than the ambiguity, of the [case law precedent]."); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 253 (2d Cir. 2001) ("To the extent that no case applying this right [to be free from excessive force] in the educational setting has previously arisen in our circuit ... [is] a strong indication that the right to be free from excessive force is so well-recognized and widely observed by educators in public schools as to have eluded the necessity of judicial pronouncement."); *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994) ("This is such an elementary violation of the First Amendment that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles."); *McDonald v. Haskins*, 966 F.2d at 295 (7th Cir. 1992) ("In sum, that no precisely analogous case exists does not defeat [plaintiff]'s claim. It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books. As we recognized in *K.H. ex rel. Murphy* ... the easiest cases don't even arise." (internal quotation marks omitted)).

1052, 1061-62 (9th Cir. 2003) (holding that officer's alleged conduct in subduing mentally ill

citizen violated "clearly established" law because the court "need[ed] no federal case directly on

point to establish that kneeling on the back and neck of a compliant detainee, and pressing the

weight of two officers' bodies on him even after he complained that he was choking and in need

of air violates clearly established law, and that reasonable officers would have been aware of the

same"); and *Polk v. District of Columbia*, 121 F. Supp. 2d 56, 70-71 (D.D.C. 2000) (holding

that, where police officer allegedly directed ride-along civilian to detain someone for whom there

was no probable cause, the absence of any reported cases addressing that precise conduct did not

foreclose a determination that the right to be free from such detentions was clearly established;

there was no "open question" whether the Constitution outlawed the officer's conduct and "there

can be little doubt that the Constitution forbids police officers to share their authority to conduct

searches and seizures with unauthorized civilians").[37]

---

[37]*See also Clem*, 284 F.3d at 553-54 (holding that, where Supreme Court had held that
deadly force cannot be used by a police officer to seize an unarmed nondangerous suspect,
officers who, in response to a call from a woman requesting assistance with her mentally ill
husband who had not taken his medications, subjected the husband to pepper spray and shot him
three times, violated the husband's clearly established Fourth Amendment rights); *Skrtich v.
Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002) (holding that, where Supreme Court cases held
that prisoners cannot be subjected to gratuitous disproportionate force that has no object but to
inflict pain, guards who severely beat a prisoner during a cell extraction after they had rendered
the prisoner completely inert by an electric shock, violated the clearly established Eighth
Amendment rights of the prisoner; the absence of cases concerning gratuitous force *in the context
of a cell extraction* did not preclude a determination that the right in question was clearly
established); *Newburgh Enlarged Sch. Dist.*, 239 F.3d at 253; (holding that absence of
precedential case law expressly holding that students have a substantive due process right not to
be struck by a teacher did not preclude a determination that gym teacher who grabbed student by
the throat, lifted him off the ground by his neck, dragged him across the gym floor to the
bleachers, choked him and slammed the back of his head against the bleachers four times, rammed
his forehead into a metal fuse box and punched him in the face, violated the clearly established
substantive due process rights of the student); *McBride v. Village of Michiana*, 100 F.3d 457,
461 (6th Cir. 1996) (holding that "[a]lthough no Supreme Court or Sixth Circuit decisions had, at

Based on these principles, I hold that in 1984, the substantive due process right to not be murdered by a private actor where a government actor aided, abetted, collaborated or conspired with the private actor to accomplish the murder was clearly established.  Although in 1984 the courts had not addressed factual circumstances "fundamentally similar" to those alleged by the plaintiffs in this case, "in the light of pre-existing law, the unlawfulness" of Connolly's conduct was "apparent."  *Anderson*, 483 U.S. at 640.  The text of the Fifth Amendment provided the general prohibition against the government's depriving citizens of life.  It was also clearly established in 1984 that constitutional violations can be effectuated by private actors acting in concert with government actors.  *See Sherman v. United States*, 356 U.S. at 373 (1958) ("[The] Government cannot disown [the informant] and insist it is not responsible for his actions."); *Burton*, 365 U.S. at 725 (1961) ("The State has so far insinuated itself into a position of interdependence with [the private business] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."); *Hoffa v. United States*, 385 U.S. at 311 (1966) (an informant is not "to the slightest degree more free from all relevant constitutional restrictions than is any other government agent"); *Adickes*, 398 U.S. at 151 (1970) (private actor's "understanding" with police officer to refuse service to a customer was state action

--------

that time, applied time-honored First Amendment principles to a situation *specifically* involving governmental retaliation against a news reporter," town officials who had allegedly retaliated against reporter after she published reports criticizing the local government violated the clearly established First Amendment rights of the reporter); *McDonald*, 966 F.2d at 295 (holding that police officer who held a gun to the head of a 9-year old boy and threatened to pull the trigger violated the rights of the boy even though no closely analogous case existed; explaining that "[i]t should have been obvious ... that his threat of deadly force ... was objectively unreasonable given the alleged absence of any danger").

57

subject to constitutional scrutiny), discussed *supra*.  I "need no federal case directly on point,"
*Drummond*, 343 F.3d at 1061, to conclude that it was clearly established in 1984 that an FBI
agent violates the substantive due process right of an individual to be free from government-
sponsored, incited, or provoked murder if the individual is murdered as a result of the disclosure
by the agent to violent criminals that the individual is cooperating with the government in
investigations of the unlawful activities of the criminals, and the agent knows or should know that
the criminals will kill the individual, reasonably believing that the agent will protect them from
prosecution for that murder.

Although none of the parties have addressed the issue, I also hold that, based on the
plaintiff's allegations, it was reasonable for Connolly to have been aware that his conduct violated
McIntyre's clearly established right to be free from government-involved murder.  There are no
allegations supporting a conclusion that Connolly made a reasonable mistake as to what the law
required, *see Saucier*, 533 U.S. at 205, that he was reasonably ignorant of crucial facts, *see Suboh
v. District Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 95 (1st Cir. 2002), or that any other
circumstance existed that would have made it unreasonable for Connolly to appreciate that his
conduct was unconstitutional.  Moreover, while regulations do not establish constitutional rights,
they may provide fair warning that conduct violates the Constitution.  *Groh v. Ramirez*, 540 U.S.
551, 124 S.Ct. 1284, 1293-94 & n.7 (2004) (explaining that federal agency directive that its
agents had to be sure a search warrant was sufficient on its face before executing it
"underscore[d] that [an agent] should have known that he should not execute a patently defective
warrant"); *Hope*, 536 U.S. at 744 (state department of corrections regulations concerning
permitted of uses of hitching post provided fair warning that prison guards' conduct was

unconstitutional, when the guards, in violation of the regulations, handcuffed an inmate to the hitching post for seven hours without water or bathroom breaks ).  Here, the Guidelines required FBI agents to "ensure that individual rights are not infringed and that the government itself does not become a violator of the law."  Compl. ¶ 110.

I therefore hold that Connolly is not entitled to qualified immunity on count X of the complaint on this present motion for judgment on the pleadings under Rule 12(c), and I DENY his motion as to count X.

### 4.    Violation by Other Agents of the Clearly Established Substantive Due Process Rights of McIntyre

Having found that Connolly violated the clearly established due process right of McIntyre not to be murdered by the government or with government participation, I turn to the question of whether the alleged misconduct of Fitzpatrick, Greenleaf, Kennedy, Morris, or Ring also violated that right.  For purposes of this discussion, I will treat Fitzpatrick, Greenleaf, Kennedy, Morris, and Ring as "supervisors."  Although the pleadings only identify Greenleaf, Fitzpatrick, and Ring as formal supervisors at the time of the murder of McIntyre, the term "supervisor" may be "defined loosely to encompass a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior."  *Camilo-Robles*, 151 F.3d at 6-7.[38]

---

[38]Although the plaintiffs allege that all of the agents are liable for the violation of McIntyre's substantive due process rights, the plaintiffs explicitly seek to hold Ring and Greenleaf liable for the murder of McIntyre under a theory of supervisory liability.  *See* Compl. Count XA. At the time of the murder of McIntyre, Ring and Greenleaf were indeed the formal supervisors of Connolly.  As chief of the OCS, Ring was the direct supervisor of Connolly.  Greenleaf, as SAC of the FBI Boston Office, had supervisory authority over all the agents in the office.  However, in light of the loose definition of the term "supervisor" and of my duty to determine whether the plaintiffs' complaint "sets forth facts sufficient to justify recovery *on any cognizable theory*," *Soto-Negron v. Taber Partners I*, 339 F.3d 35, 38 (1st Cir. 2003) (emphasis added) (quoting *Martin v. Applied Cellular Tech., Inc.*, 284 F.3d 1, 6 (1st Cir. 2002)), I do not limit the

Supervisors are not vicariously liable for the constitutional violations perpetrated by "subordinates." *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000). Nonetheless, supervisors may violate the constitutional rights of a third party by "formulat[ing] a policy or engag[ing] in a practice that leads to a civil rights violation [of the third party] committed by another." *Camilo Robles,* 151 F.3d at 7. To be actionable as a constitutional violation, the offending conduct of the supervisor must manifest, at a minimum, a deliberate indifference to the constitutional rights of the third party. *Id.* To plead deliberate indifference, a plaintiff must allege "(1) a grave risk of harm; (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Id.* A supervisor cannot be faulted for having failed to "take easily available measures to address the risk" of harm posed by the subordinate unless the supervisor actually "had the power and authority to alleviate'" the underlying constitutional violation. *Id.* (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)). In other words, "the plaintiff must 'affirmatively connect the supervisor's conduct to the subordinate's violative act or omission.'" *Id.* (quoting *Maldonado-Denis*, 23 F.3d at 582). The affirmative connection includes a "knowing sanction" of the rights-violating conduct, but may also encompass "tacit approval of, acquiescence in, or purposeful disregard of" such conduct. *Id.*[39]

A supervisor's deliberate indifference to the rights of third parties may occur in a variety of circumstances. In *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999), for example, the

application of supervisory liability to Ring and Greenleaf.

[39]"[S]upervisory liability does not require a showing that the supervisor had actual knowledge of the offending behavior; he 'may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness.'" *Camilo-Robles*, 151 F.3d at 7 (quoting *Maldonado-Denis*, 23 F.3d at 582).

First Circuit explained that "liability [for violation of constitutional rights] attaches if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." Other courts have found conduct on the part of supervisory law enforcement officials to be deliberately indifferent to the constitutional rights of citizens where a supervisor permitted a reinstated officer to carry a weapon without reviewing the officer's record,[40] failed to exercise his discretion to keep a violent police officer assigned to a desk job to ensure that the violent officer would not come into contact with the public,[41] formulated rules likely to result in a subordinate's unjustifiably shooting a citizen,[42] and knowingly failed to remedy subordinates' pattern of dangerous or unconstitutional conduct.[43]

---

[40]*Diaz v. Martinez*, 112 F.3d 1 (1st Cir. 1997) (affirming denial of police supervisor's motion for summary judgment based on qualified immunity where supervisor permitted reinstated subordinate officer to carry a firearm without restrictions and subordinate subsequently shot plaintiff in a small scuffle; had the supervisor fulfilled his duty to review the subordinate's background before permitting him to carry a gun, supervisor would have discovered that four years earlier the subordinate had been involuntarily committed after capturing the police station and gun point and holding several fellow police officers hostage).

[41]*Camilo-Robles*, 151 F.3d at 13-14.

[42]*Harris v. Roderick*, 126 F.3d 1189, 1202-04 (9th Cir. 1997) (affirming the denial of FBI officials' motion for dismissal based on qualified immunity where FBI sharpshooter, adhering to the officials' special rules of engagement requiring the sharpshooter to shoot at any male carrying a weapon, regardless of the absence of any immediate danger, fatally shot the plaintiff's decedent).

[43]*See, e.g., Maldonado-Denis*, 23 F.3d at 582 ("A causal link [between the conduct of the supervisor and the unconstitutional act of the subordinate] may also be forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations. When the supervisor is on notice and fails to take corrective action, say, by better training or closer oversight, liability may attach."); *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (upholding judgment under § 1983 claim against director of state department of corrections where subordinates' segregation of inmate for twenty-two months violated the inmate's clearly

With the foregoing principles in mind, I turn now to the question of whether Fitzpatrick, Greenleaf, Kennedy, Morris, and Ring were deliberately indifferent to the substantive due process right of McIntyre not to be murdered by the government.  As explained above, the allegations in this case support the conclusion that the murder of McIntyre was government action because Connolly participated in the murder by disclosing McIntyre's informant status to Bulger and Flemmi.

*Kennedy.*  Despite the enumeration of wrongs that Kennedy and the other defendants allegedly committed, *see, e.g.*, Compl. ¶ 427, the plaintiffs have not alleged conduct by Kennedy that would support a conclusion that he was deliberately indifferent to the substantive due process rights of McIntyre.  The allegations concerning Kennedy's conduct, prior to McIntyre's death, essentially amount to the following.  Kennedy knew that Bulger and Flemmi were informants for the FBI, and that Connolly was their handler. As early as 1983, Kennedy had some knowledge of the criminal activities of Bulger and Flemmi.  In violation of the Guidelines, Kennedy did not share this information with the DEA or attorneys prosecuting cases involving crimes committed by Bulger and Flemmi.  Kennedy also knew that McIntyre was cooperating with law enforcement agencies investigating Bulger's role in illegal arms shipments to the IRA.  In October 1984, Kennedy interviewed McIntyre and discovered that McIntyre had information incriminating

---

established constitutional rights, and the director "knew of the actions of his subordinates which resulted in a constitutional violation" and "failed to take any preventive action"); *see also Jensen v. City of Oxnard*, 145 F.3d 1078, 1086-87 (9th Cir. 1998) ("[I]f police officials knew [the subordinate police officer] was likely to inflict a constitutional injury or if their practices and policies showed a 'deliberate indifference' to the danger such an individual posed, they should be liable under § 1983.  Because, under [the plaintiff]'s version of the shooting, [the subordinate police officer] 'could not have reasonably believed the use of deadly force was lawful,' none of the individual [supervisory] defendants are entitled to qualified immunity at this stage.").

Bulger and Flemmi in the Valhalla arms shipments.  Kennedy reported McIntyre's revelations to Greenleaf.

There are no allegations to support an inference that Kennedy knew or should have known of the risk Connolly posed to the safety of McIntyre.  To be sure, one may infer that Kennedy knew that Bulger and Flemmi were violent criminals, and that McIntyre faced danger by agreeing to cooperate.  The danger that McIntyre assumed, however, inheres in the role of an informant.  Indeed, according to the complaint, McIntyre knew the implications of cooperating - - in fact, he was "petrified" of Bulger and Flemmi.  Compl. ¶ 247.  The danger in incriminating Bulger and Flemmi was a risk McIntyre faced regardless of whether Bulger and Flemmi were informants for the FBI.  McIntyre did not have a constitutional right to be free from this risk; so there was no right, based on the risk alone, to which Kennedy could have been deliberately indifferent.

Further, even assuming that Kennedy did have knowledge of Connolly's rights-violating conduct, the plaintiffs have not alleged that Kennedy failed to take measures easily available to him to prevent that conduct.  The complaint is devoid of any indication that Kennedy had formal or informal authority over Connolly.  The plaintiffs group Kennedy together with all of the other agents in alleging that the agents failed properly to supervise Connolly (*i.e.*, failed to train him in the requirements of the Guidelines, failed to enforce the Guidelines, permitted Connolly to be the handler of Bulger and Flemmi when it was apparent he should have been removed from that position).  I must, however, read the complaint in its entirety, and the more specific allegations concerning Kennedy belie any allegation that his conduct amounted to a "failure" to change the

course of Connolly's conduct or even that he had the "power and authority," *Camilo-Robles*, 151 F.3d at 7, to do so.[44]

Because the plaintiffs have failed to plead deliberate indifference on the part of Kennedy, Kennedy is entitled to the defense of qualified immunity as to the plaintiffs' allegations that he violated the substantive due process rights of McIntyre.

Some additional comments words about the plaintiff's allegations concerning the conduct of Kennedy are in order here.[45]   As stated above, I premise my analysis of the liability of the agents on the notion that Connolly's act of revealing McIntyre's informant status to Bulger and Flemmi transformed the murder of McIntyre from private violence into government action subject to the strictures of the Due Process Clause.   The plaintiffs' claims point to another theory of government action, the viability of which I do not consider in this memorandum and order.   This theory, in substance, is that the murder of McIntyre was government action because the acts and omission of the agents with respect to Bulger and Flemmi enabled and emboldened Bulger and Flemmi to murder McIntyre.[46]   Under this theory, a determination of whether an agent violated the substantive due process rights of McIntyre would not be limited to an analysis of his acts and

---

[44]*Cf. Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 983 n.10 (7th Cir. 2004) (explaining that where a "general allegation might be enough to sustain a complaint under the liberal pleading requirements of [Fed. R. Civ. P. 8], ... 'if a plaintiff does plead particulars, and they show he has no claim, then he is out of luck - - he has pleaded himself out of court'" (quoting *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994)))

[45]These comments apply also to the allegations concerning Fitzpatrick, Greenleaf, Morris, and Ring.

[46]*Cf. McIntyre v. United States*, 367 F.3d 38, 53-54 (1st Cir. 2004) (recognizing that the plaintiffs' claims against the United States "are based on two interrelated theories of how the FBI caused McIntyre's death: (1) by leaking his confidential informant status to Bulger and Flemmi, in violation of a special duty of non-disclosure owed to him by the government, and (2) by protecting Bulger and Flemmi from investigation and prosecution, thus enabling and emboldening them to murder him").

omissions with respect to Connolly's disclosure of confidential law enforcement information. Instead, each agent would be deemed to have violated McIntyre's substantive due process rights to the extent that the conduct of the agent enabled and emboldened Bulger and Flemmi to murder McIntyre.

Even if I were to apply this theory here, I would still find that the plaintiffs have not alleged that Kennedy violated the substantive due process rights of McIntyre.  Regardless of the theory of government action advanced by the plaintiffs, the objectionable conduct must meet the conscience-shocking test.  The plaintiffs do not allege facts that support an inference that Kennedy acted with an intent to injure McIntyre.  I noted earlier that the allegations also do not support an inference that Kennedy acted with deliberate indifference with respect to Connolly's violation of McIntyre's rights.  Likewise, the allegations are insufficient to support an inference that Kennedy acted with deliberate indifference by extending his own protection to Bulger and Flemmi, thereby violating the substantive due process rights of McIntyre.  The plaintiffs merely allege that, in 1983, Kennedy allegedly violated the Guidelines when he did not inform the DEA that he had obtained information regarding Bulger's criminal activities in a matter of concern to the DEA.  *See* Comp. ¶ 251.  Any causal connection between this single act and the murder of McIntyre is simply too attenuated reasonably to support an inference of deliberate indifference by reason of Kennedy's protection of Bulger and Flemmi.  Finally, Kennedy's ability to assist McIntyre directly was limited.  Kennedy did not need to warn McIntyre that he assumed a danger in agreeing to incriminate Bulger and Flemmi.  As noted above, McIntyre knew there was a risk in informing on Bulger and Flemmi.  Kennedy was not at liberty to reveal the informant status of Bulger and Flemmi to McIntyre, and there is nothing in the complaint to support an inference that

Kennedy knew or should have known that Connolly would reveal or had revealed McIntyre's informant status to Bulger and Flemmi.

In sum, neither of the plaintiffs' theories of government action are sufficient to pierce Kennedy's shield of qualified immunity.  The alleged misconduct of Kennedy was not conduct intended to injure McIntyre; nor do the allegations suggest deliberate indifference.  With "liability for negligently inflicted harm" being "categorically beneath the threshold of constitutional due process," *County of Sacramento*, 523 U.S. at 848, (and I express no opinion here as to whether the plaintiffs have alleged negligence by Kennedy), the conduct of Kennedy does not "shock the judicial conscience," *Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 623 (1st Cir. 2000).

*Fitzpatrick, Greenleaf, and Ring.*  At the time that McIntyre was murdered, Greenleaf was the SAC of the FBI Boston Office and Fitzpatrick was the ASAC.  Ring was the chief of the Organized Crime Squad.  Thus, all three agents had formal supervisory responsibility for Connolly.  The plaintiffs have adequately alleged that Fitzpatrick, Greenleaf, and Ring knew or should have known that Bulger and Flemmi committed acts of violence after becoming FBI informants, and that Bulger and Flemmi had a history of murdering persons - - including persons providing information to law enforcement agencies concerning the criminal activities of the Winter Hill Gang.  The plaintiffs also have adequately alleged that Fitzpatrick, Greenleaf, and Ring knew or should have known that Connolly did not observe the Guidelines, that the relationship between Connolly, Bulger, and Flemmi was corrupt, and that Connolly was sharing confidential law enforcement information with Bulger and Flemmi.  In light of these allegations and reasonable inferences from them, I conclude that Fitzpatrick, Greenleaf, and Ring had actual or constructive knowledge of the risk Connolly posed to the constitutional rights of informants

who incriminated Bulger or Flemmi, including McIntyre.  By virtue of the formal supervisory authority of Fitzpatrick, Greenleaf, and Ring over Connolly, their alleged failure adequately to supervise Connolly - - including failing to train Connolly, failing to enforce to the Guidelines, and permitting Connolly to continue as the handler of Bulger and Flemmi - - adequately identifies a failure to take easily available measures to alleviate that risk.  Thus, the plaintiffs have alleged deliberate indifference that violated McIntyre's substantive due process rights on the part of Fitzpatrick, Greenleaf, and Ring.

*Morris*.  The plaintiffs have adequately alleged that Morris was deliberately indifferent to the rights of McIntyre.  During the time that Morris was the direct supervisor of Connolly, he participated in, or had actual or constructive knowledge of, Connolly's disclosure to Bulger and Flemmi of the informant status of certain persons who were subsequently murdered by Bulger or Flemmi, including McIntyre.  Although Morris ceased to be Connolly's formal supervisor in December 1982, Morris maintained his corrupt relationship with Connolly, Bulger, and Flemmi.  The same year that McIntyre was murdered, for example, Morris provided Connolly with confidential law enforcement information to pass on to Bulger and Flemmi.  *See* Comp. ¶¶ 239, 241.  From (1) Morris's role in and/or knowledge of the manner in which Connolly, Bulger and Flemmi had responded in the past to threats of exposure posed by the cooperation with law enforcement agencies of associates of Bulger and Flemmi; and (2) Morris's continued involvement with Bulger and Flemmi, including the sharing of confidential law enforcement information with them, one may reasonably infer that Morris knew of and had the power to prevent the unconstitutional conduct of Connolly.  I conclude, then, that the plaintiffs have

adequately alleged that Morris acted with deliberate indifference to the substantive due process rights of McIntyre.

A conclusion that the plaintiffs have alleged deliberate indifference to the rights of McIntyre on the part of Fitzpatrick, Greenleaf, Morris, and Ring does not, however, completely preclude a qualified immunity defense.  As with the conduct of Connolly, the alleged misconduct of Fitzpatrick, Greenleaf, Morris, and Ring cannot have violated the substantive due process rights of McIntyre unless it shocks the conscience.  In determining whether the alleged misconduct of Connolly was conscience-shocking, I considered whether his conduct was "intended to injure in some way unjustifiable by any government interest," which is "the sort of official action most likely to rise to the conscience-shocking level."  *County of Sacramento*, 523 U.S. at 849.  While it is clearly reasonable to infer from the plaintiffs' allegations that Connolly acted with an intent to injure McIntyre, that same inference is not as obvious with respect to the allegations against Morris, and even less obvious with respect to Fitzpatrick, Greenleaf, and Ring.

Nonetheless, something less than conduct intended to injure can satisfy the conscience-shocking test.  Executive conduct taken in "deliberate indifference" may shock the conscience when it was "practical" for the government official to have actually deliberated prior to taking the offending course of action.  *Id.* at 851; *see also id.* at 853 ("When ... opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."); *cf. id.* at 854 (holding the "deliberate indifference" standard inapplicable to a high-speed police pursuit).  The alleged misconduct of Fitzpatrick, Greenleaf, Morris, and Ring consists generally of a failure to supervise Connolly; this conduct is of the sort where "actual deliberation is practical."  *See id.* at

850 n.10 (noting that the Court "ha[d] employed deliberate indifference as a standard of culpability sufficient to identify a dereliction as reflective of municipal policy and to sustain a claim of municipal liability for failure to train an employee who causes harm by unconstitutional conduct for which he would be individually liable"); *Shrum ex rel. v. Kluck*, 249 F.3d 773, 779 (8th Cir. 2001) ("[I]n some circumstances, official policy that is deliberately indifferent to unconstitutional conduct may satisfy the 'shocks the conscience' standard required by *[County of Sacramento v.] Lewis*."). Thus, I may gauge whether the conduct of Fitzpatrick, Greenleaf, Morris, and Ring was conscience-shocking by applying a test of deliberate indifference. Because this is the very standard I employed above to determine whether the conduct of these agents violated a fundamental right of McIntyre, I need not consider the question anew for the purpose of determining whether their conduct was conscience-shocking. Thus the conclusion: the alleged misconduct of Fitzpatrick, Greenleaf, Morris, and Ring was deliberately indifferent and therefore conscience-shocking.[47]

   One more step remains before I may conclude that Fitzpatrick, Greenleaf, Morris, and Ring are not entitled to qualified immunity on their motions for judgment on the pleadings. Because I am analyzing the conduct of these agents under a theory of supervisory liability, I must consider whether the theory of supervisory liability on which the plaintiffs rely was clearly established at the time of the relevant conduct. *Camilo-Robles*, 151 F.3d at 6. This is not a difficult analysis. It was clearly established in 1984 that an official can violate the rights of a private citizen by failing to supervise his subordinates adequately. *See, e.g.*, *Rizzo v. Goode*, 423

---

[47]The allegations supporting a conclusion that the conduct of Connolly was conscience-shocking because it was conduct "intended to injure" also support a finding that his conduct was conscience-shocking under the less exacting "deliberate indifference" standard.

69

U.S. 362, 373-74 (1976) (discussing *Hague v. CIO*, 307 US 496 (1939), and pointing out that in *Hague* "the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies by ... defendants ... including the Mayor and the Chief of Police"); *Davis v. Zahradnick*, 600 F.2d 458, 459 n.1 (4th Cir. 1979) ("By alleging and swearing that [the prison warden] had neglected his duty to supervise and control the prison guards, [the plaintiff] proceeded upon a proper theory of § 1983 liability, and not upon the discredited [r]espondeat superior doctrine."); *Demarzo v. Cahill*, 575 F.2d 15, 17-18 & n.2 (1st Cir. 1978); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) ("[A] police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence *or otherwise within his knowledge*.  That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed." (emphasis added)); *Delaney v. Dias*, 415 F. Supp. 1351, 1354 (D. Mass. 1976).

The allegations against Fitzpatrick, Greenleaf, Morris, and Ring reasonably permit the inference that, through their conduct vis-à-vis Connolly's violation of McIntyre's clearly established substantive due process right not to be murdered by or with the aid of government agents, Fitzpatrick, Greenleaf, Morris, and Ring themselves were deliberately indifferent to the substantive due process rights of McIntyre, and that this deliberate indifference was conscience-shocking.  Moreover, it was clearly established at the time of the murder that the agents could be held liable to the plaintiffs based on the agents' dereliction of their supervisory responsibilities.  Thus, Fitzpatrick, Greenleaf, Morris, and Ring are not entitled to the defense of qualified immunity with respect to allegations that they violated the substantive due process rights of McIntyre.

**E.      Access to the Courts**

The agents have moved to dismiss the plaintiffs' *Bivens* claims that the agents conspired to deprive them of their right under the First and Fifth amendments to access to the courts.  Compl. Count XII.  The agents argue that these claims fail to meet the pleading requirements for a claim of denial of access to the courts, as set forth in the Supreme Court's decision in *Christopher v. Harbury*, 536 U.S. 403 (2002).  Specifically, the agents argue that the denial of access conspiracy claims are insufficiently pleaded because the complaint fails to allege (1) a valid underlying claim upon which the Estate was denied access to the courts; (2) that the object of the agents' conspiracy was to deprive the Estate of its right of access to the courts; and (3) a remedy unique to the denial of access claim and unavailable on any other claim.

In *Harbury*, the Supreme Court set forth the elements of a backward-looking denial of access claim of the kind involved here.  536 U.S. at 415-16.  First, the allegations of the complaint must be sufficient to identify a "nonfrivolous," and "arguable" underlying claim that the plaintiffs would have brought had it not been for the alleged denial of access.  *Id.* at 415.  The complaint must also describe the official acts that denied access.  *Id.*  Next, the complaint must identify a remedy that may be awarded that is unique to the denial of access claim.  *Id.*  That is to say, the remedy must be unavailable in any suit that may yet be brought.  *Id.*  Both the underlying claim and the unique remedy must be set out in the complaint in a manner sufficient to give fair notice to the defendant.  *Id.* at 416.  In addition to meeting the *Harbury* requirements, plaintiffs asserting a conspiracy to deny access to the courts must also allege that the object of the conspiracy was either (1) unlawfully to deprive the plaintiffs of their right of access to the courts; or (2) to

achieve some lawful aim by depriving the plaintiffs of access to the courts. *See Earle*, 850 F.2d at 844.

In count XII of the complaint, the plaintiffs allege that Ahearn, Connolly, Fitzpatrick, Greenleaf, Kennedy, Morris and Ring "conspired and confederated together to deny the [plaintiffs'] Estate its clearly established right to seek redress of grievances." Compl. ¶ 467. The plaintiffs claim that the conspiracy "result[ed] in lost damages." *Id.* The plaintiffs do not make any other allegations concerning the damages resulting from the alleged conspiracy. As I explained in *Estate of Halloran v. United States*, 268 F. Supp. 2d 91, 97 (D. Mass. 2003), this vague claim for damages does not meet the *Harbury* requirement of pleading damages unique to the access to the courts claim in a manner "sufficient to give fair notice to" the agents. 546 U.S. at 416. This alone vitiates the plaintiffs' claim based on denial of access to the courts. Therefore, I need not address whether the plaintiffs have otherwise stated a claim for denial of access to the courts or whether the right was clearly established at relevant times. Accordingly, the motions of Ahearn, Connolly, Fitzpatrick, Greenleaf, Kennedy, Morris, and Ring for judgment on the pleadings are hereby GRANTED as to count XII of the complaint.

## IV.   CONCLUSION

For the reasons discussed above, I hereby order that the motions listed below be disposed of as follows:

Ahearn's motion for judgment with prejudice on the pleadings (docket entry 293) is GRANTED;

Connolly's motion to dismiss or for judgment on the pleadings on all counts of the complaints asserted against him (docket entry 306) is DENIED as to count X and GRANTED as to counts IX, XI, and XII;

Fitzpatrick's motion to dismiss for lack of jurisdiction by reason of failure to state a constitutional claim which defeats defendant's defense of qualified immunity (docket entry 299) is DENIED as to count X and GRANTED as to counts IX, XI, and XII;

Greenleaf's motion for judgment with prejudice on the pleadings (docket entry 296) is DENIED as to counts X and XA and GRANTED as to counts IX, XI, and XII;

Kennedy's motion for judgment on the pleadings (docket entry 303) is GRANTED; and,

Ring's motion for judgment on the pleadings on the basis of qualified immunity (docket entry 297) is DENIED as to counts X and XA and GRANTED as to counts IX, XI, and XII.

I also rule that Morris is entitled to judgment on the pleadings as to counts IX, XI, and

XII.

SO ORDERED.

 /s/ REGINALD C. LINDSAY
United States District Judge

DATED:        September 30, 2004