UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The Estate of John L. McIntyre,<br><br>Plaintiff<br><br>v.<br><br>United States of America, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 01-10408-RCL |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I. INTRODUCTION

On March 8, 2001, the Estate of John McIntyre filed this civil action against the United States, eight former agents of the Boston office of the FBI (H. Paul Rico, John Morris, John Connolly, Roderick Kennedy, Robert Fitzpatrick, James Greenleaf, James Ahearn), as well as James Bulger, Stephen Flemmi and Kevin Weeks seeking redress for the wrongful death of John McIntyre pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq, and Chapter 229 of the Massachusetts General Laws.

In October 2003, Flemmi pled guilty to his role in the murder of John McIntyre as well as several other murders. Fact 28; Third Superseding Indictment (Ex. 1). Flemmi's plea agreement states in relevant part:

> Defendant expressly and unequivocally admits that he in fact knowingly, willfully and intentionally committed the crimes described above, and is in fact guilty of those offenses . . . .Defendant agrees to cooperate fully with law enforcement agents and government attorneys designated by the U.S. Attorney. He must provide complete and truthful information to all law enforcement personnel and government agents so designated by the U.S. Attorney …. Defendant must answer all questions put to him by any law enforcement agents or government attorneys and must not withhold any information. He must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity …. If the Government determines that Defendant has breached

> this Agreement by making any false, incomplete, or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the Government may terminate this Agreement …
>
> Flemmi Plea Agreement at 1, 9,12 (Ex. 2) (emphasis added).

In conjunction with the plea, the Flemmi, his attorneys and A.U.S.A. Fred Wyshak, on behalf of the United States, were signatories to the Parties' Agreed Statement of Facts, submitted to Judge Stearns "to assist the Court in its determination that there is an adequate factual basis to support the plea." Therein, Flemmi and the United States stipulated:

> When [John] McIntyre returned to Boston on the Valhalla he was contacted by law enforcement authorities and agreed to cooperate. He provided information that led to the seizure of a large quantity of marijuana which was being transported into Boston harbor on the vessel 'Ramsland.' The loss of the arms shipment and the seizure of the Ramsland caused Bulger and defendant Flemmi to suspect that somebody was cooperating with law enforcement. They subsequently learned from their federal law enforcement contacts that one of the individuals who had returned on the Valhalla was cooperating.
>
> On or about November 30, 1984, a Winter Hill Gang member brought McIntyre to the East Third Street house where Bulger, defendant Flemmi and [Kevin] Weeks were waiting. They held McIntyre at gunpoint and physically restrained him. Bulger and defendant Flemmi interrogated McIntyre about the extent of his cooperation with law enforcement as well as the Murray drug organization, and then took McIntyre to the basement where Bulger strangled him and shot him in the head.
>
> Agreed Statement of Facts at 14-15 (Ex. 3)

At deposition in this matter, Flemmi acknowledged he plead guilty because he is guilty and the term of his plea agreement. Flemmi Tr. at 23-37 (Ex. 4). Flemmi also acknowledged that the Agreed Statement of Facts was a product of his debriefing by government agents as part

of his cooperation and that it was truthful.[1] Flemmi Tr. at 43-46 (ex. 4). Flemmi also testified that the sole government agent who revealed that "one of the individuals who had returned on the Valhalla was cooperating" was FBI SA John Connolly. Flemmi Tr. at 170-173 (Ex. 4).

In July 2000, Kevin Weeks plead guilty to his role in the murder of John McIntyre as well as several other murders. Fact 30; Superseding Information (Ex. 5). As with Flemmi, Weeks' plea agreement states in relevant part:

> Defendant expressly and unequivocally admits that he in fact knowingly and intentionally committed the crimes charged in the Superseding Information and is in fact guilty of those offenses . . . .Defendant agrees to cooperate fully with law enforcement agents and government attorneys. He must provide complete and truthful information to all law enforcement personnel. Defendant must answer all questions put to him by any law enforcement agents or government attorneys and must not withhold any information. He must not attempt to protect any person or entity through false information or omission, or to implicate falsely any person or entity …. If the U.S. Attorney determines that Defendant has breached this Agreement by making any false, incomplete, or misleading statement, or by providing any false, incomplete or misleading information to any law enforcement personnel, grand jury or court, the U.S. Attorney may terminate this Agreement . . . .
>
> Weeks Plea Agreement at 1, 5, 7 (Ex. 6) (emphasis added).

Pursuant to his plea agreement, Weeks' testified as a government witness in the criminal trials of John Connolly, Michael Flemmi and Richard Schneiderhan. At trial in Connolly, Weeks' testimony corroborated the government's and Flemmi's account of McIntyre's murder:

> "Jim Bulger was told by John Connolly that one of two people that were on the VALHALLA were cooperating with the government on the guns to Ireland. Subsequently, John McIntyre was brought into a house where Jim Bulger

[1]The Agreed Statement of Facts is admissible as a statement by Flemmi pursuant to Fed. R. Evid. 801(d)(2). Unlike Flemmi, who acknowledged the Agreed Statement of Facts as truthful, the United States has refused to concede the facts it proffered before Judge Stearns are truthful in this litigation. In November 2005, the Magistrate denied Consolidated Plaintiffs' Motion to Strike United States' Answers to Interrogatories. In her Order, the Magistrate held that the doctrine of judicial estoppel did not apply to the Parties' Agreed Statement of Facts. The Court later overruled plaintiffs' objection to the Magistrate's order. Pursuant to these orders, the United States may not be precluded by the doctrine of judicial estoppel from contesting the facts it previously stipulated to before Judge Stearns, nevertheless, as with Flemmi, the Agreed Statement of Facts is still admissible as a statement by the United States pursuant to Fed. R. Evid. 801(d)(2) and the United States must now present contrary affidavits if it intends to challenge the facts set forth therein. Fed. R. Civ. P. 56.

> questioned him and he admitted to it. The plan was that John McIntyre was either going to go down to South America and hide until the grand jury was over or Jim Bulger was going to tell him what to say to the grand jury. Jim decided at the last minute to kill him."
>
> "Q. Why was it that Bulger wanted to kill McIntyre?
> A. Because he was an FBI informant.
> Q. How did Bulger know that?
> A. From the FBI.
> Q. Do you know from whom?
> A. From John Connolly.
>
> Tr. May 15, 2002 at 113-114; Tr. May 16, 2002 at 65 (Ex. 7).

This background, and the full record as set forth below, establishes that John McIntyre was cooperating with United States Customs and the FBI in October and November 1984 and provided information that lead to the seizure of the "Ramsland" causing Bulger and Flemmi to suspect that somebody was cooperating with law enforcement. The record also establishes that Connolly disclosed to Bulger that the informant was one of the two individuals who had returned on the Valhalla. As a direct result of this disclosure of confidential law enforcement information, Bulger and Flemmi determined that McIntyre was cooperating and, along with Weeks, murdered him. Fact 45-46, 48.

Based on this record, plaintiff moves for summary judgment against John Connolly on Counts 1 through 4 based upon his providing confidential law enforcement information to Bulger and Flemmi that one of the two individuals who returned on the Vahalla was cooperating with federal law enforcement which disclosure was a direct and proximate cause of John McIntyre's murder. Similarly, plaintiff moves for summary judgment against the United States on Counts 1 through 4 based upon Connolly's disclosure of McIntyre's cooperation to Bulger and Flemmi as

this conduct was within Connolly's scope of employment, breached the government's duty to McIntyre and does not fall within the discretionary function exception.[2]

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a summary judgment motion the court construes "the record evidence in the light most favorable to, and [draws] all reasonable inferences in favor of, the non-moving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (citation and internal quotations omitted). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986) (citation and internal quotations omitted). Once that burden is met, the non-moving party must "produce evidence on which a reasonable finder of fact … could base a verdict for it," or else the motion will be granted. Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citation omitted).

## III. STATEMENT OF MATERIAL FACTS

[2] Pursuant to 28 U.S.C. § 2679(d)(1), the United States certified that each of the agents named in the Complaint, except for Connolly and Morris, were acting within the scope of employment and the United States was substituted as a party defendant for these agents on the state law claims. Because the United States has not certified that Connolly was acting within the scope of his employment, he is still a party on the state law claims. Nevertheless, if the government refuses to certify scope of employment, the employee or the plaintiff, may at any time prior to trial petition the court for de novo review of whether the employee was acting within the scope of employment. 28 U.S.C. § 2679(d)(3); Gutierrex de Martinez v. Lamagno, 515 U.S. 417, 434 (1995); Operation Rescue National v. United States, 975 F. Supp. 92, 100 (D. Mass. 1997). If the court determines that Connolly was acting within the scope of his employment, the United States will be substituted as a party on the state law claims. By this motion, plaintiff requests a determination from the court that Connolly was acting within the scope of employment at time of the incident out of which the claim arises. Should the court not resolve this issue on the pleadings, plaintiff requests a hearing on scope of employment prior to or in conjunction with trial. See e.g., Operation Rescue, 975 F. Supp. at 108 ("The court may … hold evidentiary hearings to resolve immunity-related factual disputes").

Pursuant to Local Rule 56.1, attached is a statement of materials facts of record as to which plaintiff contends there is no genuine issue of to be tried.

IV.   ARGUMENT

A.   The United States is Liable for the Conduct of Agent Connolly[3]

This Court, in a related case, previously recognized the validity of a claim for the wrongful death of Debra Davis against the United States premised on the FBI's relationship with Bulger and Flemmi that "allowed – and in some instances even encouraged – Flemmi and Bulger to commit murder and other serious crimes." Davis v. United States, 340 F. Supp. 2d 79, 85 (D. Mass. 2004). The claim in Davis is premised on a theory that Bulger and Flemmi's informant status allowed them to commit serious crimes with impunity. Id. at 82, 85 ("plaintiffs allege[d] that the protection afforded Flemmi and Bulger by FBI agents allowed the two criminals to kill Davis in 1981, without fear of prosecution . . . . the FBI carried out its practice of protecting Flemmi and Bulger without any real regard to the foreseeable trial of victims, including Davis"). Based upon these allegations, this Court rejected the government's FTCA defenses that Davis' claims are not based on conduct within an agent's scope of employment, that Massachusetts law does not impose a duty on a private person to prevent criminal acts by another person and the agents' conduct is protected by the discretionary function exception. Id. at 87-93.[4] Applying this Court's reasoning in Davis to a more fully developed record and to a more specific claim -- McIntyre was murdered as a direct result of Connolly's disclosure of confidential law

---

[3] Section IV.C. explains Connolly's liability under Massachusetts law. Sections IV.A-IV.D explains the United State's liability for Connolly's conduct.

[4] In each of the related cases premised on FBI misconduct, this Court as well as Judge Young and Judge Gertner reached similar conclusions regarding the government's FTCA defenses. See Rakes v. United States, 352 F. Supp. 2d 47 (D. Mass. 2005) (conducting similar analysis but not reaching ultimate issue upon holding that claim was barred by statute of limitations); Halloran v. United States, 01-11346-RCL (D. Mass. December 1, 2004) (relying on Davis opinion when denying motion to dismiss premised on defense that leak of informant's identity is outside scope of employment); Limone v. United States, 271 F. Supp. 2d 345 (D. Mass. 2003) (denying motion to dismiss).

enforcement information to Bulger and Flemmi – leads to one conclusion, the Estate is entitled to summary judgment against the United States based upon this theory of relief.[5]

B. Connolly Was Acting Within the Scope of His Employment

1. The Wang Test

The FTCA serves as a waiver of sovereign immunity for claims "caused by the negligent or wrongful act of omission of any employee of the government, while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Whether a government employee is acting within the scope of employment is determined in accordance with the law of the state where the act or omission occurred. Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996).

Under Massachusetts law, the conduct of an agent is within the scope of employment: 1) if it is of the kind he is employed to perform; 2) if it occurs substantially within the authorized time and space limits; and 3) if it is motivated, at least in part, by a purpose to serve the employer. Wang Laboratories, Inc. v. Business Incentive, Inc., 398 Mass. 854, 859 (1986) (citing Restatement (Second) of Agency § 228 (1958)) (other citations omitted). This scope of employment test "is not construed restrictively" and "may extend beyond the employee's actual authority." Davis, 340 F. Supp. 2d at 88 (citing Clickner v. Lowell, 422 Mass. 539, 542 (1996), Howard v. Burlington, 399 Mass. 585, 590 (1987)). An act may be within the scope of employment even if forbidden or criminal. Davis, 340 F. Supp. 2d at 88 (citing Restatement (Second) of Agency § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment") and § 231 ("An act may be within the scope of employment although consciously criminal or tortuous")).

2. The "Kind of Activity" Prong

[5] Plaintiff may also be entitled to judgment based upon alternate theories such as the government failed to protect McIntyre or supervisory liability. Plaintiff has elected not to present this issue for summary judgment.

The "kind of activity" prong of the Wang test "requires a determination of the duties a person is employed to perform" such as the handling of informants. Operation Rescue v. United States, 975 F. Supp. 92, 106 (D. Mass. 1997) (citing Wang, 398 Mass. at 859). Under Massachusetts law, "it is ordinarily the actual and customary, rather than formally described, duties which determine scope of employment." Id. (quoting Howard, 399 Mass. at 590). Moreover, "the scope of an employee's employment is not construed restrictively." Id. (quoting Howard, 399 Mass. at 590 and citing Commonwealth v. Jerez, 390 Mass. 456, 461-62 (1983). Rather, "anything which is reasonably regarded as incidental to the work specifically directed" satisfies this prong. Howard, 399 Mass. at 591 (quoting Restatement (Second) of Agency § 229 cmt. a (1958)). Finally, although state law controls the ultimate determination of scope of employment, federal law defines the "nature and contours" of the employee's "federal responsibilities." Operation Rescue, 975 F. Supp. at 106 (quoting Aversa, 99 F.3d at 1209).

Applying these considerations to the facts of this case, it is evident that handling informants was a "kind of activity" that Connolly was employed to perform. Coyne v. United States, 270 F. Supp. 2d 104, 109 (D. Mass. 2003) (holding that FBI agent's negligent leaking of informant's identity was within scope of employment).

First, a paramount role of the organized crime squad and the FBI was the investigation and prosecution of the Italian mafia. Fact 7-8.

Second, the FBI's ability to investigate crime is dependant on developing and maintaining informants: "[t]he use of informants is the single most important tool available to the FBI for the gathering of information bearing on our investigation. The past successes we have had in our investigative endeavors has, in part, resulted from the operation of quality informants.

It is the responsibility of every field office to ensure that necessary informant coverage is established and maintained." Fact 102.

Third, every FBI agent "involved in investigative activity is obligated to develop and operate productive informants." Fact 103(c).  Once an informant is developed, the contact agent is responsible for operation of that informant.  Fact 103(d) ("The activities of all informants should be directed as much as possible to ensure that they are developed to their fullest potential. Every effort should be made to control the informant's activities when acting in the FBI's behalf to ensure that the informant's conduct will be consistent with legal and administrative restrictions").

Fourth, under FBI Guidelines, and in accordance with the pattern and practice of the Boston Office of the FBI, Connolly was responsible for handling Bulger and Flemmi. United States v. Connolly, 341 F.3d 16, 20 (1st Cir. 2003); Fact 3.

Fifth, Connolly was delegated great latitude in handling Bulger and Flemmi by his direct supervisors (Morris and Ring) and several SACs of the Boston Office and was relied upon to train members on his own squad and other squads around the country in the handling of informants.  Fact 9(a) – (d).

Finally, Connolly's stature as an agent based on his ability to develop and operate informants was recognized on repeated occasions by the Director of the FBI himself.  Fact 9(e) – (g).

Based upon this record, it is indisputable that handling of informants was the "kind of activity" Connolly was employed to perform.  Coyne, 270 F. Supp. 2d at 109 ("the record is clear that SA Cronin was acting within the scope of her employment, at least with respect to the

alleged negligent conduct of exposing Coyne's identity and failing to protect him").[6] Operation Rescue, 975 F. Supp. at 107 ("In making the remarks now claimed to be defamatory, Senator Kennedy was informing his constituents and the general public of his view on pending legislation scheduled to be considered by the Senate the next day. Such statements were 'of the kind he [was] employed to perform"); Heinitz v. Great Woods, Inc., 1991 U.S. Dist. Lexis 9513 (D. Mass. July 10, 1991) ("employees responsible for attack" on concert patrons within scope of employment because they "were on shift in the parking lot, carrying out their duties of cleaning the grounds"); see also Davis, 340 F. Supp. 2d at 88 (collecting Massachusetts scope of employment cases). The leaking of McIntyre's identity was for the specific purpose of operating, developing and maintaining Bulger and Flemmi as "productive informants." Fact 9(a), (e). It was not a frolic or detour, but for the express purpose of nurturing this "special relationship" where each party would reveal confidential information to the other. If Bulger and Flemmi were lost as informants because of their involvement with illegal arms shipments or drug trafficking, the FBI was the loser. Connolly's leak that one of the two individuals who returned on the Valhalla was cooperating was part and parcel of the government's Fustian bargain: it would allow Bulger and Flemmi to operate and control their criminal world with immunity provided that they continued to assist the FBI in the prosecution of LCN. Fact 21-23. The FBI received the benefit of the bargain and successfully prosecuted the LCN. In this light, there is absolutely no qualitative difference between the FBI's institutional obstruction of the other investigations into Bulger and Flemmi and the decision to leak McIntyre's identity. Fact 14-20; United States v. Salemme, 91 F. Supp.2d 141, 208-213 (D. Mass. 1999) (detailing FBI's efforts

[6] In Coyne, the government certified the agent was within the scope of her employment, there conceding that the leak of an informant's identity was the "kind of activity" an agent is employed to person and was motivated, at least in part, to serve the FBI.

to obstruct investigations). All of these acts were in violation of the criminal code, but all of these acts were carried out to preserve Bulger and Flemmi's informant status.

Moreover, the First Circuit's opinion in Aversa v. United States focusing on the employee's actual, customary and incidental duties precludes an argument that Connolly was acting outside the scope of employment.[7] In Aversa, an Assistant United States Attorney and IRS agent, when announcing an indictment and a subsequent guilty plea, "falsely stated and implied to the local and national news media" that the plaintiff was involved in "laundering illegally-gotten money, tax evasion, drug trafficking and racketeering activity." 99 F.3d at 1203. The district court judge who presided over the criminal case found the AUSA's statements to have been "totally false," "misleading," "outrageous," "self-serving" and "unfair." Id.

After Aversa's criminal conviction was reversed on appeal, he sued the AUSA and the IRS agent alleging a constitutional claim and several state law claims including slander, intentional infliction of emotional distress and, on behalf of his wife, loss of consortium. Pursuant to the Westfall Act, the government certified that the AUSA and the IRS agent acted within the scope of their employment and the United States was substituted as the party defendant. Aversa challenged this finding, but after discovery on the issue, the district court upheld certification and dismissed the state law claims arising out of libel and slander pursuant to the intentional tort exception of 28 U.S.C. § 2680(h) leaving Aversa without a remedy.[8] Id. at 1206.

On appeal, the First Circuit agreed with the Justice Department that the AUSA and IRS agent were acting within the scope of employment at the time they committed their intentional

---

[7] Aversa applies New Hampshire law "which is virtually identical to that of Massachusetts" because both Massachusetts and New Hampshire rely upon the Restatement (Second) of Agency § 228 and both adopt the incidental duties approach. Rakes, 352 F. Supp. 2d at 53. Moreover, Aversa is instructive First Circuit precedent on the interplay between the "nature and contours" of the employee's "federal employment" and state law.

[8] The constitutional claim was dismissed based upon qualified immunity.

acts. The panel reached this decision despite finding that the AUSA violated provisions of the United States Attorneys' Manual regarding "Media Relations," violated controlling CFRs proscribing the types of information that may be made available to the media about pending cases, that the release of the information served "no law enforcement function" and that the AUSA was "not authorized" to make the statements at issue. Id. at 1210-1211. The Court found the conduct sufficiently egregious to refer the AUSA's conduct to OPR and to the New Hampshire Professional Conduct Committee and made similar referrals based upon the misconduct of the IRS agent and the United States Attorney supervising their conduct. Id. at 1216. Nevertheless, the panel found that the defamatory statements were "incidental to authorized duties" because, although all applicable polices were violated and the specific comments were not approved:

> The Justice Department authorized or at least could foresee that an Assistant United States Attorney permitted to inform the public about arrests, indictments and convictions would convey to the public a reasonable amount of negative information about the persons involved. Further, although unfortunate, we think that the Department of Justice reasonably could anticipate that an employee entrusted with that power might abuse it. Id. at 1212 (emphasis added).

Similarly, Connolly and the FBI, on an institutional basis, violated the applicable guidelines regarding the handling of high echelon informants because, despite their actual or constructive knowledge of Bulger and Flemmi's criminal activities, including but not limited to murder, Connolly continued to leak information to Bulger and Flemmi and the agency failed to close Bulger and Flemmi as informants because their services were invaluable to the prosecution of LCN. Fact 51-94. Although Connolly may not have been specifically authorized to leak McIntyre's identity just as the AUSA may not have been authorized to make the defamatory statements, the act of leaking was coterminous with the responsibility delegated to him. Given

the wide latitude entrusted to agents in developing informants in general, and Connolly in particular, the FBI could anticipate that Connolly might abuse that power, especially when taking into account the prior history of individuals cooperating against Connolly's prized informants suddenly turning up dead. See Facts 78-94; Restatement (Second) of Agency § 230 ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment"); § 231 ("An act may be within the scope of employment although consciously criminal or tortious"). Thus, the leak was "incidental" to Connolly's authorized duties under Massachusetts law. Howard, 399 Mass. at 591.

3. Connolly Was Motivated, At Least in Part, to Serve the FBI

The final prong of the Wang test is satisfied if the agent is motivated, at least in part, by a purpose to serve the employer.[9] Id. at 859. Under Massachusetts law, "the fact that the predominant motive of the [employee] is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." Id. at 859-60. Only "if the employee 'acts from purely personal motives … in no way connected with the employer's interests, [is] he considered in the ordinary case to have departed from his employment and the master is not liable." Pinshaw v. Metropolitan District Commission, 402 Mass. 687, 694-95 (1988) (quoting W. Prosser & W. Keeton, Tots 506 (5th ed. 1984)).

It cannot be credibly contested that Connolly was motivated, at least in part, to preserve Bulger and Flemmi as FBI informants so that the information provided by Bulger and Flemmi could continue to be used in ongoing and continuing investigations of LCN.[10] In October 1984,

[9] The can be no dispute the "time and space" prong of the Wang test is easily satisfied.

[10] Connolly has stated: "[e]verything I ever did . . .I did it for the FBI, all the way to D.C., constant oversight;" and "I want to make it absolutely clear that my conduct in handling investigative assignment regarding Mr. Flemmi and

McIntyre provided Customs and the FBI names of Bulger associates involved in the shipment of arms to the IRA – Patrick Nee and Kevin Weeks -- and linked Nee, Weeks and Bulger to Murray's drug trafficking.  Fact 34-35.  The following month McIntyre provided information leading to the seizure of marijuana on the "Ramsland" – a shipment in which Bulger and Flemmi expected to profit in excess of a million dollars.  Fact 45.  Like previous informants against Bulger and Flemmi (Castucci and Halloran)[11] who were murdered after Connolly's disclosed their identity, McIntyre's ongoing cooperation presented the very real threat Bulger and Flemmi could be subject to prosecution and lost as informants against the FBI's larger prize – LCN.  The evidence establishes that, in order to persevere this governmental interest, Connolly disclosed to Bulger and Flemmi that one of the two individuals on the Valhalla was cooperating.  Fact 46.

Moreover, the benefit to the FBI is not speculative.  At the time McIntyre began to cooperate, Bulger and Flemmi's value was clearly established within the FBI.  Fact 10-11, 21-22; Salemme, 91 F. Supp. 2d at 203-206 (1980-81 Prince Street Wiretap).  After McIntyre's murder, Flemmi was officially re-opened as an informant and, along with Bulger, continued to provide information serving as the source for several wiretaps leading to the convictions of leading figures of LCN.  Fact 11, 23-25; Salemme, 91 F. Supp. 2d at 244-46 (1985 Vanessa's Wiretap).  The continuation of Bulger and Flemmi as informants, notwithstanding the criminal means employed to perpetuate their status, meant that the FBI could publicly pronounce "mission accomplished" regarding FBI Priority I – prosecution of LCN.  The resulting prestige to Connolly and his supervisors, the FBI and the DOJ is self-evident.  Fact 9(e)–(g); Ring Tr. at 228 (Ex. 11)  Although Connolly may have benefited personally and may have joined a criminal enterprise, it is beyond dispute that his personal motives were connected with the FBI's interests

---

Mr. Bulger was done with the full knowledge, approval and direction of my superiors in the Department of Justice."
Salemme, 91 F.Supp.2d at 188.
[11] Fact 78-90.

and that their actions were motivated, at least in part, to serve the FBI.  Aversa, 99 F.3d at 1212

(AUSA's statements "albeit tortious and contrary to his employer's policies and rules [were a

means] of accomplishing the Justice Department's objective of informing the public of recent

law enforcement efforts"); Operation Rescue, 975 F. Supp. at 108-109 (Senator Kennedy's

remarks, although made after fundraising event, served his governmental duties); Meyer v.

Runyon, 869 F.Supp. 70, 79 (D. Mass. 1994) (stating that the fact that postal worker might have

had a personal motive in contacting plaintiff did not detract from the fact that he also had motive

that served employer).

     C.     Massachusetts Law Provides a Remedy Against Both Connolly and the United
          States

The FTCA provides a cause of action for the wrongful acts of omissions of government

employees "under circumstances where the United States, if a private person, would be liable to

the claimant in accordance with the law of the place where the act or omission occurred."  28

U.S.C. __ 1346(b).  "To prevail on a negligence claim under Massachusetts law, the plaintiff

must establish that (1) the defendant owed a plaintiff a legal duty, (2) the defendant breached that

duty, (3) proximately or legally causing (4) the plaintiff's actual injury or damages."  McCloskey

v. Mueller, 385 F. Supp. 2d 74, 82 (D. Mass. 2005) (citing Fithian v. Reed, 204 F.3d 306, 309-09

(1st Cir. 2000)).  "In the context of an FTCA claim, a legal duty of care exists where there is

'some relationship between the governmental employee[s] and the plaintiff to which state law

would attach a duty of care in purely private circumstances.'"  McCloskey, 385 F. Supp. 2d at 82

(quoting Sea Air Shuttle Corp. v. United States, 112 F.3d 532, 537 (1st Cir. 1997).

Here, Massachusetts law provides several instances were a legal duty of care exits

between the Connolly or the government and McIntyre.  First, regardless of the relationship

between the plaintiff and the defendant or the defendant and a third party, under Massachusetts law liability attaches to affirmative conduct by the defendant:

> Speaking in terms of classical tort principle, when one claims that negligence lies in the commission of an act, a defendant's duty not to behave negligently typically extends to include all those whom the defendant might reasonably have foreseen to be potential victims of the negligence.
>
> Carrier v. Riddell, Inc., 721 F.2d 867, 868 (1st Cir. 1983) (emphasis in original).[12]

Moreover, a duty of care exists based upon the relationship between the plaintiff and the defendant or the defendant and a third party. Massachusetts law, following the Restatement (Second) of Torts § 315, "recognizes two types of special relationships that may form the basis of an exception to the general principle that a person has no duty to control the conduct of a third person." McCloskey, 385 F. Supp. 2d at 82 (quoting Jean v. Commonwealth, 414 Mass. 496, 513 (1993)). The first arises where "a special relationship exists between the actor [i.e., the person whose duty is at issue] and the third person which imposes a duty upon the actor to control the third person's conduct." McCloskey, 385 F. Supp. 2d at 82 (quoting Restatement (Second) of Torts § 315). The second arises where "a special relationship exists between the actor and the other [i.e., the potential plaintiff] which gives to the other a right to protection." McCloskey, 385 F. Supp. 2d at 83 (quoting Restatement (Second) of Torts § 315).

Yet another theory of liability recognized in Massachusetts law is "joint liability or liability arising from the aiding and abetting of another in a wrongful act." Davis, 340 F. Supp. 2d at 91. Section 876 of the Restatement provides for liability to harm resulting to a third person from the tortious conduct of another if he:

---

[12] In Davis, this Court relied on Restatement (Second) of Torts § 321(1) ("if the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect") and Commonwealth v. Levesque, 436 Mass. 443 (2002) for the conclusion that a party can be held civilly liable to failing to mitigate a hazard of its own creation resulting in death. 340 F. Supp. 2d at 90-01.

> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue; or
>
> (b) knows that the other's conduct constitutes a beach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
>
> Davis, 340 F. Supp. 2d at 91 n. 10.[13]

The facts of this case provide for liability premised on each of these theories of relief standing alone and together. First, it is an understatement to say the least, that Connolly's disclosure to Bulger and Flemmi was the affirmative commission of an act reasonably increasing the risk of foreseeable harm to McIntyre. At the time of this disclosure, McIntyre had been cooperating with FBI and Customs for nearly six weeks and Agent Brady did not have any concern for McIntyre's safety as he believed McIntyre had Murray's confidence. Fact 47. As a result of the disclosure, McIntyre was murdered. Fact 45-48.

Second, in Davis, this Court recognized that the FBI's "special relationship" with Bulger and Flemmi, based on their informant status, created a duty of care to the general public to control Bulger and Flemmi. 340 F. Supp. 2d at 81. Here, the duty is not only general as in Davis premised on Connolly's and the FBI's relationship with Bulger and Flemmi, but also specific to McIntyre, an FBI and Customs informant with whom the government also had a "special relationship" and who was in particular danger both because was cooperating with the government and because Connolly revealed the fact of his cooperation to Bulger and Flemmi.

---

[13] Based on the facts alleged in Davis, this Court focused on § 876(b) as the basis of liability. 340 F.Supp. 2d at 91-93. Massachusetts clearly provides a remedy under § 876(a). See Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998) (recognizing private liability for acting in concert with third party); cf. Caciolla v. Nellhaus, 49 Mass. App. Ct. 746, 752 (2002) (recognizing liability for actively assisting in a third party's breach of fiduciary duty). Based upon the recognition of § 876(a) – (b), it is likely Massachusetts would also recognize a theory of liability under § 876(c).

Thus, the disclosure of the fact of McIntyre's cooperation violates both duties recognized under Massachusetts law flowing from § 315.  Id. (collecting cases).

Moreover, the United States is also liable based upon each prong of Section 876.  At the time McIntyre began cooperating, Bulger and Flemmi, while serving as FBI informants, had murdered approximately 23 people.  Fact 51-77.  Bulger and Flemmi were not prosecuted for any of these murders while they were productive FBI informants.   At least two of these individuals, Castucci and Halloran, were murdered in 1976 and 1982 after they began cooperating with the government and after Connolly leaked the fact of their cooperation to Bulger and Flemmi.  Fact 78-90.  A third, Callahan, was murdered in 1983 after Connolly leaked that authorities intended to induce him to cooperate.  Fact 91-94.  Based upon this history, disclosing to Bulger and Flemmi that one of the two individuals who returned on the Valhalla was cooperating with the government is clearly a breach of the United States' duty to McIntyre and/or jointly undertaken activity that proximately or legally caused his murder at the hands of Bulger, Flemmi and Weeks.  See Haberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983 (woman civilly liable for murder her boyfriend committed while burglarizing a home, although not present at scene, because she helped run the criminal enterprise); see also Davis 340 F. Supp. 2d at 91-92 (collecting joint liability cases).

D.    Leaking an Informant's Identity is Not Protected by the Discretionary Function Exception

The FTCA bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The First Circuit applies to two-prong test to determine whether discretionary function applies:

> First, an inquiring court must identify the conduct that allegedly caused the harm. Then, in determining whether Congress sought to shelter that sort of conduct from tort liability, the court must ask two interrelated questions: (1) is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments? If both of these queries yield affirmative answers, the discretionary function exception applies and the government is shielded from liability.
>
> Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir. 2003) (citing, inter alia, United States v. Gaubert, 499 U.S. 315, 322-23 (1991) and Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)).

Here, the "conduct that allegedly caused the harm" was Connolly's disclosure of confidential law enforcement information – one of the two individuals who returned on the Valhalla was cooperating – to Bulger and Flemmi as part of the ongoing practice of tipping Bulger and Flemmi to pending investigations in order to preserve their status as FBI informants.

Conduct is not discretionary if it violates: 1) the constitution; 2) a federal statute, regulation or policy; or 3) exceeds the agent's scope of authority. Muniz-Rivera, 326 F.3d at 15 ("The jurisprudence of the FTCA permits us to classify these actions as non-discretionary only if a federal statute, or policy specifically instructed federal officials to follow a specified course of action"); Davis, 340 F. Supp. 2d at 93 (conduct construed as "unconstitutional, proscribed by statute, or exceeded the scope of [the agent's] authority not protected by discretionary function because "a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority") (citing Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 254 (1st Cir. 2003). Leaking the identity of a government informant to the targets of a criminal investigation is, under no circumstances, a discretionary act entitling the government to immunity from suit based upon that conduct. This principle is firmly embedded in the mandatory guidelines regarding handling of informants, federal statutes, and the affidavits and pleadings previously filed by the United States in this and related matters.

The Attorney General's Guidelines and FBI Guidelines memorialized in the MIOG are a formal statement of policies and practices regarding the operation of informants.[14] Fact 96. Specific to the issue at hand, the Attorney General Guidelines and 1984 version of the MIOG mandates:

> Special care must be taken to carefully evaluate and closely supervise [an informant] use, and to ensure that individual rights are not infringed and that the government itself does not become a violator of the law. Though informants and confidential sources are not employees of the FBI, their relationship to the FBI can impose a special responsibility upon the FBI when the informant or confidential source engages in activity where he has received encouragement or direction for that activity from the FBI. Fact 95(a).
>
> Every effort should be made to control the informant's activities when acting in the FBI's behalf to ensure that the informant's conduct will be consistent with legal and administrative restrictions. Fact 103(d).
>
> Constant care should be exercised to avoid any disclosure to anyone which might result in the identification of an informant or cast suspicion upon an informant. Fact 103(e).
>
> Care must be exercised in handling informants to ensure that they are provided no information other than that necessary to carry out their assignments. Fact 103(f).

When leaking the fact of McIntyre's cooperation, Connolly violated each of these mandatory directives. McIntyre v. United States, 367 F.3d 38, 53-54 (1st Cir. 2004) ("FBI Manual requires agents to exercise constant care to ensure that an informant's identity is not disclosed, whether intentionally or inadvertently") (emphasis added); Rakes, 352 F. Supp. 2d at 57 ("nothing in the United States' brief suggests that these rules and regulations were actually discretionary in any way"). Moreover, every government agent deposed in this litigation agreed it is not within an agent's discretion to reveal the identity of an informant to the targets of the

---

[14] Connolly and his supervisors within the Boston Office of the FBI consistently violated these mandatory policies as applied to Bulger and Flemmi. Rakes, 352 F. Supp. 2d at 56 ("A 1997 administrative inquiry by the FBI Office of Professional Responsibility found that FBI supervisors did not follow written review requirements, and an October 1999 Compliance Review found a total of twenty-seven instances of Bulger and Flemmi threatening someone, yet there is no record that FBI headquarters was ever notified of the threats").

investigation. Ring Tr. at 236; Brady Tr. at 26-28; Kennedy Tr. at 10-11; Boeri Tr. at 36-37; Fitzpatrick Tr. at 32-33; Cronin Tr. at 17-18. Ex. 8. Indeed, such conduct is clearly violative not only of the guidelines, but several federal criminal statutes and cannot fall within the discretionary function exception. See e.g., 18 U.S.C. §§ 1503 (obstruction of grand jury proceeding), 1512 (Tampering with a witness, victim, or an informant), 1513 (Retaliating against a witness, victim, or an informant).

Moreover, in this litigation, when opposing the consolidated plaintiffs' motion to un-redact informant signal numbers in 30 year old documents subject to protective order, the government submitted an affidavit stating: "It is FBI policy to protect the identities of its confidential informants from disclosure to the maximum extent permitted by law and regulation and sound public policy." Declaration of Kevin Vanhutton, Unit Chief, Civil Discovery Review Unit II Federal Bureau of Investigation at ¶ 12 (Ex. 9). Finally, when moving to dismiss the Halloran and Donahue complaints on the theory that the leak of an informant's identity is outside the scope of employment, the government conceded the following: "Connolly and Morris were not authorized to leak an informant's name to other informants …. An FBI agent pledges to protect against disclosure of an informant's identity …. FBI agents are under an obligation not to reveal the identity of an informant." See Memorandum In Support of United States' Motion For Partial Dismissal of Halloran and Donahue Cases at pp. 6-8 and cases cited therein. Therefore, Connolly's leak of confidential law enforcement information to Bulger and Flemmi in violation of FBI rules and regulations as well as federal law is not discretionary and not covered by the discretionary function exception to the FTCA.[15]

[15] Because the leak cannot be considered discretionary, the Court need not reach the question of whether the decision to leak is subject to "policy-related judgments." However, in Coyne, Judge Gertner held that disclosure of an informant's identity was not susceptible to policy related judgments. 270 F. Supp. 2d at 116.

## V. CONCLUSION

For the reasons stated above, the Court should grant plaintiff's Motion for Summary Judgment against Connolly and the United States. However, because Connolly was acting within the scope of employment, the remedy against the United States is exclusive on the State law claims and the United States should be substituted a party for Connolly and plaintiff should be permitted to proceed against the United States as to the amount of damages arising from its State law claims.

Respectfully submitted,

The Estate of John L. McIntyre

DATED: February 24, 2006

/s/William E. Christie
William E. Christie, Esquire
Bar No. 566896
Shaheen & Gordon, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302-2703
(603) 225-7262
wchristie@shaheengordon.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 24, 2006.

DATED: February 24, 2006

/s/William E. Christie
William E. Christie, Esquire
Bar No. 566896
Shaheen & Gordon, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302-2703
(603) 225-7262
wchristie@shaheengordon.com

F:\DATA\CLIENTS\MCINTYRE\MEMO OF LAW MOTION FOR SUMMARY JUDGMENT2.DOC