# United States Court of Appeals
## For the First Circuit

Nos. 07-1663, 07-1664

EMILY MCINTYRE, AS ADMINISTRATOR OF THE ESTATE OF JOHN L.
MCINTYRE; CHRISTOPHER MCINTYRE, IN HIS CAPACITY AS CO-
ADMINISTRATOR OF THE ESTATE OF JOHN L. MCINTRYE,

Plaintiffs, Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellant/Cross-Appellee,

H. PAUL RICO; JOHN MORRIS; JOHN J. CONNOLLY, JR.; RODERICK
KENNEDY; ROBERT R. FITZPATRICK; JAMES RING; JAMES W. GREENLEAF;
JAMES AHEARN; KEVIN J. WEEKS; JAMES J. BULGER; STEPHEN J. FLEMMI;
JOHN DOE Number 1-50; FEDERAL BUREAU OF INVESTIGATION; LAWRENCE
SARHATT; JOHN V. MARTORANO; RICHARD F. BATES; JOSEPH YABLONSKY;
JAMES F. SCANLON; DENNIS F. CREEDON; THOMAS J. DALY,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Besosa,'* District Judge

'Of the District of Puerto Rico, sitting by designation

Thomas M. Bondy, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jonathan F. Cohn, Deputy Assistant Attorney General, Steven I. Frank and Jonathan H. Levy, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellant/cross-appellee.

William E. Christie, with whom Steven M. Gordon and Shaheen & Gordon, P.A. were on brief, for appellees/cross-appellants.

_____

October 16, 2008

_____

**LIPEZ, Circuit Judge.** This case is another chapter in the saga of the relationship between the FBI's Boston Office and two organized crime figures, James "Whitey" Bulger and Stephen Flemmi, whose unlawful, violent conduct in that city spanned three decades. Following an eighteen-day bench trial featuring nine witnesses and thousands of pages of exhibits, the district court concluded that former FBI agent John Connolly was acting within the scope of his employment when he leaked the identity of an informant, John McIntyre, resulting in McIntyre's brutal murder by Bulger, Flemmi and their associates in the notorious Winter Hill Gang. The court consequently awarded McIntyre's estate approximately $3.1 million in damages against the government under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346.

The government has appealed, arguing that Connolly was a rogue agent whose disclosure of McIntyre's identity violated fundamental FBI policies and was beyond any rational view of conduct falling within the scope of his employment. We reject the government's position. We affirm the judgment of the district court.

## I.

The district court meticulously set out the factual background of this case, detailing the decades of history concerning Bulger's and Flemmi's involvement with the FBI in Boston and, in particular, the pair's relationship with Connolly. See

McIntyre v. United States, 447 F. Supp. 2d 54, 62-104 (D. Mass. 2006). Parts of that more than 40-page history also have been reported in other opinions that we have issued, including our decision affirming Connolly's conviction on charges stemming from his efforts to facilitate Bulger's and Flemmi's criminal activities and to protect them and their associates from arrest and prosecution. See United States v. Connolly, 504 F.3d 206 (1st Cir. 2007); McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004); United States v. Connolly, 341 F.3d 16 (1st Cir. 2003). Unable to improve on the district court's exhaustive review of the record, we provide here only a summary of the facts essential to an understanding of the scope of employment issue at the heart of this case. However, we assume the reader's familiarity with all of the district court's factual findings, which have not been challenged by the government on appeal. Our precis borrows liberally from the district court's well stated recitation, as well as from our own prior opinions.

## A. Connolly's Official Role with Bulger and Flemmi

Bulger and Flemmi were informants for the FBI's Boston office at various times during a period of more than twenty-five years. Flemmi was first recruited in 1964 and Bulger in 1971, and both men provided information off and on until 1990. McIntyre, 447 F. Supp. 2d at 73. They were considered particularly valuable sources for the office's high-priority investigation of the Boston

-4-

branch of La Cosa Nostra ("LCN").[1]  Although they were members of the competing Winter Hill Gang, Bulger and Flemmi frequently consorted with LCN members "and purported to transmit inside information to the FBI concerning organized crime activities in New England." Connolly, 504 F.3d at 210. The Boston LCN investigation proved fruitful, leading to the 1983 arrests and 1986 convictions of the leading figures of the Boston branch, Gennaro Angiulo and Illario Zannino, as well as other LCN members. McIntyre, 447 F. Supp. 2d at 63.

Connolly, who joined the FBI in 1968, served as Bulger and Flemmi's "handler" during most of their tenure as FBI informants, beginning in 1975. Connolly, 341 F.3d at 20; McIntyre, 447 F. Supp. 2d at 73-74.[2]  In that capacity, he met with them

---

[1] As the district court related, "[d]uring the late 1970s and early 1980s, the stated national priority of the FBI's Organized Crime Program was the takedown of Cosa Nostra." 447 F. Supp. 2d at 62 (citing Ex. 69, April 1980 Memo from Director, FBI to Attorney General, at 17) ("The majority of resources, both investigative and prosecutorial, should continue to be expended and directed against LCN, the most powerful of the organized crime groups, as it represents a greater threat to this nation than all other organized crime groups combined."). The Boston LCN branch was likewise "the number one priority of the Organized Crime Program in the Boston Division of the FBI . . . in the 1970s and early 1980s." Id. at 62-63 (citing, inter alia, Ex. 110, April 1981, Addendum of Supervisor Morris) ("Consistent with the national priority, the LCN is the primary target of the Organized Crime Program in the Boston Division."); see also Tr. Day 6, at 55 (Testimony of Robert Fitzpatrick, Assistant Special Agent in Charge ("ASAC") of the Boston Office, acknowledging that LCN "was the number one priority" in the office).

[2] Connolly was assigned to the Boston Office's C-3 Squad, which worked solely on organized crime, from October 1973 until

regularly and controlled other agents' access to them. Rarely did other FBI agents talk with the two men outside of Connolly's presence. See, e.g., id. at 87 (stating that Connolly served as an intermediary with Bulger and Flemmi for other agents investigating several murders); id. at 90 (noting that the Boston office rejected a request that Bulger and Flemmi be interviewed in connection with two murders "upon instructions from FBI Headquarters that no one other than Connolly" should interview them); id. at 91 (noting Agent Montanari's belief that "Bulger and Flemmi, 'as informants of an agent' would refuse to meet with him absent Connolly's intervention"); id. at 98 ("Bulger and Flemmi communicated almost exclusively with Connolly, and they refused to work with any other handler."). When Connolly retired suddenly in 1990, Bulger and Flemmi were immediately closed as informants. Id.

## B. Connolly's Collaboration with Bulger and Flemmi

At some point, the relationship between Connolly and his two informants turned illicit. A grand jury indicted Connolly in 2000 on charges of racketeering, obstruction of justice, conspiracy and making a false statement, alleging that he had provided protection, the identities of informants, and other assistance to Bulger and Flemmi in exchange for bribes and favors.[3]  He was

March 1988. Id. at 64-65.

[3] Through the years, Connolly received more than $200,000 in cash and gifts from Bulger and Flemmi. 447 F. Supp. 2d at 110 (citing Flemmi's testimony, Tr. Day 2, at 98; Day 3, at 82-83).

convicted in 2002 and sentenced to 121 months in prison.[4] We twice rejected his appeals. See Connolly, 504 F.3d 206; Connolly, 341 F.3d 16.

Among Connolly's misdeeds was disclosure of the names of at least two informants, before the McIntyre episode, both of whom were murdered by Flemmi, Bulger or their associates shortly after the leaks. Flemmi stated that, in December 1976, Connolly told Bulger that a bookmaker who did business with the Winter Hill gang, Richard Castucci, had been cooperating with the FBI. Tr. Day 1, at 90-91; Ex. 3 at 7 (Agreed Statement of Facts in United States v. Flemmi, No. 99-10371 (D. Mass. May 23, 2001)). Castucci was shot to death by members of the group later that month.[5] A second informant, Edward "Brian" Halloran, approached the FBI in early 1982 with information about the Winter Hill Gang and their possible involvement the previous year in the murder in Tulsa, Oklahoma, of a businessman named Roger Wheeler.[6] Among other information,

_____

[4] At the conclusion of a three-week trial, a federal jury found him guilty of one count of racketeering, two counts of obstruction of justice, and one count of making false statements. Connolly, 341 F.3d at 19.

[5] Flemmi testified that John Martorano shot Castucci in the head, and that Flemmi and Bulger disposed of the body. Tr. Day 1, at 93-94.

[6] The Winter Hill associates were, in fact, responsible for Wheeler's murder. Flemmi and Bulger provided weapons for the killing, and Martorano shot him outside his country club in Tulsa, Oklahoma on May 27, 1981. Tr. Day 2, at 21-22 (Flemmi testimony); Ex. 3, at 10. Wheeler was the owner of World Jai Alai ("WJA"), a business that operated in Florida and Connecticut. He had drawn

Halloran told Agent Leo Brunnick that Bulger and Flemmi met with
Connolly on a weekly basis and that the two men "had a 'pipeline
into the Boston Office.'"[7] 447 F. Supp. 2d at 83 (citing Ex. 84,
Memo from Brunnick). Sometime before May 11, 1982, Connolly told
Bulger of Halloran's cooperation. Tr. Day 2, at 34-35 (Flemmi
testimony). Bulger shot and killed Halloran and an associate,
Michael Donahue, on May 11, as they were leaving a restaurant in
Boston. 447 F. Supp. 2d at 86.[8]

Agents at the FBI's Boston Office and at FBI Headquarters
suspected that Bulger and Flemmi were involved in the Wheeler,
Halloran and Donahue murders. 447 F. Supp. 2d at 84-86. Indeed,
Halloran had told Agent Brunnick and his partner, Agent Gerald
Montanari, that Bulger, Flemmi and Callahan[9] were responsible for
plotting Wheeler's murder and that he, Halloran, had been paid
$20,000 to keep quiet about it. Id. at 82-83 (citing Ex. 27, Memo

_____

the wrath of the Winter Hill gang by refusing to sell the business
to John Callahan, who was the former president of WJA and had lost
his license to operate a parimutuel betting business in Connecticut
because of his relationship with "his gangster friends," including
members of the Winter Hill gang. McIntyre, 447 F. Supp. 2d at 81
(citing Ex. 3); see also Tr. Day 2, at 20 (Flemmi testimony).

[7] Brunnick's memo further states that the "pipeline" was "not
necessarily Connolly" and that Halloran had "no information or
indication that Connolly is furnishing any information to Stevie or
Whitey."

[8] As the district court observed, Donahue's killing appears to
be a classic case of being "in the wrong place at the wrong time."
447 F. Supp. 2d at 86.

[9] See supra note 6.

-8-

from McWeeney); Tr. Day 15, at 18 (Montanari testimony). He also told the agents that Martorano - the gunman - might be using Callahan's Fort Lauderdale condominium as a safe-house. Id. at 83. All of Halloran's information was passed along to FBI Headquarters. Id. at 84. Although some details of Halloran's story were investigated, "inexplicably, the Boston Office never followed up on Halloran's claim that Martorano, the reported shooter in the Wheeler murder and a federal fugitive, was hiding out at Callahan's condominium in Florida." Id. at 85.

In the last week of May 1982, meetings to discuss the Wheeler and Halloran killings took place in Washington and Boston. At the Washington meeting, agents from Boston, Miami and Oklahoma City, as well as officials from FBI Headquarters, acknowledged that Bulger and Flemmi were suspects in the cases, but a decision was made to retain them as "open" informants because the allegations against them were unsubstantiated and they were extremely valuable assets in the LCN investigation. Id. at 87 (citing Ex. 30, May 25, 1982 Memo from ASAC Fitzpatrick to Special Agent in Charge ("SAC") Lawrence Sarhatt); Tr. Day 9, at 59-60 (Fitzpatrick testimony).[10] If the suspicions had been confirmed, agency policy would have

_____

[10] Fitzpatrick testified that, despite his view that Bulger, at least, should be closed as an informant, "everyone at headquarters thought he should remain open" because "he was too valuable."

prevented their retention as informants without authorization from the highest levels of the FBI and Justice Department.[11]

At a follow-up meeting two days later in Boston, Connolly - who had not been at the meeting in Washington - was informed that Bulger and Flemmi were the focus of the investigation into the Wheeler and Halloran murders. He argued that they were not involved. It was agreed that the agents investigating the murders would not directly interview Bulger and Flemmi, and would rely instead on Connolly acting as an intermediary. 447 F. Supp. 2d at 87.

Two months later, Callahan also was dead. Connolly had told Bulger in July that the FBI was looking for Callahan to question him in connection with the Wheeler murder. Tr. Day 2, at

---

[11] The FBI's rules regarding the handling of informants, contained in Section 137 of the agency's Manual of Investigative Operations and Guidelines ("MIOG"), required supervisors to make written findings on the "suitability" of an individual to serve as an informant. Ex. 6, § 137-17(1) (Attorney General's Guidelines on FBI Use of Informants and Confidential Sources, Part D(1)(1981)). Although the Guidelines allow use of informants who are involved in criminal activity, the crimes must not be "of a serious nature." 447 F. Supp. 2d at 68 (citing Guidelines at Part G(2)). If a field office learned that an informant had participated in a "serious act of violence," it was required to notify FBI Headquarters and only the Director or a "senior Headquarters official" could approve the continued use of such an informant - after consultation with the Assistant Attorney General in charge of the Criminal Division. Id. at 69-70 (citing Guidelines at Part G(3)). Throughout their tenure as informants, Flemmi and Bulger were "closed" - i.e., terminated as informants - and re-opened multiple times. Id. at 74 n.35 (giving a chronology of Bulger's and Flemmi's openings and closings as informants between 1964 and 1990). At least with respect to Flemmi, a closing had little effect; he was treated as an informant regardless of his official status. Id. at 74.

37 (Flemmi testimony).  According to Flemmi, Connolly also told Bulger that "Callahan was a weak link who would not be able to withstand the pressure of an FBI interrogation."  447 F. Supp. 2d at 88.  Bulger and Flemmi concluded that Callahan needed to be killed.  Their usual hit man, Martorano, assisted by another Winter Hill member, Joseph McDonald, killed Callahan at Fort Lauderdale International Airport on August 1, 1982.  Id. at 87 (citing Tr. Day 2, at 40-41, Flemmi testimony).[12]

The FBI's recognition of the apparent link between the Winter Hill gang and three murders – Wheeler's, Halloran's and Callahan's – was reported in a November 1982 memo sent by the Chief of the FBI's Organized Crime Section, Sean McWeeney, to Associate Deputy Director Oliver Revell.  The memo stated that "there is evidence [the murders] were committed by an organized crime group in Boston, Massachusetts, the Winter Hill gang."  Id. at 88 (citing Ex. 121, at 1).  James Greenleaf, who became the SAC of the Boston Office on November 29, 1982, was among those copied on the memo, which was generated at FBI Headquarters in Washington.

By the time of that memo, Flemmi – but not Bulger – had been closed as an informant.  Officially, the reason for the

---

[12] Martorano picked up Callahan at the airport and shot him in the back of the head after he entered Martorano's car.  Martorano and McDonald transferred the body to the trunk of Callahan's car, where it was discovered after a parking attendant noticed blood dripping from the vehicle.  447 F. Supp. 2d at 87 (citing Tr. Day 2, at 40-41, Flemmi testimony).

closing was his possible implication in criminal activity unrelated to the murders. However, internal communications in the Boston Office indicated that the murder investigation prompted his change in status. 447 F. Supp. 2d at 88 n.59. Despite his closing, Flemmi continued to provide significant information to the FBI throughout the period until he was re-opened in early July 1986. Meanwhile, Bulger remained open and, in February 1983, while the murder investigations were ongoing, he was designated a "Top Echelon" informant, meaning that he was expected to provide information about management-level activity of an organized crime group. Id. at 66. Eventually, the murder investigation wound down without a contemporaneous resolution, despite the forty or so volumes of files that had been produced on the crimes. Tr. Day 13, at 96, 108 (Montanari testimony).[13]

## C.  FBI Knowledge of Connolly's Conduct

In its closing argument before the district court, the government asserted that Bulger and Flemmi were not indicted in connection with the murders and other criminal activity until 1995 because they were "very, very smart, and very, very cognizant of

[13] Following an indictment in 1995, Flemmi pled guilty in 2003 to racketeering acts that included the Castucci, Wheeler, Callahan and McIntyre murders. Another Winter Hill member, Kevin Weeks, pled guilty to racketeering acts that included aiding and abetting the Halloran, Donahue and McIntyre murders. 447 F. Supp. 2d at 59- 60 nn.5 & 6. Bulger, who was charged with similar crimes, has been a fugitive since the indictment was issued. See Connolly, 504 F.3d at 210.

everything that was going on around them." Tr. Day 18, at 121.
However, considerable evidence supports the district court's view
that their awareness was not solely attributable to their own
skills and acuity. Other law enforcement representatives had
expressed concern about the Boston Office's "too-close association"
with members of Winter Hill. 447 F. Supp. 2d at 89. In a meeting
with FBI Headquarters representatives in November 1982, Florida
state and local law enforcement members who were responsible for
investigating the Callahan murder reported that they were reluctant
to provide information to the Boston Office because they believed
the Winter Hill connection had been hindering that office's
investigation into the murders. Id.[14] The concerns from Florida
were relayed in a memo from Organized Crime Chief McWeeney to
Associate Deputy Director Revell:

> Inferences could be drawn from conversations
> indicating that these state and local
> officials were of the opinion that the FBI had
> confidential informants within the Winter Hill
> organization and because of this their efforts
> against this group were curtailed. In fact,
> FBI Boston has previously utilized two
> suspects in this matter as organized crime
> sources in the Boston Division.

---

[14] The Florida representatives also were troubled by the
association between personnel in the FBI's Miami Office and a
former Boston Office agent, H. Paul Rico, who at the time of the
murders was working as head of security at World Jai Alai. 447 F.
Supp. 2d at 89. In 1969, Rico had warned Flemmi that he was about
to be indicted, enabling Flemmi to become a fugitive for five
years. Flemmi testified that he returned to Boston in 1974 after
Rico told him he would be protected from prosecution. Id. at 78-
79; see Tr. Day 2, at 71-75 (Flemmi testimony).

Ex. 121, at 6; see also id. at 3 (noting the belief of law enforcement agencies in Miami that "some Agents in the Boston FBI would not pursue allegations against the Winter Hill gang vigorously").

In addition to these hints that the Boston Office was protecting Bulger and Flemmi from murder charges, the FBI had been told explicitly by Halloran that someone in the office was leaking information to them. In his testimony, Flemmi confirmed that Connolly reported to him and Bulger on the progress of the murder investigation, Tr. Day 3, at 71-72, as well as on a 1984 investigation by the Drug Enforcement Administration into suspected drug activity by Bulger and Flemmi, id. at 23.[15] The district court also found that "there had long been allegations of leaks by Connolly from the Massachusetts State Police." 447 F. Supp. 2d at 95 n.71.

Despite the concerns from various sources that Connolly was improperly disclosing information to Bulger and Flemmi, he consistently received one of the FBI's top two ratings for his overall performance and his handling of informants throughout the period from 1978 to 1987. Id. at 96. On one occasion, Connolly's then-supervisor, Agent James Ring, was chastised by an inspector

---

[15] The DEA investigation did not produce results even though Bulger and Flemmi were involved in drug trafficking from approximately 1981 to 1990. 447 F. Supp. 2d at 94 (citing Tr. Day 2, at 62-63 (Flemmi testimony)). They eventually were indicted for their drug activity in 1995.

from FBI Headquarters for rating Connolly "superior" rather than
"exceptional." Id. at 97. In a memo to the Special Agent in
Charge of the Boston Office, Inspector Bob Reutter stated that he
considered "'the contributions made by SA [Special Agent] Connolly
as crucial to the overall OC [Organized Crime] program and
substantial in terms of the results achieved.'" Id. (quoting Ex.
55w, Memo of July 8, 1987). Connolly was repeatedly recommended
for salary increases and monetary awards on the basis of his
performance,[16] and he was asked by FBI Headquarters to instruct
other federal agents on the development and handling of informants.
Id. In 1988, he became the Organized Crime Drug Enforcement Task
Force Coordinator in the Boston Office. Id.

## D. McIntyre's FBI Involvement and Murder

McIntyre's relationship with the FBI's Boston Office
began in the fall of 1984, shortly after the United States Customs
Service seized a ship, the Valhalla, on which he was serving as a

_____

[16] In a Performance Appraisal Report covering the period from
November 15, 1981 through November 12, 1982 - during which Halloran
and Callahan were killed - Connolly was praised for "develop[ing],
maintain[ing], and operat[ing] a corps of extremely high level and
productive informants." Ex. 55e. The Report continued: "His
direction and their resultant information has brought about results
exceeded by none in the Boston Division's Organized Crime Program.
. . . His performance has been at the level to which all should
aspire to attain but few will realistically reach." A memo from
the Boston Office to the Director of the FBI in August 1981 stated
that Connolly "currently operates . . . high-placed informants
furnishing information on Organized Crime in the New England area
and has significantly contributed toward the achievement of the OC
Squad goals and objectives especially through his skillful
direction of high-quality informants." Ex. 55h.

crew member. The *Valhalla* had just returned from Ireland, where it had delivered an illegal cargo of weapons and ammunition for the Irish Republican Army ("IRA"). McIntyre, one of two crew members on board, had already been cooperating with agents of the Drug Enforcement Agency ("DEA"),[17] and the next day, October 17, 1984, he met with a Customs agent, Philip Brady, and two FBI officers, Roderick Kennedy and George Bertram. Brady and Kennedy were members of the Drug Task Force, which consisted of representatives from Customs, the IRS and the FBI. Bertram was present at the meeting because he covered the IRA for the FBI. 447 F. Supp. 2d at 99.

During the meeting, McIntyre discussed an upcoming drug shipment that was expected by Murray, whom customs already knew paid "tribute" - a fee - to Bulger so that he could safely operate his drug smuggling operation in South Boston.[18] *Id.* McIntyre confirmed the Murray-Bulger connection, reporting that "'an individual named Whitey [a Bulger nickname] who operates a liquor store in South Boston became partners with Joe Murray.'" *Id.* at 100. McIntyre was released after he agreed to cooperate with Customs and the FBI in the ongoing investigation into Murray's drug

---

[17] McIntyre was working at the time for Joe Murray, another Boston crime figure who was involved in drug and weapons smuggling.

[18] Bulger and Flemmi collected "rent" or tribute from other criminals as payment for the privilege of conducting activity within territory controlled by them. *Id.* at 94 n.69.

activities. On the basis of information he provided, the combined law enforcement agencies seized Murray's next drug load on a ship, the *Ramsland,* as it entered Boston Harbor in mid-November 1984. McIntyre was on board as a member of the "substitute crew" that had replaced the ship's English crew at the mouth of the harbor. The ship was carrying thirty tons of marijuana, and Flemmi testified that he expected to receive $1 million from the shipment's sales proceeds. Kevin Weeks, another Winter Hill member, testified that he, Bulger and Flemmi each were to receive $3 million.

After the *Ramsland* was seized, McIntyre reported to Brady that Murray suspected someone in the substitute crew of cooperating with law enforcement. McIntyre did not feel that he was in danger, and Brady also assumed McIntyre was not at risk because there had been no apparent change in his relationship with Murray. Id. at 101. On November 22, a few days after the *Ramsland*'s seizure, McIntyre reported to Brady that Pat Nee, a Bulger associate, had offered him the opportunity to invest $20,000 in a drug smuggling venture. Id. In reality, the "offer" was a ruse designed to lure McIntyre to meet with Bulger and Flemmi. Id. at 102. Customs provided McIntyre with the money, and McIntyre delivered it to Nee on November 29. The next day, Nee brought McIntyre to a house in South Boston, where McIntyre had expected a social gathering. Instead, Flemmi and Bulger confronted him with their suspicion that he had been cooperating with Customs. After securing McIntyre's

-17-

confession of his complicity with law enforcement, Bulger made an unsuccessful attempt to strangle him, and then shot and killed him. Id. at 102-104. Fifteen years later, on January 14, 2000, Weeks led authorities to McIntyre's makeshift grave.[19]

Bulger and Flemmi learned that McIntyre was an informant from Connolly, who had disclosed that one of the two individuals taken off the *Valhalla* was cooperating with law enforcement. Although Connolly did not identify McIntyre by name, the information he conveyed was sufficient to reveal his identity to Bulger and Flemmi, who knew that McIntyre had been one of the two people on the ship.

## E. The FTCA Litigation

The relationship between the Winter Hill gang and the Boston Office of the FBI was publicly exposed in 1999 in a lengthy opinion issued by Judge Mark Wolf of the Massachusetts District Court in United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999), rev'd in part, 225 F.3d 78 (1st Cir. 2000).[20] In his

---

[19] McIntyre originally was buried in the basement of the house where he was killed, next to another Bulger-Flemmi murder victim, Arthur Barrett. See Barrett v. United States, 462 F.3d 28, 30 (1st Cir. 2006). A third victim, Deborah Hussey, was murdered and buried in the house in early 1985. The remains of all three were removed on Halloween night in 1985, when it appeared that the house was about to be sold, and they were re-buried in Dorchester. 447 F. Supp. 2d at 104 n.88.

[20] Francis Salemme was an associate of Bulger and Flemmi, and he was indicted with them and others in January 1995 for varied organized crime activities. Judge Wolf presided over the complex proceedings in that case. The opinion cited above reviewed the

decision, Judge Wolf outlined a possible pattern of corruption involving Bulger, Flemmi, Connolly and at least one of Connolly's FBI supervisors, John Morris.   Judge Wolf speculated in his opinion that Connolly may have disclosed McIntyre's identity to Bulger and Flemmi.  Id. at 213; see also McIntyre v. United States, 367 F.3d 38, 40 (1st Cir. 2004).

Five months later, in January 2000, McIntyre's body was recovered.    On May 25, 2000, McIntyre's estate, through its administrator  (McIntyre's   mother,   Emily  McIntyre)   and   co-administrator (his brother, Christopher McIntyre),[21] filed this action against the United States under the Federal Tort Claims Act.[22]  The statute provides that the United States may be sued for money damages for personal injury or death caused by the negligent or otherwise wrongful acts or omissions of its employees while acting within the scope of their office or employment.  28 U.S.C.

_____

background of Flemmi's and Bulger's relationship with the FBI, describing many of the same incidents detailed in the district court's opinion in this case.  Much of the analysis in Judge Wolf's opinion was devoted to Flemmi's motions to dismiss the charges against him and to suppress statements he had made to the FBI based on FBI promises of immunity.

[21] For convenience, we at times will refer to the plaintiffs in this case as McIntyre.

[22] McIntyre also asserted claims against Bulger, Flemmi, Weeks and  eight former agents of the Boston Office of the FBI, including Connolly.   The district court bifurcated the trial of the claims against the United States from the trial of the individual claims, and only the case against the government is before us.

§ 1346.[23] The McIntyre claim was premised on multiple theories: (1) that the FBI directly caused McIntyre's death when Connolly informed Bulger and Flemmi that McIntyre was cooperating with authorities, foreseeably leading to his murder, (2) that the agency indirectly caused his death through the protection its agents afforded Bulger and Flemmi, which encouraged and enabled them to commit murders, including McIntyre's, and (3) that other agents negligently supervised Connolly, failing to take corrective action even though they knew or should have known that Connolly was leaking information to Bulger and Flemmi and protecting them from investigation, arrest and prosecution. McIntyre, 367 F.3d at 41; McIntyre, 447 F. Supp. 2d at 59. The claims proceeded to trial on June 5, 2006.[24]

---

[23] The FTCA is a limited waiver of the federal government's sovereign immunity, granting federal courts jurisdiction over claims that fall within its scope. These include claims

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

[24] The district court had granted the government's motion to dismiss McIntyre's action as untimely on the ground that the prerequisite administrative claim was not filed within two years of accrual, as required by the FTCA, 28 U.S.C. § 2401(b). We reversed the dismissal and remanded after concluding that the factual predicate for McIntyre's claims could not reasonably have been known earlier. See McIntyre, 367 F.3d at 56-57.

On September 5, 2006, the district court issued its comprehensive decision in favor of the plaintiffs, reaching only the first of McIntyre's theories of liability. The court found the United States responsible for McIntyre's death "because Connolly, acting within the scope of his employment, disclosed information to Bulger and Flemmi sufficient for them to identify McIntyre as a government informant, and McIntyre's death was a foreseeable consequence of that disclosure." 447 F. Supp. 2d at 60. As noted above, the court awarded McIntyre's estate approximately $3.1 million in damages.[25]

## II.

An FTCA suit may be brought only if the conduct on which the action is based would support a cause of action against a private person under "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006). In this instance, the applicable state law is the Massachusetts wrongful death statute, which allows recovery for deaths caused by negligence. Mass. Gen. Laws. ch. 229, § 2; see also Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998).

---

[25] The damages consisted of $3 million for McIntyre's conscious suffering during the few minutes that Bulger attempted to strangle and then shot him, $100,000 for his mother's loss of consortium, and $1,876 in funeral and burial expenses.