To succeed with such a claim under the FTCA, the plaintiff must satisfy the state's standard for tort liability. Mitchell, 141 F.3d at 13. Under Massachusetts law, "a tort plaintiff must show that (1) the defendant owed him a duty, (2) the defendant breached that duty, (3) the breach constituted a proximate cause of the ensuing harm, and (4) the breach caused actual injury." Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000); see also McCloskey, 446 F.3d at 267; Jupin v. Kask, 849 N.E.2d 829, 834-35 (Mass. 2006).

In its appeal of the district court's ruling, the United States presents a narrow challenge:[26] it claims that the court erred only in concluding that Connolly's leak of McIntyre's identity fell within the scope of his employment for the FBI, the prerequisite to liability against the United States under the FTCA. See 28 U.S.C. § 1346(b)(1) (providing recovery "for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment"). The government does not take issue with the court's findings on the state-law elements of the FTCA claim: that Connolly had a duty to protect McIntyre from harm at the hands of Bulger and Flemmi because of his informant status, id. at 106-108, that

---

[26] Both parties also have appealed, on different grounds, the calculation of post-judgment interest on the damages award. Neither party disputes the assertion of the other, and we therefore touch on that issue only briefly in Section III below.

disclosure of McIntyre's identity as an informant breached that duty, id. at 108, and that McIntyre's murder was a foreseeable risk of that disclosure, id. at 111. Accordingly, we confine our discussion to the scope of employment question.

## A. Legal Principles

Whether an employee is acting within the scope of his employment for purposes of the FTCA is determined by the law of the state in which the relevant conduct occurred. Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996). Under Massachusetts law, an employee's conduct is within the scope of his or her employment if (1) it is of the kind the employee was hired to perform, (2) it occurs within "authorized time and space limits," and (3) "'it is motivated, at least in part, by a purpose to serve the employer.'" Pinshaw v. Metro. Dist. Comm'n, 524 N.E.2d 1351, 1356 (Mass. 1988) (quoting Wang Labs., Inc. v. Business Incentives, Inc., 501 N.E.2d 1163, 1163 (Mass. 1986)); see also Clickner v. City of Lowell, 663 N.E.2d 852, 855 (Mass. 1996).

The scope of employment "is not construed restrictively," Howard v. Town of Burlington, 506 N.E.2d 102, 105 (Mass. 1987); see also Commonwealth v. Jerez, 457 N.E.2d 1105, 1108 (Mass. 1983),[27]

---

[27] In Jerez, the court observed:

> We long have recognized that acts not strictly necessary for fulfilment of an agent's duties nonetheless may fall within the agent's scope of employment. The scope of an agent's authority is not construed restrictively in this Commonwealth, and on several occasions we have considered

-23-

and it may extend beyond the employee's explicit authority, Howard, 506 N.E.2d at 105. "[I]t is ordinarily the actual and customary, rather than formally described, duties which determine scope of employment." Id. at 105-106. In elaborating on the employer's responsibility for unauthorized acts, the Massachusetts Supreme Judicial Court observed:

> "If the act complained of was within the scope of the servant's authority, the master will be liable, although it constituted an abuse or excess of the authority conferred. The master . . . is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury on a third person."

Pinshaw, 524 N.E.2d at 1356 (quoting Kent v. Bradley, 480 S.W.2d 55, 57 (Tex. Civ. App. 1972)). We also have recognized that a principal may be responsible for conduct customarily within its agent's scope of employment "'even though it is established fact that the act was forbidden by the principal.'" United States v. Potter, 463 F.3d 9, 26 (1st Cir. 2006) (quoting Harold Reuschlein & William Gregory, The Law of Agency and Partnership 167 (1990)); see also Restatement (Second) of Agency § 230 ("An act, although

---

whether an intentional tort committed by an agent was performed within the scope of his employment.

457 N.E.2d at 1108 (citations omitted).

forbidden, or done in a forbidden manner, may be within the scope of employment.").[28]

The Restatement lists a number of factors to consider in determining whether unauthorized conduct is sufficiently similar or incidental to authorized conduct to be within the scope of employment, including whether the employer "has reason to expect that such an act will be done," "the similarity in quality of the act done to the act authorized," "the extent of departure from the normal method of accomplishing an authorized result," and "whether or not the act is seriously criminal." Restatement (Second) of Agency, § 229 (2)(f), (g), (i), (j).[29]  As with forbidden acts, criminal acts are not automatically outside the scope of employment. See Restatement (Second) of Agency § 231.

---

[28] The Restatement illustrates the "forbidden act" principle by giving the example of a gun salesman who has been directed never to insert a cartridge while exhibiting a gun. A salesman who violated the directive would nonetheless be acting within the scope of his employment. Restatement (Second) of Agency § 230, illus. 1 (1958); see also Potter, 463 F.3d at 26 n.10 (describing Restatement illustration).  We note that Massachusetts courts routinely rely on the Restatement in examining scope-of-employment questions. See, e.g., Clickner, 663 N.E.2d at 855; Pinshaw, 524 N.E.2d at 1356; Howard, 506 N.E.2d at 106; Wang, 501 N.E.2d at 1166-67.

[29] The other relevant factors listed in § 229(2) are: whether the act is commonly done by such employees; the time, place and purpose of the act; the previous relations between the employer and employee; the extent to which the employer's work is apportioned among different employees; whether the act is outside the employer's business or has not been entrusted to any employee; and whether the instrumentality by which the harm is done has been furnished by the employer.

## B. The District Court Decision and the Standard of Review

The district court concluded that Connolly's leak of McIntyre's identity to Bulger and Flemmi was within the scope of his employment as an FBI agent because "[t]he management of informants was both a formal job requirement and an actual and customary duty of FBI agents," 447 F. Supp. 2d at 108, and communicating with informants was the "'kind of conduct [Connolly] was employed to perform,'" 447 F. Supp. 2d at 109 (quoting Wang, 501 N.E.2d at 1166). In explaining its conclusion, the court cited, inter alia, Connolly's long relationship with Bulger and Flemmi and his responsibility to obtain information from them, which required Connolly to "maintain his relationship with them and cultivate their goodwill." Id. The court also noted the decades of protection afforded to Bulger and Flemmi by the FBI, reflecting their high value to the agency, and it pointed as well to the agency's repeated endorsement of Connolly's handling of informants. Id.

In discussing the third prong of the Massachusetts test - motivation - the court began by explicitly crediting Flemmi's testimony that he and Bulger gave Connolly in excess of $200,000 between 1981 and 1990. Id. at 110. The court acknowledged Connolly's personal interest in keeping Bulger and Flemmi happy, and found that the leak about McIntyre's identity was partially motivated by greed and the desire to maintain his friendship with

the two men.  Id. at 111.  However, the court also found that he was "motivated, at least in part, by a desire to promote the FBI's goal of taking down Cosa Nostra through the use of Bulger and Flemmi as informants."  Id.

We review the scope of employment determination de novo. Aversa, 99 F.3d at 1210.  The underlying factual findings, including the court's determination of Connolly's motive, are reviewed for clear error.  See Reyelt v. Danzell, 533 F.3d 28, 31 (1st Cir. 2008) ("[T]he [district] court's factual findings are reviewed only for clear error . . . ."); Aversa, 99 F.3d at 1212-13 (noting that district court "justifiably could find" that employee intended, "at least in part and although misguidedly, to serve an objective of his employer").

## C. Discussion

The government argues that the United States may not be held responsible for McIntyre's death because Connolly "departed in [] an extreme fashion from any recognized boundary of the employment concept . . . , committ[ing] the most fundamental and heinous betrayal of his job."  In the government's view, Connolly's action was "the opposite of the scope of employment."  In the terms of the multi-prong framework of Massachusetts law, the United States maintains that leaking McIntire's identity was neither the

-27-

kind of conduct Connolly was hired to perform (prong one) nor motivated by a purpose to serve the FBI (prong three).[30]

In support of its view, the government cites numerous ways in which Connolly's action was at odds with the FBI's interests. It emphasizes that the leak of an informant's identity is contrary to explicit FBI policy,[31] it violated Connolly's Employment Agreement with the FBI,[32] and such a disclosure would jeopardize the agency's continuing ability to recruit informants – who are a crucial tool in the FBI's investigatory efforts. The government additionally characterizes Connolly's leak of McIntyre's identity as a form of theft or embezzlement that he committed in exchange for the money and other gifts provided by Bulger and

---

[30] Prong two – requiring that the conduct occur "within authorized time and space limits" – warrants little discussion. There is no dispute that Connolly was the handler for Bulger and Flemmi when he disclosed McIntyre's identity, and his job was not confined to specific hours or locations. Consequently, prong two is easily satisfied.

[31] The FBI's Manual of Investigative Operations and Guidelines cautioned that agents must take care in handling informants "to insure that they are not provided any information other than that necessary to carry out their assignments." See Ex. 6, Guidelines, § 137-3(8) (1978).

[32] The agreement that Connolly signed acknowledges his understanding that "unauthorized disclosure of information in the files of the FBI or information I may acquire as an employee of the FBI could . . . prevent the FBI from effectively discharging its responsibilities," and he agreed never to "divulge, publish, or reveal either by word or conduct . . . to any unauthorized recipient without official written authorization by the Director of the FBI or his delegate, any information from the investigatory files of the FBI . . . or disclose any information . . . acquired as a part of the performance of my official duties."

Flemmi, and it argues that taking bribes to steal from an employer can never constitute conduct within the scope of employment.

As to motivation, the government highlights Connolly's conviction for collaborating with Bulger and Flemmi, and argues that the McIntyre leak was motivated solely by his desire to further their joint criminal enterprise and to protect them from prosecution. The government argues that there is no evidence that Connolly's revelation of McIntyre's identity was in any way intended to further the interests of the FBI; rather, it was in keeping with other acts of betrayal that he committed to advance his personal interests at the expense of the FBI and its mission.

Connolly's role as Bulger's and Flemmi's handler cannot, the government insists, place all of his interactions with them within the scope of his employment. Protecting them at any cost – and facilitating McIntyre's murder – was not the sort of conduct he was hired to perform. The government's view is perhaps best summarized by its statement at oral argument that, by the time of the McIntyre leak, "this guy [had] crossed to the other side; he was a criminal who had a day job as an FBI agent."

We understand the government's perspective. Connolly took advantage of his law enforcement status to form a corrupt relationship with Bulger and Flemmi. As a general matter, disclosing an informant's identity to violent criminals who have a penchant for murdering people whom they consider a threat seems far

-29-

outside the range of conduct Connolly was employed to perform. The McIntyre leak violated a bright-line law enforcement rule that informant identity never be revealed, and put at risk the life of an individual who was helping the FBI. There is some appeal in the government's position that such conduct is categorically outside the scope of an FBI agent's employment and that, consequently, it could only be motivated by Connolly's desire to advance his lucrative, unlawful second "career."

The government's depiction of the case, however, fails to acknowledge its extraordinary context. The factors it lists in arguing that Connolly's disclosure of McIntyre's identity fell outside the scope of his employment - including the contractual and policy prohibitions on leaks, the "'seriously criminal'" nature of his action, and its "extreme 'departure from the normal method of [handling informants],'" Reply Brief at 8 (quoting Restatement (Second) of Agency, § 229(2)(j),(i)) - paint Connolly as a lone renegade whose outrageous, unprecedented behavior could not have been anticipated by his superiors. This assessment of Connolly's conduct is unduly narrow.

Although it is undisputed that Connolly had no explicit authority to disclose McIntyre's identity, we must look to his "actual and customary" duties to determine if the leak may be considered within the scope of his employment. Howard, 506 N.E.2d at 105-106; see also Potter, 463 F.3d at 26;. As we shall explain,

-30-

we agree with the district court that Connolly's disclosure was within the boundaries of the FBI's longstanding method of handling Bulger and Flemmi through Connolly, and that it consequently is "'just'" to treat the harm caused by the disclosure "'as one of the normal risks to be borne by the business in which the servant is employed,'" Croes v. United States, 726 F.2d 31, 32-33 (1st Cir. 1984) (quoting Restatement (Second) of Agency, § 229 (cmt. a)).

1.   Prong One: Kind of Employment

The FBI as an institution had selected La Cosa Nostra as its highest priority, and it correctly viewed Bulger and Flemmi as uniquely effective tools in dismantling Winter Hill's organized crime competitor. As a result, the two men received kid-glove treatment from all levels of the FBI for decades. The district court recounts in great detail that suspicions about Bulger's and Flemmi's involvement in serious crimes were repeatedly left unexplored or were pursued minimally, and the FBI routinely departed from the agency's regulations when working with them – presumably to assure that they would remain available to provide critical LCN intelligence.

Examples of this deferential handling of Bulger and Flemmi abound in the record. They include judgments made by Headquarters personnel as well as by supervisors in the Boston Office. Among them are the following, some of which we previously have described in more detail:

-31-

(1) Bulger and Flemmi were removed from a 1979 indictment charging a scheme to fix horse races, and listed only as unindicted co-conspirators, after a request by Connolly and his then-supervisor, John Morris, because of their value to the LCN investigation.  447 F. Supp. 2d at 80;[33]

(2) At the Washington and Boston meetings in May 1982, high level FBI officials decided to retain Bulger and Flemmi as open informants despite suspicions about their roles in the Wheeler and Halloran murders.  Id. at 87;

(3) In response to a 1983 request from the Oklahoma City Office of the FBI that Bulger and Flemmi's informant files be examined for reports of activity around the time of the Wheeler and Callahan murders, Connolly wrote a report – two years after the Wheeler murder and a year after Callahan's – establishing alibis for Bulger for both dates.  Connolly's supervisors apparently accepted the report without questioning its delay, despite Connolly's conspicuous violation of FBI guidelines requiring a much prompter report under the circumstances.  Id. at 90-91;[34]

---

[33] At the time, neither Bulger nor Flemmi was officially open as an informant.  447 F. Supp. 2d at 80.

[34] The district court found that Connolly discussed the alibi for the Wheeler death with Bulger shortly after the murder, telling Bulger that if he were implicated in the killing, Connolly would say that he and Bulger had spoken by telephone the night of the murder and that Bulger was in Boston, not in Oklahoma City, at that time.  The memo Connolly prepared two years later provided just such an alibi.  447 F. Supp. 2d at 82 (citing Ex. 111, Memo from Connolly to SAC).  The Manual of Investigative Operations and

(4) When Bulger and Flemmi eventually were interviewed about the murders following an inquiry from the Tulsa Police Department, they were interviewed together at the pair's insistence, contrary to standard procedures. Id. at 91;

(5) The Boston Office files contained many references to Bulger's and Flemmi's involvement between 1965 and 1987 in loansharking and bookmaking, crimes that should have triggered investigations into their suitability to remain informants. Id. at 76-78 & n.41. Even during periods when Flemmi was closed as an informant, he was treated as an informant, and during one closed stretch in 1983, an agent who wanted to interview him approached him through Connolly. Id. at 74 (citing Tr. Day 13, at 105-107, Montanari testimony);[35]

(6) James Greenleaf, the SAC of the Boston Office from November 1982 through October 1986, testified that investigations of Bulger and Flemmi by other law enforcement agencies "just didn't register" with him. This lack of attention to the growing evidence

---

Guidelines requires that contacts with informants be recorded in the informant's file at or near the time they occurred. Ex. 6, Guidelines § 137-8(1) (1981) ("All information pertinent to our investigative responsibilities furnished by informants must be promptly reviewed, recorded, indexed, evaluated, channelized, and all other necessary action taken.").

[35] The continuity of the relationship violated FBI guidelines. The MIOG requires that, when an informant is closed because he is "no longer suitable to provide information or operational assistance, his relationship with the Bureau shall be promptly terminated." Ex. 6, § 137-17, Guidelines Part D(7).

of the pair's involvement in serious criminal activity allowed him

to avoid meaningful suitability reviews of their status.  See Tr.

Day 14, at 104.[36]

        Although the United States asserts that Bulger and Flemmi

escaped prosecution and retained their informant status, sometimes

unofficially, because none of the FBI's suspicions were validated

by concrete evidence, the record supports the district court's

observation that "the FBI was not pounding the pavement looking for

evidence that could 'stick.'  Instead, the FBI stuck its head in

the sand when it came to the criminal activities of Bulger and

Flemmi."  447 F. Supp. 2d at 93.[37]  Indeed, the deference paid to

Bulger and Flemmi did not go unnoticed by the two men.  Flemmi

_____

[36] Greenleaf testified that a suitability review should be
conducted in response to reports of serious criminal activity, but
no suitability review was conducted for Bulger and Flemmi during
his tenure as SAC of the Boston Office.  Tr. Day 14, at 53-54.  He
stated that he had received no report that they were involved in
such activity.  Id.

[37] Soon after Fitzpatrick arrived in the Boston Office in 1981,
he met with Bulger and subsequently recommended to Lawrence
Sarhatt, the SAC of the Boston Office from 1980 until November
1982, that he be closed as an informant.  Fitzpatrick thought
Sarhatt agreed with him:

    I felt . . . that he went along with it.  But whatever
    happened thereafter, there were other intervening cases,
    LCN, and so forth that intruded, and we went on with
    other stuff.

Tr. Day 8, at 17.  However, when Fitzpatrick made the same
recommendation to McWeeney, the FBI's Organized Crime Chief,
McWeeney "started telling me how valuable Mr. Bulger was."  Id. at
21.  Fitzpatrick understood that it was a Headquarters decision to
keep Bulger open.  Id. at 25.

testified that the agents in the Boston Office treated him and Bulger like colleagues, "'like we were FBI agents.'" Id. at 91 n.65 (quoting Tr. June 6, 2006, at 93-94).

Moreover, Connolly's disclosure of McIntyre's identity was neither his first nor only leak of sensitive information, and the FBI repeatedly was told of concerns that Connolly was a source of leaked information. In December 1976, Connolly learned that Castucci had provided information to the FBI about the whereabouts of two Winter Hill members. He told Bulger, who promptly arranged Castucci's murder. Id. at 79. The Boston Office received information from more than one source that Bulger and Flemmi had killed Castucci, id., but apparently never asked Connolly if he knew anything about the circumstances of the murder, id. at 80 n.44.

We previously have described the concerns expressed by local law enforcement authorities in Massachusetts and Florida concerning leaks from the Boston Office and from Connolly in particular. Although this knowledge of local concerns went to the highest levels of the FBI, the record shows no meaningful follow-up, even after Halloran's explicit report that someone in the Boston Office was leaking information to Bulger and Flemmi. Id. at 83 & n.49;[38] see also id. at 95 n.71 (noting the concerns "as early

---

[38] At trial, Agent Montanari testified that, despite Halloran's report about a leak in the Boston Office during the time he was investigating the murders, he did not believe anyone in the office

-35-

as 1982 that Bulger and Flemmi might be obtaining information concerning investigations of their criminal activities from the Boston Office itself"); Tr. Day 9, at 39-40 (Fitzpatrick testimony). Fitzpatrick testified that he was informed by SAC Sarhatt upon Fitzpatrick's arrival in Boston in 1981 that Connolly and his supervisor, Morris, might have leaked information to Bulger and Flemmi that compromised an investigation by state law enforcement authorities. Tr. Day 7, at 61. Fitzpatrick also had been told by FBI Assistant Director McKinnon, who was based at FBI Headquarters, that there were problems in the Boston Office. Asked at trial if he investigated whether Connolly was "the pipeline" for Bulger and Flemmi, Fitzpatrick responded that "[i]t wasn't part of the purview at that time. That was not part of the investigation at that time." Tr. Day 9, at 40.

Greenleaf, the SAC beginning in November 1982, testified that he was not focused on the reports that Bulger and Flemmi had sources within law enforcement generally or within the FBI, although he was concerned that they were receiving information about investigations into their activities. Tr. Day 14, at 119. He knew of no investigation being conducted in response to those reports. Id.

---

was improperly disclosing information. Tr. Day 13, at 110. He said he did not give "any credence" to rumors from other police agencies expressing distrust of Connolly. Id.

-36-

Instead, as the other law enforcement departments expressed their concerns about Connolly's relationship with Bulger and Flemmi, Connolly was being highly praised by his superiors for his handling of informants. As described supra, he consistently was given the highest possible ratings for his overall performance and his work with informants, even after questions arose about whether he might be Bulger's and Flemmi's "pipeline."

We recognize that not every agent in the FBI's Boston Office condoned Connolly's tactics or ignored every allegation of serious criminal behavior by Bulger and Flemmi. To the contrary, SAC Sarhatt looked into allegations of leaks related to a wiretap in the late 1970s and, in a personal interview of Bulger, asked if he had received any information from a member of the FBI. Bulger responded negatively. Id. at 83 n.49. Fitzpatrick, who was in charge of the C-3 Squad through the mid-1980s, testified that he locked up investigative files on the Wheeler murder after Agents Montanari and Brunnick expressed concerns that Connolly had been rifling through the material and passing information along to Bulger. Tr. Day 7, at 21-24.[39] Brunnick and Montanari amassed substantial files on the Wheeler-Halloran-Donahue-Callahan murders in what appears to have been, on their part, a good-faith investigation that was frustrated by the Boston Office's collegial

___

[39] Montanari testified that he never told Fitzpatrick about Connolly rifling through his files and did not remember Brunnick expressing such a concern. Tr. Day 13, at 89.

-37-

relationship with Bulger and Flemmi.[40]   Supervisor Ring chastised Connolly for being overly friendly with Bulger and Flemmi and instructed him to stop meeting with informants at his own home. Id. at 98; Tr. Day 16, at 76, 80 (Ring testimony).   But such discrete expressions of concern about Connolly's interactions with the pair and their possible involvement in serious criminal activity do not dispel the dominant impression created by the record that the FBI, both within the Boston Office and at Headquarters in Washington, engaged for years in a strategy that gave Connolly wide berth in his interactions with Bulger and Flemmi.

        The United States argues that, even conceding that the FBI took some steps to preserve the flow of information from Bulger and Flemmi, Connolly's disclosure of McIntyre's identity – leading foreseeably to his death – was "dramatically different from all of the other acts cited by the plaintiffs" and directly contrary to the FBI's interests.   That assertion does not fairly reflect the record.   As we have described, Connolly had revealed sensitive information in the past, including the identity of informants.   FBI Headquarters knew that other law enforcement agencies suspected Connolly of being the leak in the Boston Office, but it made no

_____

[40] The district court commented that "the investigation is more notable for what was not done than for what was done," including the absence of "serious interrogation of the prime suspects, Bulger and Flemmi."   Id. at 93.

-38-

effort to seriously investigate the allegations or to terminate Connolly's relationship with Bulger and Flemmi. Unquestionably, the disclosure at issue in this case was officially unauthorized and forbidden. However, it was not outside Connolly's customary range of activity. Even if we accept that the FBI's failure to seriously investigate the allegations against Connolly, and to instead praise his abilities, does not constitute tacit approval of his methods, the agency's attitude at least reflects a judgment that Connolly's at-the-edge conduct could be tolerated for the greater good of bringing down La Cosa Nostra. McIntyre's death was one of the consequences of that attitude.

The United States argues that deeming Connolly's leak to be within the scope of his employment leads inevitably to the conclusion that Connolly also would have been acting within the scope of his employment if he had shot McIntyre himself. That dramatic argument ignores the claim actually before us. Nothing in this record suggests that Connolly committed acts of violence himself that were condoned by the FBI. By contrast, the leak of McIntyre's identity fell within the range of activity that had become customary for Connolly without reprisal from his superiors -- despite their awareness that he may be engaging in such conduct. At some point, unauthorized conduct will cross the line between acts that fall within the employee's scope of employment and those that are so far removed from the employer's methods and purposes

that they fall outside it.  The question here was where on the spectrum to place Connolly's leak of McIntyre's identity.  For the reasons we have discussed, we hold that the scope of Connolly's employment was broad enough to encompass this kind of conduct.

2.  Prong Three: Motivation

The district court did not commit clear error in concluding that Connolly's favors to Bulger and Flemmi - including his unauthorized disclosure of confidential information - were motivated at least in part by a desire to advance the FBI's agenda. See 447 F. Supp. 2d at 111.[41]  Through his connection with Bulger and Flemmi, Connolly was able to simultaneously help the FBI succeed in its efforts against LCN and help Bulger and Flemmi in their quest to control organized crime in Boston, thereby solidifying his status in both realms.  Connolly received both salary increases and monetary awards from the FBI on the basis of his performance, which, as we have explained, was highly praised

---

[41] After noting that he credited Flemmi's testimony that Connolly received more than $200,000 in cash and gifts from Bulger and Flemmi, the district court explicitly found that "Connolly was motivated in part by greed and his friendship with Flemmi and especially Bulger."  447 F. Supp. 2d at 111.  The court then rejected the notion that Connolly's motivations were "purely personal."  Id. (emphasis omitted).  Relying on its extensive review of the decades-long history of Connolly's relationship with the two men, the court stated: "For reasons already discussed, I find that Connolly was motivated, at least in part, by a desire to promote the FBI's goal of taking down Cosa Nostra through the use of Bulger and Flemmi as informants."  Id.

-40-

because of his success in working with Bulger and Flemmi. Id. at 97.

The government points out that the record contains no direct evidence that Connolly intended to benefit the FBI by revealing McIntyre's identity, and it emphasizes that every law enforcement officer who testified stated that leaking informant identity is always harmful to investigating agencies. However, the district court did not have to find that identifying McIntyre was itself in the FBI's interest. Providing Bulger and Flemmi with any confidential information of use to them would reinforce the relationship between Connolly and his informants and invite their continued reciprocity with information about LCN. Thus, even if Connolly understood that revealing an informant's identity might in the abstract harm the FBI's future ability to recruit other informants, that does not diminish the immediate benefit Connolly would perceive for the FBI from his efforts to get useful information about LCN from these individuals. Such a cost-benefit analysis seems particularly rational in the context of the FBI's national priority to eliminate LCN. See id. at 62 (citing April 23, 1980 memo from FBI Director to Attorney General).

Hence, the facts of this case are unlike those in the cases cited by the government as examples of employee conduct that is not fairly attributed to the employer. The circumstances here are easily distinguishable, for example, from a simple

embezzlement, see In re American Biomaterials Corp., 954 F.2d 919, 924-25 (3d Cir. 1992), from a day care center employee's sexual assault of children, Worcester Ins. Co. v. Fells Acres Day Sch., 558 N.E.2d 958, 967 (Mass. 1990), and from the robbery and murder of a courier by customs agents, Attallah v. United States, 955 F.2d 776, 781 (1st Cir. 1992). In none of these cases is there a plausible theory that the employee's action could have been motivated in part by the employer's interests. See 447 F. Supp.2d at 111 n.96 (distinguishing Atallah and similar cases because "there is no obvious way in which the employees' motivations would overlap" with those of the employers). Nor does the $200,000 in money and gifts that Connolly received from Bulger and Flemmi require a finding that the McIntyre leak was solely a personal endeavor.   The record does not suggest that Connolly received payments for particular tips, but rather that he received periodic rewards as part of the ongoing relationship that the FBI expected him to nurture.[42]   The district court therefore permissibly found that the McIntyre disclosure was partially motivated by Connolly's desire to maintain his relationship with Bulger and Flemmi in order to further the FBI's effort to dismantle La Cosa Nostra.

---

[42] Flemmi testified that he exchanged money and gifts with multiple members of the C-3 Squad to maintain "goodwill and protection."   Tr. Day 2, at 93-104.

-42-

3. Conclusion on Scope of Employment

In agreeing with the district court that the FBI is responsible for McIntyre's death as the foreseeable consequence of Connolly's leak, we do not suggest that such an outcome was desired or even contemplated by Connolly's superiors. Moreover, contrary to the government's suggestion, this outcome is not a judgment that the government's interests were in fact advanced by McIntyre's murder. Our conclusion, like the district court's, is only that disclosure of McIntyre's identity was in keeping with both the deferential treatment Bulger and Flemmi regularly received from all levels of the FBI and the kind of conduct Connolly undertook on other occasions with seeming acquiescence from his superiors. As such, it fell within the scope of his employment.

## III.

The district court initially entered judgment in this case without addressing post-judgment interest. The plaintiffs subsequently filed a motion under Federal Rule of Civil Procedure 59(e) seeking an amended judgment that included interest. The court granted the motion on March 14, 2007, stating that post-judgment interest would run "only from the date a party seeking recovery of interest files the judgment with the Secretary of the Treasury until the judgment is paid." The next day, the court entered an amended judgment that did not include the timing

-43-

language, but which provided for post-judgment interest to accrue
at a rate of 5.05%.

The United States then filed its own Rule 59 motion,
arguing that, under 31 U.S.C. § 1304(b)(1), it may be liable for
post-judgment interest "only from the date of filing of the
transcript of the judgment with the Secretary of the Treasury
through the day before the date of the mandate of affirmance."  The
court denied the government's motion, and the government asks on
appeal that we explicitly hold that the statutory time period
applies to the accrual of interest.

In a cross-appeal, the plaintiffs contend that the proper
post-judgment interest rate is 5.10% rather than the 5.05% rate
specified by the district court.  The government concedes that the
higher rate is correct, and the plaintiffs do not dispute that the
statutory time period applies.  Consequently, on remand, the
district court should revise its order with respect to post-
judgment interest accordingly.

The judgment of the district court in favor of plaintiffs
is affirmed.  The case is remanded for entry of a corrected order
on post-judgment interest.  No costs are awarded.

So ordered.