UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE ESTATE OF JOHN L. MCINTYRE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) | CIVIL ACTION <br> NO. 01-10408-WGY |

MEMORANDUM AND ORDER

YOUNG, D.J.                                         September 24, 2010

I.   INTRODUCTION

After six years of complex litigation, Judge Lindsay held that the Estate of John L. McIntyre ("McIntyre") could recover under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., from the United States for leaking John McIntyre's identity as an informant to two notorious criminals who tortured and killed him. Judge Lindsay awarded McIntyre $3,101,876 in damages. On February 14, 2007, McIntyre filed a motion for attorneys' fees and costs under Federal Rule of Civil Procedure 54(d) and the Equal Access to Justice Act, 28 U.S.C. § 2412. Judge Lindsay referred the motion to Magistrate Judge Alexander who recommended the award of attorneys' fees and costs. This Court adopted Magistrate Judge Alexander's Report and Recommendation and

ordered McIntyre to submit a detailed breakdown of fees and costs. The parties continue to dispute the appropriateness of an award of attorneys' fees and costs in this case, and dispute the appropriate amount of such an award.

## II. FACTS

In 1984, McIntyre was working as a fisherman in the Boston area and had helped two notorious criminals, James "Whitey" Bulger ("Bulger") and Stephen "the Rifleman" Flemmi ("Flemmi"), in an attempt to smuggle weapons to the IRA. On October 16, 1984, McIntyre was on board the <u>Valhalla</u> with another crew member when Customs officials boarded the ship. McIntyre expressed an interest in cooperating with the Customs officals and DEA agents. He began working as an informant with these agencies, providing information about Bulger and Flemmi.

Unbeknownst to McIntyre, Bulger and Flemmi, members of the Winter Hill Gang, worked as FBI informants, providing information regarding La Cosa Nostra's activities in Boston. As La Costa Nostra was the nation's largest and most powerful organized crime family at the time, infiltrating La Costa Nostra was the FBI's top priority. For approximately twenty-five years, Bulger and Flemmi worked with FBI agent John Connolly ("Connolly") and developed a relationship that went beyond a typical agent-informant relationship. Indeed, Connolly leaked McIntyre's

identify to Bulger and Flemmi, who subsequently tortured and murdered McIntyre.

The government had documents (the "DEA-6") containing Flemmi's testimony regarding numerous crimes that he had committed with Bulger. These documents were forms used by the DEA and contained information pertinent to ongoing investigations. Flemmi provided the information memorialized in the DEA-6 in exchange for an agreement from the government that it would not seek the death penalty against him. Part of the information Flemmi provided related to McIntyre's murder, and how Flemmi became aware through Connolly that McIntyre was an informant. The government, however, refused to produce the DEA-6, claiming "law enforcement privilege."

Although the DEA-6 contained a detailed confession from Flemmi regarding the information he obtained from Connolly identifying McIntyre and the resulting murder of McIntyre, the government took the position that it had no evidence that Connolly provided Bulger and Flemmi with information on McIntyre because Flemmi did not precisely say that Connolly provided them with McIntyre's name. For instance, the government filed a motion to strike certain exhibits in McIntyre's motion for summary judgment arguing that "Flemmi cannot say that Agent Connolly told him or Bulger that McIntyre was an informant." Similarly, in response to an interrogatory asking for "facts

identify to Bulger and Flemmi, who subsequently tortured and murdered McIntyre.

The government had documents (the "DEA-6") containing Flemmi's testimony regarding numerous crimes that he had committed with Bulger. These documents were forms used by the DEA and contained information pertinent to ongoing investigations. Flemmi provided the information memorialized in the DEA-6 in exchange for an agreement from the government that it would not seek the death penalty against him. Part of the information Flemmi provided related to McIntyre's murder, and how Flemmi became aware through Connolly that McIntyre was an informant. The government, however, refused to produce the DEA-6, claiming "law enforcement privilege."

Although the DEA-6 contained a detailed confession from Flemmi regarding the information he obtained from Connolly identifying McIntyre and the resulting murder of McIntyre, the government took the position that it had no evidence that Connolly provided Bulger and Flemmi with information on McIntyre because Flemmi did not precisely say that Connolly provided them with McIntyre's name. For instance, the government filed a motion to strike certain exhibits in McIntyre's motion for summary judgment arguing that "Flemmi cannot say that Agent Connolly told him or Bulger that McIntyre was an informant." Similarly, in response to an interrogatory asking for "facts

known to you relating to the disclosure and/or leak of the decedent's identity as a cooperating witness by John Connolly or any government agent to James Bulger, Stephen Flemmi, Kevin Weeks or any member of the Bulger group," the United States responded:

> Nothwithstanding the foregoing objections, the United States is aware of <u>allegations</u> within plaintiffs' complaints that John Connolly leaked or disclosed the names of certain of plaintiffs' decedents to Bulger and Flemmi but has no knowledge of "known facts" confirming such disclosure. As to the decedent John McIntyre, the United States denies that he was a "cooperating witness" and the United States has no knowledge of any facts that would confirm that McIntyre's name was revealed by a government agent to the Bulger group.

**III. ANALYSIS**

A.  Award of Fees and Costs

The government has since given up its stated position that Connolly never provided Bulger and Flemmi with McIntyre's name. In contesting the motion for attorneys' fees, the government now argues that its response to the interrogatory above is not in bad faith because the government believed that the DEA-6 was inadmissible both as a privileged document and as hearsay and there were no "facts" known to the United States about the leak of the decedent's identity. In adopting Magistrate Judge Alexander's Report and Recommendation, this Court rejected these arguments as sophistry. The Court agrees with Judge Lindsay and Magistrate Judge Alexander that the constant refrain from the United States that it had no knowledge of facts related to the

revelation of McIntyre's name, rather than his identity, was "a distinction without a difference" and made in bad faith. Moreover, the Court also rejects the argument that the government answered the interrogatory accurately because it had no reason to consider Flemmi's confession as "facts." Bosh. This Court can engage in semantic parsing too – the government was aware of the "fact" that Flemmi had made a confession that included how he came to learn of McIntyre's identity, a "fact" they should have revealed in this civil lawsuit.

The government further argues that McIntyre is not entitled to attorneys' fees and costs because even were the witholding of the DEA-6 and the failure to refer to its contents in the interrogatory answer in bad faith (as they most assuredly were), such actions had no effect on the case. The government argues that it would have defended this case exactly the same way even were McIntyre aware of the facts because "[t]he public expects that its attorneys will defend the public fisc with zeal and not concede liability simply because Stephen Flemmi told a certain story to a DEA agent." The public may expect its attorneys to defend the public fisc with zeal, but it certainly did not expect its attorneys to do everything within their power to obfuscate evidence in this civil case while advancing an entirely different theory of reality in a related criminal case. This is duplicity pure and simple. It is unworthy of government counsel.

Moreover, to the extent that it is possible to speculate about how the case would have proceeded had McIntyre had access to the DEA-6 or the information it revealed, it seems entirely likely that the case would have ended much earlier.

Under Title 28 United States Code, section 2412(b), the government may be held liable for attorneys' fees to the same extent as a private party under the common law or the terms of a statute providing for such fees. Of the few recognized common law exceptions to the American rule against fee shifting, courts may award attorneys' fees where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975) (internal citations omitted). The federal courts' power to award such fees arises from "a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991) (internal citations omitted). The government quotes caselaw from the Second Circuit for the proposition that the award can be based only on the expenses necessary to counter the losing party's bad faith conduct, see Kerin v. United States Postal Serv., 218 F.3d 185, 192 (2d Cir. 2000), and argues that McIntyre would have expended

the same amount of funds regardless of the government's bad faith actions in this case.  Here, the government's bad faith conduct pervaded the case to such an extent that it is not possible to carve out only those expenses directly related to its conduct. Compare Davis v. United States, No. 02-11791, Order Granting in Part and Denying in Part Mot. for Attorneys' Fees, Sept. 24, 2009.  The government is, therefore, liable for reasonable fees and expenses for the entirety of the litigation.

    B.   Reasonable Fees and Expenses

Although McIntyre is entitled to reasonable fees and expenses, the Court agrees with the government that certain categories of fees are not appropriate.  The Court addresses each of the categories identified by the government in turn.

        1.   The government objects to fees related to the attaching of property of the individual defendants and for fees related to Bivens actions and motions filed by individual defendants.  The Court rules that inclusion of these fees is appropriate because McIntyre was required to maintain suits against the individual defendants in order to ensure the possibility of obtaining necessary evidence – evidence that likely would have been unnecessary but for the government's bad faith conduct.

2.  The government appropriately objects to reimbursement of fees for communications with members of Congress. The hours billed for such communications are excluded from the fee calculation.

3.  Similarly, the government objects to reimbursement for press conferences and communications with the press. Again, the hours expended on such communications are excluded, as is the $3,411.82 for subscriptions to the Boston Herald and Boston Globe newspapers.

4.  The government objects to fees associated with communications with AUSA Wyshak and Investigator Johnson. Neither party provided sufficient evidence to determine the relevance of such communications. Therefore, the hours billed for such communications are excluded.

5.  The government objects to fees related to a bankruptcy matter, surmising that they may relate to Kevin Weeks' bankruptcy. The government also objects to fees related to a motion to disqualify Attorney Denner as counsel in a related case. The associated fees are excluded.

6. The government objects to fees related to the United States' Motion for Sanctions for Failure to Comply with the Court Order to Produce Chris McIntyre's Journal.  As it appears that McIntyre could have forestalled this motion by responding to letters sent by the government with a full disclosure on the loss of the journal, the hours billed for this motion are excluded.

7. The government objects to fees related to attempts to settle with John McIntyre's widow and work related to the government's Motion to Dismiss for Failure to Prosecute in the Name of the Real Party in Interest.  The Court agrees that McIntyre's attempts to settle with the surviving spouse are not directly part of the litigation and thus the hours billed for the settlement attempts are excluded.  The Court disagrees with the government as to the time spent responding to the motion to dismiss, which was part of the litigation for which McIntyre is entitled to fees.

8. The government objects to fees related to drafting and filing the complaint.  The Court holds that it is appropriate to bill for the drafting and filing of the complaint.

9. The government objects to fees related to the cost of an application to appear before the court pro hac vice. The Court agrees with the government that the pro hac vice fee is an expense that should be borne by that attorney.

10. The government objects to fees associated with time spent working with expert witnesses because one expert was not called during trial and one expert was never qualified during trial. Much of the work an attorney performs in preparation for trial may not evidence itself during the course of trial, but is nevertheless a reasonable expenditure of time. The Court holds that these fees are appropriate. The government also objects to the amounts requested for reimbursement of the fees paid to the experts because McIntyre did not provide documentation justifying the amount. The Court agrees that the reimbursement requests totaling $18,505.31 should be excluded.

11. The government objects to the 956.55 hours in fees for conferences within the law firms. The Court agrees that it is appropriate to reduce these fees by 40%.

12. The government objects to the 303.25 hours billed for appellate work as there was no suggestion that the appeals themselves were taken in bad faith. While the specific issues pursued on appeal were not inappropriate, the government's bad faith conduct pervaded the entire litigation such that reimbursement for these fees is appropriate. The government, however, is correct that it is appropriate to discount for dual attendance at an appellate hearing. Therefore, the Court excludes the billing by Gordon and Karl for attending the oral argument in the First Circuit on March 2, 2004. Similarly, the Court excludes the billing by Gordon and Holoubek for the oral argument on March 3, 2008.

13. The government objects to 567.70 hours of billing for reviewing transcripts in this matter. The Court agrees that this billing should be reduced by 40%.

14. The government objects to 216.9 hours in fees related to reviewing transcripts in the <u>Salemme</u> matter and reviewing Judge Wolf's opinion. The Court reduces this billing by 60%.

      15.   Throughout the billing records, the attorneys billed for travel time between Boston and New Hampshire. All such travel is excluded.

      16.   McIntyre conceded four billing issues raised by the government. Each of these mistaken entries is excluded.

In addition to the objections described above, the government objected to the billing rates charged by the attorneys, the hours billed, and the number of attorneys billing. The primary objection made by the government is that in his motion for attorneys' fees and costs, McIntyre originally suggested a substantially lower reasonable market billing rate, listed substantially fewer hours billed on the matter, and fewer timekeepers. McIntyre's original estimate of $642,915.00 for fees and $72,627.48 for costs exploded into a combined total of $2,092,222.78. McIntyre explains that the original submission on February 14, 2007, contained only a "fair estimate" of the amounts sought; the higher billing rate is attributable to discussions with experienced trial counsel in the Boston area as to the appropriate billing rate; the increased hours billed and additional timekeepers materialized from a thorough review of historical billing records.

While Boston area trial counsel likely provided the listed billing rates for experienced Boston trial counsel, such rates do

not represent the actual rates being paid to Boston law firms. Clients negotiate discounts to rates or a percentage discount over the entire bill. Lawyers themselves discount the hours they bill to a client. Thus the rate suggested by the Boston area trial counsel and the historical billing records provide a total amount that does not reflect a realistic yield. After excluding all the items discussed above, the Court holds that the appropriate billing rate for this matter is $300 for partners and $100 for associates and paralegals.

## IV. CONCLUSION

Accordingly, the parties are instructed to submit a stipulated proposed form of judgment reflecting the rulings made herein within thirty (30) days of this Memorandum and Order.

SO ORDERED.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE